**CARELLA, BYRNE, CECCHI,**
   **OLSTEIN, BRODY &**
**AGNELLO P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiff*
*and the Class*

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
Sharan Nirmul
Kimberly A. Justice
Johnston de F. Whitman, Jr.
Jonathan F. Neumann
Stephanie M. Grey
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
kjustice@ktmc.com
jwhitman@ktmc.com
jneumann@ktmc.com
sgrey@ktmc.com

*Lead Counsel for Lead Plaintiff*
*and the Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE CAMPBELL SOUP COMPANY SECURITIES LITIGATION | Case No. 18-cv-14385-NLH-JS **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................1

II.    JURISDICTION AND VENUE ........................................................6

III.   PARTIES AND RELEVANT NON-PARTIES ................................7

      A.    Lead Plaintiff ........................................................................7

      B.    Defendants ............................................................................7

           1.    Campbell Soup Company .........................................7

           2.    The Individual Defendants .......................................8

      C.    Relevant Non-Parties ...........................................................9

           1.    Former Employees ..................................................9

IV.   OVERVIEW OF DEFENDANTS' FRAUD ...................................13

      A.    Campbell's Rise to Prominence as a Household Name.......13

      B.    The Company Stagnates Under Entrenched Leadership ......13

      C.    The "Fresh Revolution": Morrison's Plan to Turn Campbell Around ................15

           1.    The Early Years ....................................................15

           2.    Morrison's Acquisition Spree ................................17

           3.    Morrison Creates "C-Fresh" to Further Rebrand Campbell's Image ................................................19

      D.    The Bolthouse Recall...........................................................20

      E.    Campbell Props Up Its Stock to Fund its Largest Acquisition Ever....................23

      F.    Internally, the Company Struggles to Recover From the Bolthouse Recall and Fails to "Campbellize" C-Fresh ........................26

           1.    The Beginning of the "Death Spiral"........................26

           2.    Defendants' Efforts to Counteract the "Death Spiral" Fall Flat ................................................30

i

3. The Failed "Campbellization": The Company Exacerbates a Dire Situation by Imposing Overly Restrictive Quality Controls and Needless Cuts ...................................... 32

G. In Order to Secure Billions in Financing for the Snyder's-Lance Acquisition, Defendants Resort to Lies ................................................................... 33

H. The Bottom Falls Out: The Company Takes a $619 Million Impairment Charge on C-Fresh, Fires its CEO and Announces C-Fresh Will Be Divested .................................................................................................. 38

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................... 42

A. July 19, 2017 ................................................................................................ 42

B. August 31, 2017 .......................................................................................... 43

C. November 21, 2017 ..................................................................................... 47

D. February 16, 2018 ....................................................................................... 51

E. Defendants Violated Item 303 of Regulation S-K ................................. 55

VI. THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION ......................... 57

A. November 21, 2017 ..................................................................................... 57

B. February 16, 2018 ....................................................................................... 59

C. May 18, 2018 ................................................................................................ 61

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ............................................................ 64

A. Defendants' Actual Knowledge ................................................................. 64

B. The Fraud Concerns the Core of Campbell's Operations ....................... 67

C. Defendants' High Level Positions .............................................................. 67

D. The Individual Defendants Controlled the Contents of the Company's Public Statements During the Class Period ............................................... 68

E. Defendants Were Motivated by Financial Gain ....................................... 69

F. Campbell Revised its FY18 Guidance ........................................................ 70

G.      Morrison's Resignation...................................................................................71

H.      Defendants' SOX Certifications ............................................................72

VIII.    THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE
APPLIES.............................................................................................................73

IX.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
DOCTRINE ARE INAPPLICABLE ................................................................74

X.       CLASS ACTION ALLEGATIONS ..................................................................75

XI.      CAUSES OF ACTION .......................................................................................77

XII.     PRAYER FOR RELIEF .....................................................................................80

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff"), by and through its undersigned counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of Campbell Soup Company ("Campbell" or the "Company") from July 19, 2017 through May 17, 2018 (the "Class Period"), and were injured thereby (the "Class").

Lead Plaintiff's allegations herein are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based upon, among other things, the ongoing investigation conducted by and through its attorneys, which includes, among other things, interviews with dozens of individuals, including former employees of Campbell, a review of Campbell's public documents, conference calls concerning Campbell, the Company's United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Campbell, analyst reports and advisories about the Company, media reports concerning Campbell and information obtainable on the Internet.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This action arises out of Defendants' materially false and/or misleading statements regarding Campbell's ability to deliver "profitable growth" for fiscal year 2018 ("FY18") in its critically important Campbell Fresh ("C-Fresh") division.

2.    Campbell has long been one of the country's blue chip companies. It was started in 1869 and, propelled by its famous tomato soup, quickly rose to prominence as a household name.

3.    Like all good things, however, Campbell's uninterrupted run of success would eventually come to an end. Beginning in 2009, the Company's soup sales began to decline.

1

Campbell's share of the canned soup market retreated as well, down to 53% from roughly 67% a decade earlier.

4.      At the same time, consumer buying habits began to shift. Unlike their baby boomer predecessors—who were raised on Campbell's condensed soup—the new age millennial consumer prefers fresh foods, with ingredients they can pronounce.  In short order, millennials became the most discerning—and important—consumer yet.

5.      As a Company closely associated with canned soup, Campbell needed a strategy to remain relevant. On August 1, 2011, the Company ousted its prior CEO—who had been entrenched for over a decade—and hired Denise M. Morrison ("Morrison") to steer its turnaround.

6.      From the beginning, Morrison promised to overhaul Campbell's image. She declared a "fresh revolution" designed to "drive a new era of growth for Campbell." Morrison introduced hundreds of new products, added exotic flavor combinations and rebranded the Company's packaging efforts. Still, Campbell's sales did not improve.

7.      To deliver on Morrison's promise, the Company needed a way to break into the fresh foods market. Unable to produce fresh products organically, Morrison searched for new companies to acquire.

8.      Between 2012 and the beginning of the Class Period in July 2017, Morrison embarked on an acquisition spree unprecedented in the Company's history. In August 2012, Morrison purchased Bolthouse Farms ("Bolthouse"), a fresh foods brand and producer of refrigerated beverages, refrigerated salad dressings, and carrots, for $1.55 billion. At the time, it was the largest acquisition in Campbell's history. Morrison followed the Bolthouse acquisition with purchases of additional health foods brands, including Plum Organics, Garden Fresh Gourmet ("Garden Fresh"), and Pacific Foods of Oregon ("Pacific Foods").

9.     In January 2015, Morrison formed an entire division around her new fresh foods portfolio, dubbed C-Fresh.  Between 2015 and 2016, C-Fresh reported solid net sales and earnings. In turn, the Company ramped up production at Bolthouse and extolled the division as a growth driver.

10.     But C-Fresh's early success would be short-lived, as Campbell's efforts to scale up the business proved too much, too soon. On June 22, 2016, Bolthouse voluntarily recalled its selection of protein drinks—which held a 47% share of the market for super-premium protein beverages—"due to possible spoilage," after receiving numerous "consumer complaints, including reports of illness" (the "Bolthouse Recall").

11.     Following the Bolthouse Recall, C-Fresh's sales and earnings plummeted. For the first quarter of 2016 alone, operating profit dropped nearly 62%, and its sales declined by 5%. Morrison nonetheless assured investors that the problems at Bolthouse had been corrected, and all was back to normal.

12.     Despite Morrison's assurances, C-Fresh's problems persisted.  From September 2016 until the beginning of the Class Period, C-Fresh's (and by extension, the Company's) earnings and net sales were never able to regain the amounts reported prior to the Bolthouse Recall.

13.     Meanwhile, the Company's soup sales continued to underwhelm. And by September 2017, a new problem had arisen: Campbell was embroiled in a bitter fight with its largest retailer, Wal-Mart, Inc. ("WalMart")—which accounted for more than 40% of the Company's soup sales—over its product placement.

14.     With her acquisitions flailing and it evident internally that C-Fresh was plagued with potentially irreversible problems, Morrison sought a new blockbuster deal to disguise the problems of the prior acquisitions. By the beginning of the Class Period, discussions were well

under way with one of Campbell's largest competitors in its Global Biscuits and Snacks division, Snyder's-Lance, Inc. ("Snyder's-Lance").

15.     Critical to Campbell being able to fund the Snyder's-Lance acquisition—which it planned to do with roughly $5 billion in debt—was Campbell's credit rating, which was flirting with a downgrade based on the several quarters of poor earnings and the debt burden of the prior acquisitions. Morrison needed a plan to convince investors that Campbell was financially stable, and that C-Fresh was generating free cash flow.

16.     On the first day of the Class Period, July 19, 2017, Morrison told investors at the Company's analyst day that C-Fresh "will significantly improve," and for FY18, "Campbell Fresh would be over the [1% to 3%] range." Defendant Anthony P. DiSilvestro ("DiSilvestro") added: "We do anticipate I would call fairly significant margin expansion in C-Fresh in F'18." Investors were impressed, and Campbell's stock shot up nearly 5% overnight.

17.     Throughout the Class Period, Defendants continued to claim that C-Fresh would return to profitability in 2018.   They claimed, for example: (i) "we expect [C-Fresh] to return to profitable growth in fiscal 2018," (ii) "we do expect to see top line growth in Campbell Fresh in 2018," (iii) "the Campbell Fresh turnaround is progressing," and (iv) "we would expect to see profitability pretty quick in Campbell Fresh."   In November 2017, Morrison announced that C-Fresh had returned to normal beverage production and packaging, and again touted this in February 2018, also claiming that C-Fresh had returned to its normal promotional activities.

18.     These statements were materially false and/or misleading when made. Indeed, as multiple former employees ("FEs") have confirmed, the Company never recovered from the Bolthouse Recall, which permanently damaged customer relationships and led to a downward

"death spiral" at C-Fresh. For example, Lead Plaintiff has learned the following through the course of its investigation:

- As of August 2017, C-Fresh's sales targets were "unrealistic," "overly optimistic," "extremely aggressive," and could not be met. ¶¶ 109-12.

- In October 2017, many of C-Fresh's most important and largest national retailers were denying shelf-space to C-Fresh. Kroger stopped purchasing Bolthouse mid-sized (32 oz.) beverages, the most important driver of beverage revenue for C-Fresh, in retaliation for the Bolthouse Recall. WalMart and Publix also stopped purchasing Bolthouse's mid-sized beverages. ¶¶ 106-15. Thus, the market for a "normal capacity" of C-Fresh's beverages had all but dried up.

- By September 2017, Campbell had drastically cut C-Fresh's marketing budget by as much as 70%, outsourced much of its marketing, and laid off key marketing personnel with long-standing client relationships, all of which reflected that "management had less confidence in reaching the desired results." ¶¶ 127-34. These acts were consistent with unwinding the business, rather than resuming "normal promotional activities" as Morrison told Campbell's investors.

19.     While C-Fresh's performance continued to slide during the Class Period, Defendants reaffirmed their claim that C-Fresh was on the cusp of renewed profitability. They cited a return to "normal capacity," and claimed "beverage innovations [that] will drive improved performance in the second half."

20.     In truth, as numerous FEs disclosed, retailers were spurning C-Fresh's existing premium beverages and also turning their noses at C-Fresh's new "beverage innovations," including the Company's highly touted pea protein milk. The latter "simply wasn't selling," and was received by customers so poorly that unsold cases were given away to warehouse employees.

21.     Still Morrison was able to maintain the charade long enough to close her showcase acquisition of Snyder's-Lance. Notably, as Moody's observed in rating the deal, Campbell's 2018 cash flow was a critical component in how the Company's debt would be rated, and thus the cost to Campbell. In other words, Morrison could not close this deal if she exposed the true state of

affairs in C-Fresh, which was barreling toward a shocking write-down. The deal was approved by Snyder's-Lance shareholders on March 23, 2018, and closed on March 26, 2018.

22.    Barely two months later, the jig was up. On May 18, 2018, Campbell recorded losses of $19 million for C-Fresh, and made the shocking announcement that it was taking a ***$619 million*** impairment charge on C-Fresh alone—two-thirds of which was specifically related to Bolthouse—despite having just claimed two months earlier that it would return to profitability in the second half of 2018.

23.    The Company further announced that Morrison would be retiring, effective immediately, with no permanent successor. It would later be reported that Morrison was pushed out by the Board.

24.    Market reaction to this head-spinning negative news was swift and unforgiving. Shares of the Company's common stock tumbled over 12%, erasing billions in market capitalization.  Rather than being the growth engine poised for profitability, with a stable of innovative new beverages and operating at full capacity, C-Fresh's business was permanently impaired and ruined. Investors now seek their resulting losses from this fraud through this lawsuit.

## II.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

26.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because Defendant Campbell conducts business in this District and also maintains its administrative headquarters in this District.

28.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.      Lead Plaintiff

29.     Court appointed Lead Plaintiff Oklahoma Firefighters purchased shares of Campbell common stock on the NYSE at artificially inflated prices during the Class Period and suffered losses as a result of the conduct alleged herein.  Lead Plaintiff's Class Period transactions in Campbell common stock are reflected on the certification attached hereto as **Exhibit A**.

### B.      Defendants

#### 1.      Campbell Soup Company

30.     Defendant Campbell is a New Jersey corporation with its principal executive offices located in Camden, New Jersey.  Campbell is a global food company that manufactures and markets a range of soups and simple meals, beverages, snacks, and packaged fresh foods.  The Company operates in three divisions: (i) Simple Meals and Beverages, which includes Campbell's soups, broths, stocks, sauces, gravies, pasta, beans, canned poultry, V8 beverages, and tomato juices, (ii) Global Biscuits and Snacks, which encompasses Pepperidge Farm, Snyder's-Lance, Arnott's, and Kelsen products, and (iii) C-Fresh, which includes Bolthouse fresh carrots, carrot ingredients, refrigerated beverages, refrigerated salad dressings, Garden Fresh salsa, hummus,

dips, tortilla chips, and the Company's U.S. refrigerated soup business. During the Class Period, C-Fresh maintained its principal executive offices in Santa Monica, California.

31.     Campbell's common stock trades on the NYSE under the ticker symbol "CPB." For the fiscal years 2017 and 2018, respectively, Campbell reported total net sales of $7.89 billion and $8.68 billion.  In 2017 and 2018, C-Fresh reported total net sales of $967 million and $970 million, respectively, or 12% and 11% of Campbell's total sales. During the Class Period, Campbell's five largest customers accounted for approximately 39% of the Company's consolidated net sales.  Campbell's largest customer, WalMart, accounted for approximately 20% and 18% of the Company's consolidated net sales in 2017 and 2018, respectively.

## 2.     The Individual Defendants

32.     Defendant Morrison served as President and Chief Executive Officer of Campbell from August 2011 until May 2018.  Previously, Morrison served as Campbell's Executive Vice President and Chief Operating Officer.  Morrison also held a position on Campbell's Board of Directors from October 1, 2010 until her departure in May 2018.

33.     Defendant DiSilvestro has served as Senior Vice President and Chief Financial Officer of Campbell since May 1, 2014.  In this role, DiSilvestro is responsible for Campbell's global finance group, encompassing controllers, treasury, external development, tax, real estate, corporate audit, investor relations, and the business unit finance functions.

34.     The Defendants referenced above in ¶¶ 32-33 are referred to herein as the "Individual Defendants."

C.      **Relevant Non-Parties**

1.      **Former Employees**[1]

35.      FE 1 worked in the Company's C-Fresh division as a mid-level Sales Support Manager throughout the Class Period.  In this position, FE 1 worked with C-Fresh's marketing and field sales teams to develop sales plans to get C-Fresh's products on the shelves of C-Fresh's retail store customers.  FE 1 worked to service many of C-Fresh's major retail customers.  In the context of those customers, FE 1 was responsible for developing national channel-specific trade strategies for C-Fresh's products concerning distribution, shelving, and merchandising.  FE 1's responsibilities also included participating in quarterly review sessions with customers regarding Campbell's products at retail stores.  Additionally, FE 1 attended monthly meetings held by Defendant Morrison.  During these meetings, Morrison discussed trends impacting the sales and business strategies for the C-Fresh division.  FE 1 also worked with C-Fresh's sales strategy teams to identify and execute initiatives to meet sales targets.  As a mid-level Sales Support Manager, FE 1 reported up through Damon Caton, Vice President of Customer Planning & Business Development.

36.      FE 2 was a mid-level Financial Manager throughout the Class Period.  In this role, FE 2 often functioned as a liaison between C-Fresh and Campbell.  FE 2's responsibilities included assisting in consolidating C-Fresh's financial results into Campbell's financials and sending C-Fresh's profit and loss data to members of Campbell's finance team.  Members of Campbell's finance team included Franco Paparo, Senior Manager Financial Reporting, and Jack Legge, Manager Financial Reporting.  Additionally, FE 2 participated in monthly meetings with C-Fresh

---

[1] FEs will be identified herein by number (FE 1, FE 2, etc.).

executives where the division's monthly financial data was discussed. The executives in attendance at these monthly meetings were Dave Rooke, Senior Vice President of Farms Sales & Sales and Customer Management; Todd Putman ("Putman"), General Manager; Andrew Ross, Vice President of Bakersfield Plant Operations; Jim Caltabiano ("Caltabiano"), C-Fresh's CFO; Reyes Espinosa, C-Fresh Controller; and Financial Planning and Analysis forecasters Aaron Famersa, Rob Stevens, and Josh Ochs. During these meetings, Caltabiano informed the group that he would brief C-Fresh President Ed Carolan ("Carolan") on the discussions, who in turn briefed Defendants Morrison and DiSilvestro. FE 2 reported up through the C-Fresh Controller, Reyes Espinosa.

37. FE 3 was a mid-level Manager located in C-Fresh's Santa Monica office from before the class period until early 2018. In this role, FE 3 oversaw the sales and promotion strategies, managed brands, and helped market products for one of Bolthouse's business lines. FE 3 also attended monthly meetings, in which the C-Fresh division analyzed the FY18 sales trends and targets as well as the strategies aimed at increasing C-Fresh's sales numbers. Also in attendance at these meetings were the following C-Fresh executives: Carolan, President; Putman, General Manager; Suzan Saltzman Ginestro ("Ginestro"), Chief Marketing & Innovation Officer; Bill Lange ("Lange"), Vice President of Marketing; as well as others. Further, FE 3 attended quarterly performance reviews held by Caltabiano, C-Fresh's CFO, where Caltabiano discussed the full C-Fresh financial performance, including the details for all product lines. FE 3 ultimately reported up to Bolthouse's Vice President of Marketing, Lange.

38. FE 4 was employed as a National Major Account Representative for the C-Fresh division from mid-2017 until spring 2018. While at Campbell, FE 4 was the lead for a Major Customer Account ("MCA") #1, managing the Bolthouse and Garden Fresh brands. In this role,

FE 4 directed the development and execution of Campbell's business plans to achieve the C-Fresh's sales targets for MCA #1's stores.  Additionally, FE 4 and FE 4's team worked with Campbell's Finance Department to develop C-Fresh's FY19 projections for MCA #1.  During FE 4's time at Campbell, FE 4 reported to the Global MCA #1 Team Lead, who in turn reported to Dave Burke, the Lead Manager for the entire Diversified Channel, which includes MCA #1 and other MCAs.

39.     FE 5 served as a Senior Sales Executive for the C-Fresh division throughout the Class Period.  FE 5's responsibilities encompassed overseeing the sales strategies and execution for all C-Fresh and Garden Fresh products except for the raw carrots.  In this role, FE 5 was involved in forecasting sales and reported the sales trends to Campbell's management.  FE 5 reported to C-Fresh General Manager, Putman.

40.     FE 6 was employed as a Regional Sales Manager in the C-Fresh division throughout the Class Period.  FE 6 was responsible for C-Fresh sales in a large multi-state region of the country.  In this position, FE 6 reported up through a Vice President of C-Fresh's Sales.

41.     FE 7 was a mid-level Director of Research and Development ("R&D") for C-Fresh from summer 2017 through late 2018.  FE 7 was responsible for resolving commercialization and start-up issues related to C-Fresh's Plant Protein Milk Drink made with pea protein.  Additionally, FE 7 provided process development and packaging engineering support for C-Fresh.  In this role, FE 7 reported up through the Vice President of R&D for C-Fresh.

42.     FE 8 served as a mid-level Manager for Bolthouse and Garden Fresh.  During the Class Period, FE 8's main customer was MCA #2.  In this position, FE 8 worked with C-Fresh's sales team in an effort to meet Campbell's sales targets. FE 8's duties included meeting with MCA #2's representatives and discussing products' performances, as well as analyzing product

promotions, and selling MCA #2's new products.  Additionally, FE 8 participated in monthly meetings with C-Fresh executives Carolan, Imran Kahn, Vice President of C-Fresh sales, and Putman.

43.     FE 9 worked in the C-Fresh division as a Marketing Director throughout the entire Class Period.  FE 9's responsibilities included coordinating the sales and marketing divisions for Bolthouse and Garden Fresh.  Additionally, FE 9 participated in monthly meetings with Campbell executives, which included Defendant Morrison, regarding C-Fresh's declining sales.

44.     FE 10 was a Senior Marketing professional for C-Fresh during the Class Period. FE 10's responsibilities included bringing C-Fresh products to market, which included concept development, managing portfolios, brand management, and demand creation.  In this role, FE 10 interacted with Defendants Morrison and DiSilvestro.  FE 10 also interacted with C-Fresh President, Carolan, who reported to Defendant Morrison.

45.     FE 11 worked within R&D for C-Fresh until late 2017.  FE 11 worked with C-Fresh's R&D and Marketing teams to research, develop, and implement Bolthouse's products. Through this role, FE 11 was knowledgeable regarding the testing of Bolthouse's protein drinks for shelf stability and ingredient formulation. Additionally, FE 11 knew about the ingredient formulation research for incorporating pea protein into C-Fresh's Plant Protein Milk.

46.     FE 12 was employed as a mid-level Manager at C-Fresh's warehouse in Bakersfield, California. FE 12 held this position during the entire Class Period. FE 12's responsibilities included receiving product from the warehouse and loading it onto C-Fresh's trucks for delivery, as well as moving C-Fresh product within the warehouse facility for processing.

47.     FE 13 served as a Senior Marketing Executive for the Company's C-Fresh division during the entire Class Period.  FE 13's responsibilities included managing the marketing strategies for the entire C-Fresh product portfolio. While at C-Fresh, FE 13 reported to C-Fresh General Manager, Putman.

## IV.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     Campbell's Rise to Prominence as a Household Name

48.     Campbell first introduced its classic ready-to-eat tomato soup in 1895. During the twentieth century, Campbell expanded its soup offerings to include its famous cream of mushroom and chicken noodle soups. Since then, it has become one of America's most iconic brands. In short order, the Company's products were found in virtually every consumer's kitchen.

49.     The Company has even become famous in pop culture. "Thanks in large part to Andy Warhol," a recent TakePart article reads, "there is no American food product more symbolic of the ease, convenience, and comfortable sameness that defined midcentury kitchens than Campbell Soup."

50.     Building on the success of its soups, through the decades, the Company added some of the food industry's best known brands: Pepperidge Farm, Godiva, V-8, Swanson, SpaghettiOs and Prego.  As the Company's offerings expanded, its focus broadened as well. By the early 2000s, snack foods (chips, cookies, pretzels, goldfish etc.) had become just as important as soup to Campbell.

### B.     The Company Stagnates Under Entrenched Leadership

51.     Perhaps because of its engrained status as an American icon, the Company's leadership and innovation have largely stagnated over the years.

52.     Seven members of the Company's current 12-member Board have been in place for nine years or more. In fact, three Directors—who collectively control 41% of the Company's

13

voting stock—are the descendants of John T. Dorrance, the inventor of Campbell's condensed soup, who purchased Campbell's from its founder, John C. Campbell: Bennett Dorrance (who has served on the Board since 1989); his sister, Mary Alice Dorrance Malone, (who has served on the Board since 1990); and Archbold Dorrance van Beuren (who has served on the Board since 2009). Four other Board members are similarly well-entrenched, having joined the Board in 2002 (Randall W. Larrimore), 2003 (Chairman Les C. Vinney), 2005 (Sara Mathew), and 2009 (Nick Shreiber).

53.    Largely content to sell soup and collect dividends, the Board has been remarkably tolerant of underperforming officers and unaccountable to shareholders. As one Board member, George Strawbridge, Jr., explained in a recent legal filing against Campbell's Board: "the Board is beholden to three of its members who, as descendants of the Company founder, hold a significant bloc of the Company stock and an iron will to resist any real change at Campbell regardless of whether such change might create maximum value for all stockholders."

54.    Beginning in 2009, however, soup sales began to decline. Campbell's share of the canned soup market retreated as well, down to 53% from roughly 67% a decade earlier.

55.    By the first quarter of 2011, the Company's shares were trading at a price more than 18% lower than in the first quarter of 2007, and the Company's total stockholder return (including dividends) from the first quarter of 2001 to the first quarter of 2011 has been just 31%. Compared to its peer group during the same period, the Company stands out for its underperformance. Similar American food products companies, like McCormick and Hormel, had increased total stockholder returns by well over 219% and 229%, respectively, while others like General Mills and Hershey have increased total stockholder returns by over 108% and 84%, respectively, over the same period.

14

56.     The Company's woes have only been compounded by the large-scale macroeconomic shifts towards healthy and organic products, which had been completely lacking from Campbell's portfolio. Indeed, over the last decade, consumer buying habits have shifted towards convenient but fresh foods.  The millennial generation is more conscious of their food-buying options—and discerning in their choices—than any previous generation.  For example, a recent study by the International Food Information Council found that about 40% of millennials would rather have fresh, packaged fresh, or organic food than frozen, canned, or condensed food.

57.     This change in food purchasing habits also impacted sales at traditional grocery stores.  Since 2013, consumption of packaged fresh food has grown 5.4% a year, compared to 1.4% for shelf-stable food.  In 2015, research firm Catalina reported that 90 of the top 100 brands in consumer packaged goods had lost market share.

58.     In short, Campbell's "iconic" brands have not resonated with younger consumers, who prefer fresh foods over canned soup. As Americus Reed, a marketing professor with the University of Pennsylvania's Wharton School recently told NPR, "The challenge for these legacy brands is that the people that were born into them are going to die . . . so you better have a plan to talk to these younger types of consumers."

**C.     The "Fresh Revolution": Morrison's Plan to Turn Campbell Around**

**1.      The Early Years**

59.     As a Company closely associated with canned soup, Campbell needed a strategy to remain relevant.  In an effort to spur change, on August 1, 2011, the Company ousted its prior CEO—who had been entrenched for over a decade—and hired an up and coming leader, Morrison, to steer its turnaround as President and CEO.

60.     Prior to her appointment, Morrison had been with Campbell since 2003, most recently as Chief Operating Officer. At the time of her hire, Morrison was considered by many to

be a progressive and a visionary. In her prior roles at Campbell, she had championed controversial ideas, such as ordering higher sodium levels back in soups, while retaining a line of reduced-sodium products. Reinforcing this reputation, Morrison immediately promised dozens of new product offerings to court younger customers.

61.     Morrison announced a "new strategic direction for the company," designed to "drive a new era of growth at Campbell."   Morrison's new business strategies provided Campbell with a new direction focused on three growth areas:

> (i) stabilize and then profitably grow North American soup and simple meals;
>
> (ii) expand the Company's international presence; and
>
> (iii) drive growth in healthy beverages and baked snacks.

62.     Discussing this plan, Morrison stated, "Implementing our new strategic direction will require substantial investment to fund our new innovation process, accelerate innovation across our portfolio, and reinvigorate consumer-focused marketing to expand the equities of important brands."

63.     In the fall of 2011, Campbell began its courtship of millennial shoppers. In a little more than a year at the helm, Morrison introduced 100 new products, including a line of hipster-inspired soups under the "Campbell's Go" soup brand. To complement its new offerings, Morrison redesigned Campbell's packaging, added exotic flavor combinations, and began offering microwaveable bags in addition to its traditional line of cans. The Company also hired a chief marketing officer, a rarity for a food company, to help it connect with this Internet-savvy generation.

64.     But these efforts only went so far. Campbell's sales and performance remained relatively flat. The Company needed another way to break into the fresh foods market. Unable to produce fresh products organically, Morrison searched for new companies to acquire.

### 2. Morrison's Acquisition Spree

65.     Between 2012 and the beginning of the Class Period, the Company went on an unprecedented acquisition spree aimed at reinventing Campbell's portfolio.

66.     First, on August 6, 2012, Campbell acquired Bolthouse, a fresh-food brand, for $1.55 billion in cash.  At the time, it was the largest acquisition in the Company's history. Bolthouse was (and is) a leading producer and supplier of fresh carrots, super-premium fresh beverages, and refrigerated salad dressings.  Bolthouse provided Campbell with a significant presence on fresh food shelves in grocery stores and a new platform for expanding in the rapidly growing $12 billion market for packaged fresh foods.

67.     Commenting on the Company's excitement for the Bolthouse acquisition, Morrison stated: "Bolthouse is a great strategic fit with Campbell.  Its business platforms, capabilities, and culture are well aligned with the core growth strategies we announced last year. . . . [Bolthouse] offers exciting opportunities for expansion into adjacent packaged fresh segments that respond directly to powerful consumer trends." Later, in its 2014 annual report, Campbell proclaimed that Bolthouse was "inspiring the fresh revolution."

68.     Less than a year later, on June 13, 2013, Campbell completed the acquisition of Plum Organics, a provider of organic foods and snacks for babies, toddlers, and children, for $249 million. The brand was extremely popular among millennial mothers.  At the time, it was the number two brand of organic baby food in the United States and is the number four baby food brand overall.

69.     In a press release announcing the acquisition, Campbell's then-President of Campbell North America stated: "Plum is generating great success in the marketplace, and we believe that Campbell's resources help fuel further expansion . . . within the fast-growing premium, organic food segment."

70.     On June 29, 2015, Campbell continued with its business strategy to expand into the packaged fresh food industry by acquiring Garden Fresh for $231 million.  Garden Fresh was the number one brand for refrigerated salsa in the U.S., and also produced hummus, dips, and tortilla chips.

71.     At the time, Jeff Dunn, then President of C-Fresh, extolled the benefits of the acquisition: "Garden Fresh Gourmet provides Campbell with another platform for growth in a key strategic area – the fast-growing perimeter of the grocery store.  Garden Fresh Gourmet's on-trend products are the ideal complement to the Bolthouse Farms portfolio in the produce section and will help extend our presence in the deli section."

72.     Finally, on December 12, 2017, Campbell announced that the Company had completed yet another acquisition.  Pacific Foods was purchased for $700 million in cash.  As a leading producer of organic broth and soup and shelf-stable plant based beverages, Pacific Foods allowed Campbell to further transform its image from processed foods to a company offering fresh and healthy food options, and now specifically in the soup aisle.

73.     Morrison expressed the Company's excitement over the acquisition, stating: "Pacific Foods is an excellent strategic fit with Campbell's health and well-being portfolio with its strong position in the faster-growing natural and organic category."

74.     Morrison's run of acquisitions was unparalleled in Campbell's history. Prior to the Bolthouse acquisition in 2013, the Company had not acquired a single new brand since 2009, when Pepperidge Farm bought Eccen Panis, a producer of gourmet artisanal breads. In fact, the original Campbell Soup division had not made a deal since 1998, when the Company acquired Fortun Foods, the maker of StockPot refrigerated soups.

75.     Morrison validated these business decisions.  She touted the Company's new "growth engines," which, she claimed, would serve the dual purpose of decreasing Campbell's reliance on soup and expanding its health and well-being products consistent with consumer preferences.

76.     Analysts took notice. Regarding the Pacific Foods deal, for example, Morningstar wrote: "Despite the small size of the deal, we think it is strategic, providing Campbell with another means of bolstering its shelf space in the natural and organic aisle, which has been winning out at the expense of traditional center-store categories (growing at a midteens rate, far in excess of center-of-the store categories, where growth has remained tepid)."

### 3.     Morrison Creates "C-Fresh" to Further Rebrand Campbell's Image

77.     Three years into Morrison's tenure as CEO, Campbell's effort to rebrand itself as a legitimate player in the fresh foods market was well underway. At an investor meeting in 2014, Morrison proclaimed the Company needed to change its brand and product portfolio to account for the "***profound transformation***" in Americans' eating habits.  Carolan, the President of C-Fresh, reaffirmed this business strategy in July 2014, stating, "***Veggies are on trend and we believe the craze is here to stay***." Additionally, in Campbell's 2014 Form 10-K the Company noted the "recent consumer and retailer trends towards fresh and/or healthy products" and that Campbell "plan[ned] to increase [its] focus on [its] fresh and packaged fresh products."

78.     Formed in large part from various pieces of Morrison's acquisition spree, C-Fresh was created in January 2015. At the time, Campbell reorganized its entire business operations into three divisions focused on categories of food, as opposed to its previous geographic organization. The new divisions included: (i) Americas Simple Meals and Beverages; (ii) Global Biscuits and Snacks; and (iii) C-Fresh.

79.     In explaining its decision to create C-Fresh, the Company stated, "The fresh opportunity is so compelling that we formed an entire division around it: Campbell Fresh, which we call C-Fresh." The Company further stated: "the creation of C-Fresh positions us to bring scale and a more diverse portfolio to help customers attract the desirable health-conscious shoppers they are seeking."

80.     At the time of its creation, the C-Fresh division only included Bolthouse's portfolio of fresh carrots, carrot ingredients, refrigerated beverages, and refrigerated salad dressings. By the beginning of the Class Period, the portfolio had grown to include Garden Fresh salsa, hummus, dips and tortilla chips, and the U.S. refrigerated soup business.

81.     For a time, it appeared as if the Company's growth strategy focused on fresh foods was working. In C-Fresh's first three reportable quarters in 2015, the Company reported multi-million dollar sales and earnings for the division:

| Quarter | Net Sales | Earnings |
|---------|-----------|----------|
| Quarter Ending November 1, 2015 | $249 million | $18 million |
| Quarter Ending January 31, 2016 | $282 million | $21 million |
| Quarter Ending May 1, 2016 | $263 million | $13 million |

82.     But C-Fresh's fortunes would soon change.

**D.     The Bolthouse Recall**

83.     Bolthouse—and in particular its super premium drink options—was at the center of C-Fresh's early growth.  In 2014, Campbell announced its "first marketing programs to build the Bolthouse Farms brand," and that it was "expand[ing] the distribution of Bolthouse products." As the brand continued to gain traction, the Company recorded capital expenditures for additional

capacity expansion projects in 2015: $33 million for beverage and salad dressing capacity expansion, $12 million for warehouse capacity expansion, and $11 million for a flexible beverage production line.

84.     Campbell continued to push Bolthouse's ability to expand in 2016.  The Company recorded an additional $16 million in capital expenditures for Bolthouse's beverage and salad dressing capacity expansion.

85.     During the same period, C-Fresh reported net sales and earnings for Bolthouse as follows: (i) for 2015, $1.38 billion in net sales and $107 million in earnings; and (ii) for 2016, $1.01 billion in net sales and $60 million in earnings.

86.     The early traction for Bolthouse (and C-Fresh) was short-lived, however. On June 22, 2016, Bolthouse voluntarily recalled its selection of all-important protein drinks—which held 47% the market share for super-premium protein beverages—"due to possible spoilage that may cause the beverages to appear lumpy, taste unpleasant, and have an off odor" after receiving numerous "consumer complaints, including reports of illness."  The Bolthouse Recall affected 3.8 million bottles, distributed nationwide.

87.     After conducting an investigation into the cause of the spoiled drinks, the Company determined that its "manufacturing equipment and process" was the "primary cause of the spoilage." The implication was obvious: Morrison's forced growth at Bolthouse had proved to be too much, too soon.

88.     Underscoring the materiality of the business line to the Company's overall health, the Bolthouse Recall had an immediate impact on Campbell's earnings. On September 1, 2016, the Company reported its first quarter 2016 results. C-Fresh's operating profit plummeted nearly

62%, and its sales likewise declined by 5%—the first quarterly earnings drop since the Company created the C-Fresh division in 2015.

89.     Still, Morrison assured investors that the problems that had led to the recall had been fixed and that the impact on Campbell's earnings was temporary. On a September 1, 2016 earnings call, Morrison explained that the Company had "corrected these problems, rigorously tested the product and started shipping again." At the same time, however, she acknowledged that "production has not returned to the pre-recall levels due to new operating procedures that [the Company has] put in place, including an enhanced test and release protocol to ensure the product meets [the Company's] high quality standards."

90.     Despite Morrison's assurances, C-Fresh's problems persisted.  From September 2016 until the beginning of the Class Period, C-Fresh's (and by extension, the Company's) earnings and net sales were never able to regain the amounts reported prior to the Bolthouse Recall. Indeed, as illustrated in the graph below, C-Fresh's earnings fell from $13 million to $1 million in the quarter immediately following the recall.  Notably, as each quarter passed, C-Fresh's earnings and net sales continued to fall.



91.     At the same time, analysts continued to press the Company on when C-Fresh would return to profitability. On February 17, 2017, Deutsche Bank, for instance, wrote: "C-Fresh remains under pressure and it is not clear when this segment will return to growth."

92.     C-Fresh was not proving to be the elixir for Campbell's stagnant growth.  While less than two years prior, it had been heralded as the transformative business that would finally allow Campbell to appeal to millennial customers, by the beginning of the Class Period on July 19, 2017, analysts were openly questioning whether C-Fresh would ever be profitable again.

93.     Meanwhile, the Company's soup sales continued to underwhelm. In addition, by September 2017, a new problem had arisen: Campbell was embroiled in a bitter fight with its largest retailer, WalMart—which accounted for over 40% of the Company's soup sales and roughly 20% of the Company's total net sales—over its product placement. As Credit Suisse noted on September 5, 2017, the disagreement "threaten[s] to give more shelf space to General Mills or its Great Value brand at Campbell's expense."  Similarly, Wells Fargo reported that the fight with WalMart "will significantly impact soup season and lower sales for FY18 -- a negative revision vs. July's Investor Day."

### E.      Campbell Props Up Its Stock to Fund its Largest Acquisition Ever

94.     With her acquisitions failing, soup sales declining, and mounting internal evidence that C-Fresh was plagued with potentially irreversible problems, Morrison sought a new blockbuster deal to disguise the problems of the prior deals. By the beginning of the Class Period, discussions were well under way with one of Campbell's biggest competitors in its Global Biscuits and Snacks division, Snyder's-Lance.

95.     Snyder's-Lance is one of the largest snack food companies in the U.S., and includes snack brands such as Snyder's of Hanover pretzels, Kettle chips, and Pop Secret popcorn. In 2016,

it generated more than $2.2 billion in net revenue, with a market capitalization of approximately $3.9 billion.

96.     On December 14, 2017, it was publicly reported that Campbell would acquire Snyder's-Lance for $50.00 per share, or $6 billion in cash, the largest ever deal in the Company's 148-year history. Morrison was quoted at the time as saying, "This acquisition will dramatically transform Campbell, shifting our center of gravity and further diversifying our portfolio into the faster-growing snacking category."

97.     Analyst reaction was largely positive, but many were quick to point out the Company's recent struggles in integrating acquired companies. Barclays, for example, "estimate[d] a potential acquisition of LNCE could drive ~+8% EPS accretion to CPB, once synergies have been achieved." But it went on to explain:

> Over the past several years, CPB has made a number of acquisitions in both the snacking and packaged fresh arenas, most of which have come at relatively lofty deal multiples, but move the company's portfolio further towards areas that are more consistent with current consumer desires and therefore, better long term growth profiles. We believe moves like these probably make strategic sense, over time, however, closer in, ***the purchase multiples paid have been relatively high, in our view, execution around some of the recent C-Fresh deals has been more spotty***, and LNCE, in its own right, remains somewhat of a work in progress that CPB would need to learn to manage going forward -- which could call into question our assumed synergy target.

98.     Morgan Stanley similarly took a "generally favorable view of this transaction," but noted, "[f]or the time being, however, we maintain our UW rating given," among other things, "[a] mixed track record on recent acquisitions (e.g., Bolthouse, Garden Fresh)."

99.     And Gabelli & Company wrote:

> Campbell continues to strive for stronger top-line growth as it stabilizes soup, reinvests to expand its product portfolio, introduces new products, improves its marketing/merchandising mix and focuses on geographic expansion and adjacencies. These efforts, coupled with the acquisition of Snyder's-Lance should

24

generate significant earnings improvement over the next few years; however, without asset sales which may be considered over time management loses its flexibility near-term to continue to make acquisitions or repurchase shares.

100.    Critical to Campbell being able to fund the Snyder's-Lance acquisition was Campbell's credit rating, which was hovering at a downgrade based on several quarters of poor earnings and the debt burden of the prior acquisitions.  Campbell sought to raise debt to fund the acquisition and the cost of the debt was critical to the deal's closing.

101.    Ratings agencies expressed concern at the level of debt Campbell was assuming. A day after the deal was announced, S&P Global Ratings downgraded the Company's credit rating to BBB, just two notches above junk status. In a statement, S&P Global said: "We believe the proposed acquisition will substantially increase Campbell's debt obligations and meaningfully weaken its credit protection measures."

102.    Moody's similarly placed Campbell's A3 senior unsecured debt ratings under review. In a press release, Moody's stated, the "review for downgrade primarily reflects the significant increase in financial leverage that would result from the proposed transaction." Moody's Senior Credit Officer Brian Weddington was further quoted as saying: "Campbell should be able to reduce financial leverage steadily through core operating cash flow and cost savings, which will provide important support of the company's credit profile."

103.    When Moody's review was completed, on March 9, 2018, it downgraded Campbell's senior unsecured debt rating to Baa2 from A3. Still, Moody's concluded that the outlook for the Company going forward was "stable," which "reflects Moody's expectation that Campbell will be able to reduce debt/EBITDA below 4.0x within 24 months through core operating cash flow and cost synergies." Mr. Weddington was again quoted in the press release: "Despite Campbell's recent disappointing operating performance due to weak soup and premium

beverage sales and increased carrot and transportation costs, core cash flow should remain relatively strong."

104.   On March 15, 2018, the Company completed a $5.3 billion debt offering to fund the deal. The deal was approved by Snyder's-Lance shareholders on March 23, 2018, and closed on March 26, 2018.

105.   On March 26, 2018, in an updated report, Moody's further explained that one of the "Detailed Credit Considerations" that it had evaluated for Campbell's rating was C-Fresh's anticipated return to profitability in the second half of 2018.   According to Moody's, "The company believes that it has remediated the most of the problems in C-Fresh after modifying production processes, reorganizing the division and replacing several managers. However, it will take more time to fully recover or replace business lost due to poor service levels, some of which was likely bid away on a long-term basis. However, the C-Fresh division's sales and profitability should improve incrementally in the second half of fiscal 2018."

**F.    Internally, the Company Struggles to Recover From the Bolthouse Recall and Fails to "Campbellize" C-Fresh**

**1.    The Beginning of the "Death Spiral"**

106.   Despite Defendants' outward assurances, the Company never recovered from the Bolthouse Recall. As FE 1 explained, even when production capacities returned to normal following the Bolthouse Recall, sales were still down because of lost customer goodwill. Unhappy with the supply chain disruptions, customers retaliated by pulling shelf space previously reserved for C-Fresh products.

107.   According to one FE, C-Fresh went on a downward "death spiral" following the Bolthouse Recall in 2016, and never recovered. FE 2, a mid-level Financial Manager for C-Fresh explained: "If you don't keep the shelf full, they'll [customers] start to drop you," and "we were

26

*losing shelf space like crazy*." FE 3 added that the issues were not limited to protein drinks: "Buyers were *pissed off* about the protein and they *punished* us on the juice side" as well. FE 4, a C-Fresh National Major Account Representative for MCA #1, summed up the state of the affairs succinctly: "*We were in the penalty box.*"

108.    FE 5, who was involved in C-Fresh forecasting, "absolutely" pushed up to management that sales were slowing and trending down since the Bolthouse Recall. Still, the numbers FE 5 was told to hit were never achievable following the Bolthouse Recall. FE 5 added that Campbell was a "top down organization," meaning management said, "here's the number you need to deliver."

109.    According to FE 1, the issues from the Bolthouse Recall were known to Defendants "*for sure*," when they told the market C-Fresh would deliver "positive growth" in August 2017 based on the sales numbers reported in C-Fresh's Business Intelligence ("BI") reports.  FE 1 further explained that to indicate any growth at least for the first six months of 2018 would have been a "*miscategorization*" based on the loss of customer confidence from the Bolthouse Recall. FE 3 likewise said C-Fresh Executives like Chief Marketing and Innovation Officer Ginestro, General Manager Putman and President Carolan knew by late 2017 or early 2018 that C-Fresh sales targets for 2018 could not be met.

110.    FE 6 similarly called C-Fresh's growth goals "*unrealistic*" as of August 2017. FE 7, C-Fresh's mid-level R&D executive with responsibilities for troubleshooting commercialization and start-up issues, added that the C-Fresh leadership team was "overly optimistic" going into 2017 and 2018, and "all sales targets, EBIT, and Profit Margins were extremely aggressive" for FY18 in order to "make up for prior year" shortfalls. FE 4 agreed there was no way to meet FE 4's sales goals.

111.    Unsurprisingly, the lost customer goodwill stemming from the Bolthouse Recall was immediately apparent in the Company's internal results. For example, FE 4, a National Major Account Representative for MCA #1, suffered month-over-month ("MOM") negative growth nearly the entire Class Period. In fact, according to FE 4, MCA #1's sales were down roughly **_15%-20%_** in virtually every month leading up to and during the Class Period.

112.    Notably, FE 4 even went so far as to push back on the sales targets being handed down by the C-Fresh finance team during the Class Period. For example, FE 4 specifically told C-Fresh Finance Manager Josh Ochs and C-Fresh Analyst Anil Kumar in February or March 2018 that a 10% to 12% growth rate for MCA #1 was "**_not realistic_**" in light of the continued MOM negative growth. But no action was taken. Month after month, FE 4 reiterated similar concerns. And month after month, the targets FE 4 received from the C-Fresh Finance Team (including Ochs and Kumar) failed to incorporate any adjustments proposed by FE 4.

113.    The Company's troubles only intensified as the Class Period went on. According to FE 1, one of C-Fresh's most important retailers, Kroger, stopped purchasing its mid-sized (32 oz.) beverages in October 2017. (For context, FE 1 explained, beverages account for 40% of Bolthouse revenues, and mid-size beverages were 20% to 30% of the Beverage business.) According to FE 8, the widespread belief within Campbell was that Kroger had pulled the mid-sized beverages **_in retaliation_** for the lost sales from the Bolthouse Recall.

114.    Shortly thereafter, Campbell's largest customer—WalMart—and other large retailers, including Publix, stopped purchasing mid-sized beverages from C-Fresh. The message was clear: retailers had shifted their business elsewhere, and C-Fresh would not be able to recover the shelf space it lost following the Bolthouse Recall.

115.     The evidence of lost customer goodwill was not merely anecdotal. In fact, the retaliatory measures had a material impact on the Company's performance. Notably, FE 1 stated the $11 million loss in 2Q18 was ***due to*** the loss of the mid-sized (32 oz.) beverage segment in October 2017.

116.     Numerous additional FEs have confirmed the Company's troubles, which were well known to Defendants leading up to and during the Class Period. For example, FE 1 attended Monthly Business Review Meetings ("MBR Meetings") with Carolan, Putman, Sales Leadership, Brand Leadership, and others at the Santa Monica office. Likewise, FE 3 confirmed that Carolan, Putman, Ginestro and C-Fresh Marketing Leadership would attend the MBR Meetings. At the end of these meetings, FE 2 confirmed that Caltabiano would inform the attendees that he would confer with C-Fresh President Carolan, who would then brief Morrison and DiSilvestro.

117.     The attendees would discuss declining performance, overall loss of customer confidence and a general inability to meet forecasted targets despite the initiatives in place to help the team "claw back to plan." In particular, FE 1 recalled that C-Fresh's performance—including sales and earnings—was ***negative*** between August 2017 and June 2018.

118.     Such accounts are corroborated by numerous additional FEs who also attended MBR Meetings:

- FE 8 recalled PowerPoint slides presented at MBR Meetings which showed C-Fresh as a whole was ***trending down*** from the same period year-over-year ("YOY").

- According to FE 2, nearly every month's results were worse than the previous month, and every quarter was worse than the previous quarter. FE 2 stated there was a "***steady decline***," adding FY17 was bad, but FY18 was worse.

- FE 3, a mid-level Manager overseeing sales, managing brands, and promotion strategies for C-Fresh, stated C-Fresh, including its critically-important Bolthouse juices, were "***largely trending down***" in sales and profits in late 2017 and early 2018.

- FE 9 recalled discussing declining sales during 2017 and 2018. FE 9 added that projections were likewise always discussed at MBR Meetings, and there was always "a lot to catch up on."

119.    Such negative performance was also discussed by Defendant Morrison during monthly internal "Fireside Chats," which would be shared with the entire company via Skype. According to FE 1, it was clear from Morrison's comments between August 2017 and June 2018 that C-Fresh was not performing to sales or its earnings plan.

120.    Finally, the Company had systems in place to closely track its sales and margins, which surely would have alerted Defendants to the poor performance at C-Fresh. For example, according to FE 1, a C-Fresh mid-level Sales Support Manager, Daily Budget to Actual and Prior Year to Current Year reporting was generated through a BI platform, which interfaced with ERP software to produce "Sales Reports." The Sales Reports were generated for everyone in Sales, Marketing and other supporting roles. Notably, Defendants also had access to the Sales Reports, which showed a *downward trend* from 2017 to 2018. FE 10 communicated this data to Morrison and DiSilvestro.

### 2.    Defendants' Efforts to Counteract the "Death Spiral" Fall Flat

121.    According to FE 1, making up for the lost revenue from the Bolthouse Recall became a big topic for Morrison, Carolan and the Sales Team. The plan, discussed at monthly town hall meetings during 2017 and 2018, was to heavily promote new product launches due out in April 2018.

122.    Indeed, Defendants frequently cited new product launches when providing overly optimistic guidance to the market. For example, during the Company's 1Q18 earning call, Morrison stated, "we have strong innovation plans in place with the continued rollout of Bolthouse Farms Plant Protein Milk." In the 2Q18 Form 8-K, Morrison stated "we expect our beverage innovation plans to drive improved beverage performance in the second half." And during the

2Q18 earnings call Morrison stated, "To address this [loss of Bolthouse farms beverage shelf space], we're launching our most robust beverage innovation line. . . We believe it will begin to rejuvenate the super-premium segment . . ."

123.    Multiple FEs, however, have refuted this explanation. Fundamentally, FE 1 explained, you can't replace an established product with a history and deep customer base with a new product quickly.  It will take a while for the new product to gain traction, even if it is successful.

124.    In more practical terms, FE 7, C-Fresh's mid-level R&D executive, explained that the new plant protein milk launched in fall 2017 "simply wasn't selling." FE 7 explained that C-Fresh's customers refused to reorder the product and other stores declined to pick up the product. FE 7 personally observed in late 2017 and early 2018, that the plant protein milk sales were not hitting their targets.  According the FE 11, the plant protein milk ultimately included the use of a cheaper and less expensive peas than had been provided in customer samples.

125.    FE 12, a Warehouse Supervisor, explained that the plant protein milk was received so poorly that unsold cases were put out for warehouse employees with an "Employee Giveaway" sign. But the drink tasted so bad, nobody took it. "They couldn't give it away. It wasn't very good," FE 12 further stated. As such, excess plant protein milk sat in FE 12's warehouse on numerous occasions because no one wanted the product.

126.    Beyond the plant protein milk, FE 7 added, "I was in R&D and knew their pipeline." FE 7 then explained that the 2017 and 2018 pipeline "***wasn't strong***." Instead of being centered on new and innovative products, the new juices Morrison touted for 2018 were simply the same product line without any sugar. FE 7 emphasized that there was "not a big wow to the consumer." At best, FE 7 explained, the new juices would simply cannibalize existing juice sales.

3.   The Failed "Campbellization": The Company Exacerbates a Dire Situation by Imposing Overly Restrictive Quality Controls and Needless Cuts

127.   Apart from the issues surrounding the Bolthouse Recall, C-Fresh was facing other downward pressures—many of which were self-inflicted.

128.   For a time, C-Fresh was largely permitted to operate independently. Its constituent business units, including Bolthouse and Pacific Foods, retained their pre-acquisition employees, and maintained their own leadership structure that reported up to Campbell executives in New Jersey. But as the Bolthouse period of non-intervention (which had been negotiated at the time of the acquisition) expired in 2017, things began to change.

129.   Throughout 2017 and into 2018, the Company embarked on what internally came to be known as an effort to "Campbellize" C-Fresh. It instituted new, onerous "quality" controls derived from the Company's experience with shelf-stable canned goods, but ill-suited for the perishables. As FE 2 explained, these efforts drove costs "***through the roof***," further pressuring the Company's profit margins.

130.   Beginning in mid-2017, the Company also instituted widespread restructuring and layoffs. It pushed out longstanding C-Fresh executives in California in favor of soup executives based in New Jersey. And it replaced roughly 250 seasoned C-Fresh sales representatives with outsourced sales assistance from independent contractors at Acosta, Inc., a sales and marketing outsourcing company. As multiple FEs confirmed, including FE 10 and 8, the new sales staff lacked C-Fresh product-specific knowledge, placing further strain on already tenuous customer relationships.

131.   What's more, the Company imposed needless cost cuts. Most significantly, Campbell slashed marketing budgets. FE 13, a Senior Marketing Executive at C-Fresh, said that right after the start of FY18, the C-Fresh marketing budget was "***wiped out***." According to FE 13,

"*you can't cut your way to growth*," and budget cuts made little sense if the Company expected to grow the C-Fresh business long-term.

132.    FE 10, a senior C-Fresh marketing professional, said "[w]e had no money to drive a business or invest in growth." FE 10 added, "I had a *fraction* of the money I needed to drive demand." Simply put, the more C-Fresh got incorporated into Campbell, the more the profitability of its business cratered.

133.    FE 5 added Campbell was pulling back support for C-Fresh during the Class Period. "If you are not supporting the unit," FE 5 explained, "it will not grow."

134.    In more literal terms, by January 2018, FE 3's marketing budget was slashed by *70%*. This was "huge," and it made FE 3's sales goals "*immediately unachievable*." FE 3 further stated that such cuts were a direct "indication that management had less confidence in reaching the desired results."

### G.    In Order to Secure Billions in Financing for the Snyder's-Lance Acquisition, Defendants Resort to Lies

135.    By the beginning of the Class Period, the Company's sales and margins had been on the retreat for the better part of two years. At the same time, a confluence of internal headwinds had combined to effectively foreclose any organic path forward.

136.    Rather than confront the issues facing the Company, Morrison looked for an easy out. She found a willing target in Snyder's-Lance. She offered Snyder's-Lance shareholders an all cash, $50 per share deal—a 7% premium over the prior day's share price.  Unremarkably, they accepted this rich offer. To secure the debt needed to make the deal at least tolerable, however, Morrison needed a plan to convince investors that Campbell—and C-Fresh in particular—would again be a profit driver and generate enough cash to service the enormous debt needed for the Snyder's-Lance deal.

137.    At an investor day on July 19, 2017, the first day of the Class Period, Morrison laid

out her ambitious plan and declared the Company's "ultimate goal":

> Today, I want to put another stake in the ground, to take another step to accelerate
> our efforts. That is to declare our ultimate goal. What is our moonshot? What
> actions will inspire our people and appeal to a wide range of consumers? What will
> resonate with our customers and ultimately lead to growth rates that outperform the
> industry?
>
> Let me state it clearly and unambiguously. ***Our goal is to be the leading health and
> well-being food company***. When people look for something real to eat and
> something that tastes good, they're going to look for the food we make. We chose
> this path not because it's expedient but because we believe it represents the future
> of the food industry and that it will lead to differentiated performance.

138.    To that end, Defendants touted C-Fresh as ***the*** catalyst and growth driver. Morrison

stated C-Fresh "***will significantly improve*** under the new C-Fresh leadership team." DiSilvestro

acknowledged that "sales and margins have been negatively impacted as we rebuild capacity

following the recall of our Protein PLUS drinks last year," but assured investors "we continue to

believe our strategy is right and that C-Fresh operating margins can reach 10% within the next few

years."

139.    Later in the session, Carolan was specific: "our full fiscal '18 to '20 plan is that we

will ***consistently grow organic net sales in mid-single digits***," and "***increase operating margin to

approximately 10%***, in line with what Anthony DiSilvestro has shared." To drive this growth,

Carolan further promised that C-Fresh's "plan in fiscal '18 is to increase marketing by about 75%."

140.    During the same session, Morrison was asked about C-Fresh's ability to deliver

positive growth in 2018, to which she replied: "Campbell Fresh ***would be over the [1% to 3%]***

range."

141.    DiSilvestro was likewise asked about C-Fresh's ability to deliver "your 10% C-

Fresh margin in fiscal '18," to which he responded: "We do anticipate I would call ***fairly***

*significant margin expansion* in C-Fresh in F'18. I don't think it's [currently] over half the way to the 10%, right? But I think we will get a good chunk of it the way there."

142.    Investors were impressed, and Campbell's stock price shot up nearly 5% overnight. Following the Company's analyst day, Wells Fargo wrote: "Campbell believes that growth will come in the form of transforming product offerings to health and wellness varieties and a personalization of food choices," and "Ms. Morrison firmly stated that Campbell's goal is to become the leading health and well-being food company." Zacks Investment added: "Campbell Soup is striving to revive its top line, which hasn't witnessed a single year-over-year improvement for quite some time now."

143.    Fewer than two months later, on August 31, 2017, C-Fresh reported its fourth quarter and full year 2017 results, which included modest sales growth and negative operating margins. Yet, Morrison again declared, C-Fresh will "*return to profitable growth in fiscal 2018*." During the same call, DiSilvestro reiterated Morrison's assurances: "*we do expect to see top line growth in Campbell Fresh in 2018*." Campbell further issued FY18 financial guidance for sales growth between -2% and 0%, EBIT growth between -1% and 1%, and adjusted EPS growth between 0% and 2% (equating to EPS of $3.04 to $3.11) ("FY18 Guidance").

144.    Analysts were quick to seize on Defendants' assurances. PiperJaffray, for example, said, "We expect C-Fresh segment margins to recover from poor carrot harvests and the costs of its voluntary recall of Bolthouse Farms' Protein Plus." UBS similarly noted: "Key drivers of CPB's 2H18 weighted EPS cadence will be the lack of negative soup results given seasonality as well as a return to profitability in the C-Fresh segment." Additionally, J.P. Morgan and Gabelli & Company each reiterated Campbell's FY18 guidance, noting, respectively, "a return to sales growth in C-Fresh," and "we anticipate[] improvements across C-Fresh."

35

145.    Of course, Defendants' assurances were false. As described above, the Company had never recovered from the Bolthouse Recall. ¶¶ 106-26. Perhaps even more damning, at the same time Defendants were declaring C-Fresh would return to "profitable growth," they were slashing marketing budgets—sometimes by as much as *70%*. ¶¶ 131-34.

146.    Given the lack of support for the statements made in July and August, it was no surprise to Defendants that the Company's first quarter 2018 ("1Q18")—which included operating losses of $6 million for C-Fresh—were awful. In large part because of the performance of C-Fresh, the Company lowered its FY18 Guidance.

147.    During an earnings call the same day, Morrison deflected from the quarter's poor performance and once again reassured investors, "we're now back to normal beverage capacity," and the "***Campbell Fresh turnaround is progressing***."

148.    When DiSilvestro was later pressed by an analyst on the "margin recover[y] in the C-Fresh division," he responded, "it can turn around pretty quickly," and "***we would expect to see profitability pretty quick in Campbell Fresh.***"

149.    By the time the Company reported its 2Q18 results, on February 16, 2018—which included C-Fresh losses of $11 million—the Company was more circumspect. The press release issued the same day stated in no uncertain terms, "Campbell Fresh did not meet expectations." Morrison was also quoted in the release as saying, "This was a disappointing quarter, driven by continued challenges in U.S. soup and Campbell Fresh." With the Company's sales and margins again on the decline, it again revised its FY18 Guidance downward.

150.    Amazingly, however, Defendants continued to assure the market that C-Fresh would return to "profitable growth." Supposedly bolstered by the "most robust beverage innovation line in 2 years," Morrison promised "***improved performance*** in the back half for

Campbell Fresh." Later in the call, in response to an analyst question, DiSilvestro stated, we "expect to see ***top line growth*** and ***positive EBIT*** in Campbell Fresh in the second half of the year."

151.    Analysts were skeptical, but for the moment assuaged. Wells Fargo, for example, noted: "Following a turbulent few years, Ms. Morrison reiterated that C-Fresh's growth potential remains strong as evidenced by the leading importance of fresh products in consumer surveys of health claims." And JPMorgan added: "Campbell plans to combat these losses with innovation and announced plans to launch 19 new SKUs this spring (versus three last year), including lower sugar smoothies and juices, and plant-based beverages."

152.    Unbeknownst to the market, however, Defendants' assurances were again false. The Company's sales and margins continued to slide as customer relationships following the Bolthouse Recall were permanently damaged, and Defendants continued to "los[e] shelf space like crazy." ¶¶ 106-12. Underscoring this fact, as of October 2017, several of the Company's most important customers—including WalMart and Kroger—had stopped purchasing Bolthouse's signature mid-sized beverages ***in retaliation*** for the Bolthouse Recall. ¶¶ 113-16. The Company would never regain this shelf space—irrespective of whether or not Campbell was back to "normal beverage capacity."

153.    What's more, as numerous FEs have explained, the new plant protein milk launched in fall 2017 "simply wasn't selling." ¶¶ 121-25. And the 2017 and 2018 new pipeline "***wasn't strong***." Instead of being centered on new and innovative products, the new juices Morrison touted for 2018 were simply the same product line without any sugar. ¶¶ 121-26.

154.    In the wake of the Snyder's-Lance acquisition, the Company announced yet another reorganization. On April 5, 2018, Campbell announced that it was creating an "Accelerator Unit" to "drive growth in faster-growing spaces," including, unbelievably, C-Fresh. In the press release

announcing the new "Accelerator Unit," the Company again reaffirmed C-Fresh's ability to deliver profitable growth in 2018: "The Campbell Fresh team remains focused on **_returning its CPG business to profitable growth_** with an emphasis on innovating the Bolthouse Farms refrigerated beverage portfolio, while increasing health and well-being convenient meals and snacks."

155.     Notably, despite its outward projections of confidence, the Company further announced that C-Fresh President Carolan would be leaving Campbell "to pursue another opportunity." He would be replaced by Ana Dominguez, who had previously served as President of Campbell Canada. The Company was quick to tout Dominguez's credentials—and by extension its confidence in C-Fresh—saying at the time: "the Canadian business has demonstrated strong growth and margin expansion in its key businesses."

156.     In just over a month, Defendants' house of cards would come crashing down. Contrary to Defendants' assurances, the Company never recovered from the Bolthouse Recall. With no way to get product to store shelves, disenchanted customers left in droves and never returned. At the same time, the Company cut resources and instituted widespread layoffs—effectively stunting whatever growth opportunities existed at C-Fresh.

### H.     The Bottom Falls Out: The Company Takes a $619 Million Impairment Charge on C-Fresh, Fires its CEO and Announces C-Fresh Will Be Divested

157.     The combination of the customer backlash from the Bolthouse Recall, new quality controls, layoffs and cost cuts created what one FE called a "perfect storm." When Campbell reported its 3Q18 results, on May 18, 2018, the Company could no longer conceal the truth.  It reported C-Fresh losses of **_$19 million_**, more than had been recorded for the entire year to that point. In addition, Campbell announced that it was recording a massive **_$619 million_** pretax impairment charge, related **_entirely_** to C-Fresh.

38

158.    The $619 million impairment charge effectively confirmed that customers would never return following the Bolthouse Recall, attributing $384 million or 62% to Bolthouse alone.[2]

159.    Campbell also announced that Morrison—the architect and Class Period champion of C-Fresh—had abruptly retired. As the Company would later disclose in a definitive proxy statement filed with the SEC on October 4, 2018, Morrison's "retirement" was hardly voluntary. Instead, she was pushed out by the same Board that had gained a reputation for being overly tolerant and complacent:

> Following a review, which took place prior to the release of the Company's third-quarter results, the Board initiated a dialogue with Denise M. Morrison, the then-President and Chief Executive Officer of the Company, ***expressing its dissatisfaction with the performance and execution of the business***. After further discussion with the Board, Ms. Morrison agreed with the Board that she would retire, effective as of May 18, 2018.

160.    Commenting on the results during a conference call the same day, DiSilvestro stated, "We are all disappointed with the results of C-Fresh, and we acknowledge that they are ***unacceptable***."

161.    During the same conference call, Campbell interim CEO and Independent Director Keith R. McLoughlin ("McLoughlin") offered the following admission of ongoing long-standing problems in C-Fresh:

> As disclosed in our earnings release this morning, we delivered results that were ***below expectations, ours and yours***. Our company has clearly faced challenges. Some of those are external factors that are impacting the entire industry, and others stem from our execution. As a board member and interim CEO, ***these results are unsatisfactory and disappointing to us as well as our shareholders***.

---

[2] For the full fiscal year 2018, Campbell recorded $612 million in impairment charges "related to the Bolthouse Farms refrigerated beverages and salad dressings reporting unit, the deli reporting unit, the Bolthouse Farms carrot and carrot ingredients reporting unit." In total, Campbell recorded non-cash impairment charges of $737 million on the intangible assets of C-Fresh and the Plum Organics trademark for 2018.

*    *    *

***What must change and will change is our execution and our financial performance***. Our mandate is to create long-term value for our shareholders. We intend to take appropriate and decisive actions to ensure that Campbell is positioned to compete and win in the marketplace. ***That means we must take a fresh look at our strategies, our operations and our portfolio and to do so with urgency***.

162.    McLoughlin further promised the Company would "undertake a thorough and critical review of all aspects of our strategic and operating plans, including the composition of our entire portfolio." He assured investors that "[e]verything is on the table," and "[t]here are no sacred cows."

163.    Analysts were incensed. Credit Suisse called the Company's 3Q18 results "of ***exceedingly low quality***." UBS similarly wrote: "The immediate retirement of CEO Denise Morrison ***brings the Company's strategy into question***." Some analysts even went so far as to suggest the Company look into divesting C-Fresh. PiperJaffray, for example, wrote "After repeatedly reiterating its commitment to the C-Fresh business, we expect a strategic portfolio review to lead to a sale of Campbell's C-Fresh business."

164.    Three months later, the Company announced the results of its internal review. The announcement was again accompanied by another tacit admission that Campbell had been less than forthcoming with respect to C-Fresh during the Class Period. During a conference call on August 30, 2018, McLoughlin stated:

> Simply put, we lost focus. We lost focus strategically. ***We had too many initiatives that made the company unnecessarily complex***. We were in the food business and the ag business. We had growth businesses and we had cash businesses. We are focused on startup businesses and venture capital investment. ***We aggressively pursued the important consumer megatrend of health and well being without having clarity on our source of uniqueness or whether we brought a competitive advantage to the space***. And we depended too much on M&A to shape our business strategy.

*    *    *

40

Lastly, we lost focus in process and execution. Our management processes lack the necessary operating discipline. We created too many silos throughout the company where decision rights were unclear. We lacked agility, and we're slow to react to customer needs. And finally, *we didn't have a culture of accountability*, which led to poor execution.

165.    In perhaps the most damning admission of all, McLoughlin further announced that the Company would be divesting itself of C-Fresh:

Moving to the next slide, a major lever to drive our more focused portfolio is divesting noncore businesses. ***We are pursuing the sale of*** . . . ***our Campbell Fresh business***, which includes Bolthouse Farms, Garden Fresh Gourmet and the refrigerated soup business. These proposed divestitures represent approximately $2.1 billion in net sales in fiscal year 2018. We have engaged top-tier financial advisers to run a disciplined process that will achieve maximum value.

166.    Later, McLoughlin was asked to comment on any lesson learned from C-Fresh, and offered the following:

I think what I would say is my experiences that ***deal making works and really only works when acquired brands fit well into the buyer's capabilities and strengths***. And we've got some good example of that right now in the case of Pacific, right, and soup and the case of Snyder's-Lance and connecting that to the strengths and capabilities of Pepperidge Farm snacking. But -- and we've had some examples where that wasn't the case, carrots and, potentially, other areas. So I think that's the key learning, right? And that's how we'll leverage these most recent acquisitions and while we're getting good traction on them, candidly.

167.    The message was clear:  C-Fresh had been a failure, and these failings had been hid from the market during the Class Period by Defendants' false assurances of imminent profitability. Market reaction confirming as much was swift and to the point. In a segment titled "Ripping Off the Band-Aid," Wells Fargo remarked: "The review frowned on CPB's marrying of legacy CPG assets with Ag-focused businesses and C-Fresh's pursuit of health & wellness-oriented consumers occurred absent a clear source of competitive advantage. Given its ***striking fall***, from a 9% EBIT margin in FY13 to five consecutive operating losses through Q4 FY18, ***the Board is ready to cut cord*** and we'd agree; ***it's just not worth the trouble***." JPMorgan similarly added, "It makes sense

41

for CPB to offload its C-Fresh and international businesses, *which offer few synergies* with these core operations."

168.    Then, two weeks later, on September 12, 2018, Moody's announced that the ratings outlook for the Company were "negative." In a press release, it further stated that its "review was prompted by an unexpectedly sharp decline in profitability in Campbell's fiscal third quarter and the sudden resignation of the company's Chief Executive Office."  In a report later that month, commenting on Campbell's announcement that it was now attempting to sell C-Fresh, Moody's lamented, "Notably, C-Fresh had been described by the company as recently as last year as the future of Campbell Soup Company."

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    July 19, 2017

169.    On July 19, 2017, Campbell hosted an Institutional Investor Day.  During this conference, Morrison stated C-Fresh "*will significantly improve* under the new C-Fresh leadership team."

170.    Similarly, DiSilvestro was asked about C-Fresh's ability to deliver "your 10% C-Fresh margin in fiscal '18," to which he responded: "We do anticipate I would call *fairly significant margin expansion* in C-Fresh in F'18. I don't think it's [currently] over half the way to the 10%, right? But I think we will get a good chunk of it the way there."

171.    The statements contained in ¶¶ 169-70 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) C-Fresh "will significantly improve"; and (ii) "We do anticipate I would call *fairly significant margin expansion* in C-Fresh in F'18," Defendants had actual knowledge of at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, resulting in dramatically lower sales and profit margins for C-Fresh. ¶¶ 106-15.

- C-Fresh sales were on a downward trend from 2017 to 2018, with nearly every month's results worse than the previous month, and every quarter worse than the previous quarter. ¶¶ 108-20.

- Throughout 2017 and into 2018, Campbell instituted new "quality" control measures that were ill-suited for perishables and ultimately drove costs "through the roof." ¶¶ 127-29.

- Beginning in mid-2017, the Company conducted widespread layoffs and replaced 250 seasoned C-Fresh sales representatives with outsourced labor from Acosta, Inc. The new sales staff lacked C-Fresh product-specific knowledge, placing a strain on customer relationships. ¶ 130.

172.     Moreover, none of the statements alleged in ¶¶ 169-70 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "fairly significant margin expansion" in C-Fresh as Defendants had outlined, including the risks created by the Bolthouse Recall (resulting in impaired customer goodwill and lost shelf space), layoffs and drastic cost-cutting.

**B.     August 31, 2017**

173.     On August 31, 2017, Campbell filed a Form 8-K, signed by DiSilvestro, with the SEC.  In the press release attached to the Form 8-K ("4Q17 Press Release"), Morrison stated:

> In the fourth quarter, Global Biscuits and Snacks was soft on the top line but generated a solid double-digit earnings increase versus the year-ago quarter. Americas Simple Meals and Beverages continued to deliver against its portfolio role, with sales performance in line with the categories in which we compete and margin expansion. While Campbell Fresh sales increased slightly and the bottom line was disappointing*, we expect to return to profitable growth going forward*.

> In fiscal 2017, we have made progress in several key areas, including increasing our successful multi-year cost savings initiative to $450 million by the end of fiscal 2020.  The pending acquisition of Pacific Foods will add a purpose-driven, real food brand with a solid track record of growth to our portfolio. ***Additionally, our new Campbell Fresh leadership team has taken steps to enhance our quality***

*processes and address capacity constraints toward our objective of returning the division to growth*.

174.     On that same date, Campbell hosted a conference call to discuss the Company's fourth quarter 2017 and full year operating and financial results ("4Q17 Conference Call").  During this call, Morrison reiterated that C-Fresh would return to profitable growth in 2018:

> I'm not happy with our performance in Campbell Fresh but remain encouraged by the progress we've made this year to address our key executional issues. C-Fresh delivered modest sales growth, and *we expect this business to return to profitable growth in fiscal 2018*.
>
> *     *     *
>
> *We have plans underway to increase efficiencies as part of our overall effort to eliminate supply constraints and improve margins while delivering our new higher quality standards*. As I've said before, we've learned some tough lessons in C-Fresh. Despite the executional challenges, we remain confident in the growth potential of the Packaged Fresh category and believe our C-Fresh strategy is sound. Throughout fiscal 2017, we took steps to build a stronger foundation for growth under our new C-Fresh leadership team.
>
> Looking ahead, *we plan for the business to grow profitably in fiscal 2018* as we return to *more normal capacity* and *promotional activity* across the beverage portfolio. *We also have a robust innovation pipeline to help fuel additional growth*, and we'll begin to introduce new beverage products to the market such as plant protein milk.

175.     Later in the call, Defendants were pressed on the viability of the FY18 Guidance. In response to an analyst question, DiSilvestro responded:

> **Q [Citigroup Analyst]:** But so can you just comment on the fullness of this guidance? Is there something else here? Because negative 2% to 0%, it just -- it doesn't seem to flip to some of the stuff that I thought you were saying at Analyst Day about the turnaround in C-Fresh and these opportunities in biscuits. I just feel like we were getting a bit more negative of a figure today, and maybe it's not only related to the soup issue, but would just love for you to elaborate if you can.
>
> **A [DiSilvestro]:** Yes, so if I think about it and its components, we – as Denise said, *we do expect to see top line growth in Campbell Fresh in 2018* as we get the capacity for beverage back up to where we need to be. We turned on the

44

promotional program.  That's kind of happening now as we speak, ***so we do expect growth there***.

176.    In connection with this conference call, Campbell issued and published a series of slides on its corporate website.  One of these slides entitled, "Outlook for FY 18," which was presented by Morrison, further touted C-Fresh's ability to reach "***profitable growth***."



177.    The statements contained in ¶¶ 173-76 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "we expect [C-Fresh] to return to profitable growth going forward"; (ii) "we expect this business [C-Fresh] to return to profitable growth in fiscal 2018"; (iii) "we plan for the business [C-Fresh] to grow profitably in fiscal 2018"; and (iv) "we do expect to see top line growth in Campbell Fresh in 2018," Defendants had actual knowledge of at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, resulting in dramatically lower sales and profit margins for C-Fresh. ¶¶ 106-15.

45

- As of August 2017, C-Fresh's sales targets were "unrealistic," "overly optimistic," "extremely aggressive," and could not be met. ¶¶ 109-12.

- Morrison hosted monthly internal Company-wide "Fireside Chats," which would be shared via Skype, between August 2017 and June 2018 in which she discussed C-Fresh's negative performance. ¶ 119.

- C-Fresh sales were on a downward trend from 2017 to 2018, with nearly every month's results worse than the previous month, and every quarter worse than the previous quarter. ¶¶ 108-20.

- Throughout 2017 and into 2018, Campbell instituted new "quality" control measures that were ill-suited for perishables and ultimately drove costs "through the roof." ¶¶ 127-29.

- Beginning in mid-2017, the Company conducted widespread layoffs and replaced 250 seasoned C-Fresh sales representatives with outsourced labor from Acosta, Inc. The new sales staff lacked C-Fresh product-specific knowledge, placing a strain on customer relationships. ¶ 130.

178.    Moreover, none of the statements alleged in ¶¶ 173-76 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "profitable growth" for C-Fresh as Defendants had outlined, including the risks created by the Bolthouse Recall (resulting in impaired customer goodwill and lost shelf space), layoffs and drastic cost-cutting.

179.    In addition, the statements contained in ¶¶ 173-76 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "We have plans underway to increase efficiencies as part of our overall effort to eliminate supply constraints and improve margins while delivering our new higher quality standards," and (ii) "we plan for the business to grow profitably in fiscal 2018 as we return to more normal capacity," Defendants knew or were deliberately reckless in not knowing that, irrespective of their capacity and operational levels, C-Fresh would never return to pre-Bolthouse Recall profitability or sales performance based on at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, resulting in dramatically lower sales and profit margins for C-Fresh. As such, C-Fresh no longer had a market to supply with its normal beverage capacity. ¶¶ 106-15.

180.    Finally, the statements contained in ¶¶ 173-76 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, "[w]e also have a robust innovation pipeline to help fuel additional growth," Defendants knew, or were deliberately reckless in not knowing, at least the following:

- The 2017 and 2018 product pipeline "wasn't strong," as the new products were the same as the original, only without any sugar. As such, the new products would simply cannibalize existing sales. ¶¶ 121-26.

**C.    November 21, 2017**

181.    On November 21, 2017, Campbell hosted a conference call to discuss the Company's 1Q18 financial results.  During this call, Morrison stated, in part:

> ***For fiscal 2018, our outlook for sales remains unchanged***.  We continue to expect net sales to be in the range of minus 2% to flat for the year.

> *             *             *

> ***We're now back to normal beverage capacity***. Our new co-packer was fully operational midway through the quarter and our service levels steadily improved, ***helping us instill confidence with customers. As a result, we started to return to more normal levels of promotional activity late in the quarter and expect that trend to continue in the second quarter***.

> Looking ahead, we have ***strong innovation plans*** in place with the continued rollout of Bolthouse Farms Plant Protein Milk, new Garden Fresh Gourmet fresh soup and salsa products in the first half and a range of Bolthouse Farms [indiscernible] and beverages in the back half.

> *             *             *

> Simple Meals, Canada and Foodservice performed well and ***the Campbell Fresh turnaround is progressing***.

182.    Additionally, during this call, Defendants were questioned concerning when C-Fresh would begin generating a profit.  In response, DiSilvestro stated, in part:

> **Q [Stifel, Nicholaus Analyst]:** And then if I could just ask a quick question on the margin recovery in the C-Fresh division . . . . [I]it seems like that business should get back to profit -- generating operating profit, does that happen as quickly as Q2? Or is there an upfront investment that may kind of slow that rebuild in profitability in that division?
>
> **A [DiSilvestro]:** Yes, a couple of things. I would say if we didn't have this yield issue in Q1, Campbell Fresh's division would've generated a profit.  ***So yes, it can turn around pretty quickly.***  We'll have a little bit of a lingering impact of the carrot yield issue into the second quarter. Denise mentioned we're on allocation. That should be behind us by December. ***So we would expect to see profitability pretty quick in Campbell Fresh. And as we've said before, on a full year basis, we would expect to deliver both top and bottom line growth***.

183.    Later in the call, Defendants were asked again about the Company's ability to deliver positive results for FY18:

> **Q [Goldman Sachs Analyst]:** And then, the second question, I think, comes back to a lot of the questions you've gotten today. They all sort of tether back to the believability of your ability to get the acceleration you're talking about in the back half. . . . I mean, at minimum, it sounds like your guidance implies 150 basis points of expansion, minimum in the back half of the year. Can you give us a little more teeth or a little more meat on the bone in terms of the drivers of those dynamics to help restore some credibility in that path of acceleration?
>
> **A [DiSilvestro]:** Yes. I would say, typically, our cost productivity program is more kind of, I would say, back-end weighted as opposed to front end, given the seasonality of the business and our ability to get into some of the plants when there's some downtime. So that's certainly more back half than front half. The other thing is this mix issue of soup in the first quarter, in effect, should turn as we go through the balance of the year, so that's a positive. And the third, as I said before, on our cost savings program, which is an addition to the productivity program, a lot of that should be coming in the back half as well. ***So we do expect to see improved gross margin performance in the back half***.

184.    Immediately following DiSilvestro's statement, Morrison reaffirmed his promise:

"***Yes. In the back half [we do expect to see improved gross margin performance], we have a greater mix in*** our Global Biscuits and Snacks business ***and Campbell Fresh***."

48

185.    The statements contained in ¶¶ 181-84 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "[f]or fiscal 2018, our outlook for sales remains unchanged," (ii) "the Campbell Fresh turnaround is progressing," (iii) "we would expect to see profitability pretty quick in Campbell Fresh. And as we've said before, on a full year basis, we would expect to deliver both top and bottom line growth," and (iv) "we do expect to see improved gross margin performance in the back half," Defendants had actual knowledge of at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, including, for example, Bolthouse's mid-sized (32 oz.) beverages, which accounted for up to 30% of Bolthouse's beverage revenues. ¶¶ 106-15.

- As of August 2017, C-Fresh's sales targets were "unrealistic," "overly optimistic," "extremely aggressive," and could not be met. ¶¶ 109-12.

- Morrison hosted monthly internal Company-wide "Fireside Chats," which would be shared via Skype, between August 2017 and June 2018 in which she discussed C-Fresh's negative performance. ¶ 119.

- C-Fresh sales were on a downward trend from 2017 to 2018, with nearly every month's results worse than the previous month, and every quarter worse than the previous quarter. ¶¶ 108-20.

- Throughout 2017 and into 2018, Campbell instituted new "quality" control measures that were ill-suited for perishables and ultimately drove costs "through the roof." ¶¶ 127-29.

- Beginning in mid-2017, the Company conducted widespread layoffs and replaced 250 seasoned C-Fresh sales representatives with outsourced labor from Acosta, Inc. The new sales staff lacked C-Fresh product-specific knowledge, placing a strain on customer relationships. ¶ 130.

- In or around September 2017, Campbell drastically cut C-Fresh's marketing budget by as much as 70%, an "indication that management had less confidence in reaching the desired results." ¶¶ 131-34.

49

186.    Moreover, none of the statements alleged in ¶¶ 181-84 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "profitable growth" for C-Fresh as Defendants had outlined, including the risks created by the Bolthouse Recall (resulting in impaired customer goodwill and lost shelf space), layoffs, and drastic cost-cutting, including to marketing budgets.

187.    In addition, the statements contained in ¶¶ 181-84 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, (i) "We're now back to normal beverage capacity," and (ii) "Our new co-packer was fully operational midway through the quarter and our service levels steadily improved, helping us instill confidence with customers," Defendants knew or were deliberately reckless in not knowing that, irrespective of their capacity and operational levels, C-Fresh would never return to pre-Bolthouse Recall profitability or sales performance based on at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, including, for example, Bolthouse's mid-sized (32 oz.) beverages, which accounted for up to 30% of Bolthouse's beverage revenues. As such, C-Fresh no longer had a market to supply with its normal beverage capacity.  ¶¶ 106-15.

188.    What's more, the statements contained in ¶¶ 181-84 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, "we started to return to more normal levels of promotional activity late in the quarter and expect that trend to continue in the second quarter," Defendants knew or were deliberately reckless in not knowing, at least the following:

- In or around September 2017, Campbell drastically cut C-Fresh's marketing budget by as much as 70%, an "indication that management had less confidence in reaching the desired results." ¶¶ 131-34.

189.     Finally, the statements contained in ¶¶ 181-84 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, "we have strong innovation plans," Defendants knew, or were deliberately reckless in not knowing, at least the following:

- The 2017 and 2018 product pipeline "wasn't strong," as the new products were the same as the original, only without any sugar. As such, the new products would simply cannibalize existing sales. ¶¶ 121-26.

- As of fall 2017, C-Fresh's new plant protein milk "simply wasn't selling," and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either. ¶ 126.

**D.     February 16, 2018**

190.     On February 16, 2018, Campbell filed a Form 8-K, signed by DiSilvestro, with the SEC. In the press release attached to the Form 8-K ("2Q18 Press Release"), Morrison stated:

> Looking ahead to the spring, ***we expect our beverage innovation plans to drive improved beverage performance*** in the second half. We are committed to returning this business to ***profitable growth***."

191.     On February 16, 2018, Campbell hosted a conference call to discuss the Company's second quarter 2018 financial results.  During this call, Morrison stated:

> As I mentioned at the outset, ***the C-Fresh team has made progress in overcoming several of its operational challenges, namely we've improved beverage and carrot quality, addressed capacity constraints in beverages, and returned the CPG business to competitive promotional levels***.
>
> *             *             *
>
> Several customers recently reset their premium juice category, reducing space in the super premium segment. ***Because of these resets and our previous supply constraints, Bolthouse Farms lost some shelf space, which hurt beverage sales in the quarter***.
>
> ***To address this, we're launching our most robust beverage innovation line in 2 years***. Our upcoming beverage innovation suite is designed to address the sugar issue and evolve our beverage portfolio to be in step with consumer preferences. . . . . We're launching 19 beverage SKUs this spring compared to just 3 a year ago.

Additionally, we're building on the initial success of our alternative dairy drink, Bolthouse Farms Plant Protein Milk, by expanding our plant-based offerings in the ultra-premium segment with 3 new protein varieties of 1915 by Bolthouse Farms. *We expect our spring beverage innovations will drive improved performance in the second half*.

*   *   *

In closing, this was a difficult quarter, and I'm not satisfied with our performance. *We're continuing to take actions to improve our execution and expect better results in the second half*. We've made progress with our key customer around soup, and we now expect sales declines in soup to moderate in the second half. We have plans in place to combat the headwinds in the super-premium beverage category segment and expand our presence in the ultra-premium segment of the market. *We expect our robust beverage innovation and marketing to lead to improved performance in the back half for Campbell Fresh*.

192.    Morrison continued, adding, "At the highest level, we know that consumer preferences for fresh and healthier food continues to be strong, and we remain confident in the growth potential of the packaged fresh category. *We're focused on improving our execution and returning C-Fresh to profitable growth*."

193.    Later in the call, Defendants were asked specifically about C-Fresh's ability to recover in the second half of 2018:

> **Q [Citigroup Analyst]:** But C-Fresh, is profit recovery tied to sales growth? And then just explaining that a little further, what I'm trying to get at is, shouldn't we see profit recovery from these depressed levels even if sales are constant? And then related to C-Fresh, but on the sales line specifically, what is the second half expectation? It sounds like you're telling us that there should be a sizable boost with all the new product activity. But I'd really like to calibrate expectations well. The segment's been hard for us to forecast.
>
> **A [Morrison]:** What we have going on in the second half of the year is we have *much more robust innovation in beverages*, coupled with our supply constraints behind us and a normal promotional schedule. *It's the first time that we had all 3 legs of the stool going for us, and that's why we're optimistic that we can make significant gains in the beverage business in the back half of the year. And the rest of our CPG business in Campbell Fresh is positive growth.* So getting beverages back to growth and continuing that momentum in the other parts of the business -- and that's the higher-margin part of the business, is an important idea.

52

In carrots, carrots and carrot ingredients actually grew. However, because of the yield issue we had due to the adverse weather, it cost us more and, therefore, affected our profitability. Given that, we have very robust plans in the supply chain, and with improve productivity, to make margin improvements in this business. And we are very, very focused on executing those. ***So the growth of the top line in the CPG business, coupled with the improvement of margins from the supply chain and productivity programs, should give us a much more profitable growth algorithm on this business***.

194.    In response to the same question, DiSilvestro also stated in part, "But just to add to that, the margin recovery is not sales dependent. ***And we would expect to see top line growth and positive EBIT in Campbell Fresh in the second half of the year***."

195.    The statements contained in ¶¶ 190-94 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "[w]e are committed to returning this business to profitable growth," (ii) "[w]e're focused on improving our execution and returning C-Fresh to profitable growth," (iii) "the rest of our CPG business in Campbell Fresh is positive growth," and (iv) "we would expect to see top line growth and positive EBIT in Campbell Fresh in the second half of the year," Defendants had actual knowledge of at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, including, for example, Bolthouse's mid-sized (32 oz.) beverages, which accounted for up to 30% of Bolthouse's beverage revenues. ¶¶ 106-15.

- As of August 2017, C-Fresh's sales targets were "unrealistic," "overly optimistic," "extremely aggressive," and could not be met. ¶¶ 109-12.

- Morrison hosted monthly internal Company-wide "Fireside Chats," which would be shared via Skype, between August 2017 and June 2018 in which she discussed C-Fresh's negative performance. ¶ 119.

- C-Fresh sales were on a downward trend from 2017 to 2018, with nearly every month's results worse than the previous month, and every quarter worse than the previous quarter. ¶¶ 108-120.

- Throughout 2017 and into 2018, Campbell instituted new "quality" control measures that were ill-suited for perishables and ultimately drove costs "through the roof." ¶¶ 127-29.

- Beginning in mid-2017, the Company conducted widespread layoffs and replaced 250 seasoned C-Fresh sales representatives with outsourced labor from Acosta, Inc. The new sales staff lacked C-Fresh product-specific knowledge, placing a strain on customer relationships. ¶ 130.

- In or around September 2017, Campbell drastically cut C-Fresh's marketing budget by as much as 70%, an "indication that management had less confidence in reaching the desired results." ¶¶ 131-34.

196.    Moreover, none of the statements alleged in ¶¶ 190-94 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "profitable growth" for C-Fresh as Defendants had outlined, including the risks created by the Bolthouse Recall (resulting in impaired customer goodwill and lost shelf space), layoffs, and drastic cost-cutting, including to marketing budgets.

197.    In addition, the statements contained in ¶¶ 190-94 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, (i) "the C-Fresh team has made progress in overcoming several of its operational challenges, namely we've . . . addressed capacity constraints in beverages," (ii) "Because of these resets and our previous supply constraints, Bolthouse Farms lost some shelf space, which hurt beverage sales in the quarter," (iii) "our supply constraints [are] behind us,"  Defendants knew or were deliberately reckless in not knowing that, irrespective of their capacity and operational levels, C-Fresh would never return to pre-Bolthouse Recall profitability or sales performance based on at least the following:

- Customer goodwill had been permanently damaged, as C-Fresh's largest and most important customers, including WalMart, Kroger, and Publix, had permanently reduced shelf space for C-Fresh's most important beverages products, including, for example, Bolthouse's mid-sized (32 oz.) beverages, which accounted for up to 30% of Bolthouse's beverage revenues. As such, C-Fresh no longer had a market to supply with its normal beverage capacity.  ¶¶ 106-15.

198.    What's more, the statements contained in ¶¶ 190-94 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, they had (i) "returned the CPG business to competitive promotional levels," and (ii) resumed a "normal promotional schedule," Defendants knew, or were deliberately reckless in not knowing, at least the following:

- In or around September 2017, Campbell drastically cut C-Fresh's marketing budget by as much as 70%, an "indication that management had less confidence in reaching the desired results." ¶¶ 131-34.

199.    Finally, the statements contained in ¶¶ 190-94 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "we expect our beverage innovation plans to drive improved beverage performance in the second half. We are committed to returning this business to profitable growth," (ii) "[w]e expect our spring beverage innovations will drive improved performance in the second half," and (iii) "[w]e expect our robust beverage innovation and marketing to lead to improved performance in the back half for Campbell Fresh," Defendants knew or were deliberately reckless in not knowing, at least the following:

- The 2017 and 2018 product pipeline "wasn't strong," as the new products were the same as the original, only without any sugar. As such, the new products would simply cannibalize existing sales. ¶¶ 121-26.

- As of fall 2017, C-Fresh's new plant protein milk "simply wasn't selling," and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either. ¶ 126.

### E.    Defendants Violated Item 303 of Regulation S-K

200.    Defendants also violated their obligations pursuant to Item 303 of SEC Regulation S-K by failing to disclose known material adverse trends. More specifically, pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."
17 C.F.R. § 229.303(a)(3)(ii). Such disclosures are required to be made by an issuing company in
the "Management's Discussion and Analysis of Financial Condition and Results of Operations"
for every Form 10-Q filed by public companies.

201.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989
Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties
> that are reasonably expected to have material effects, such as: A reduction in the
> registrant's product prices; erosion in the registrant's market share; changes in
> insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and reasonably likely to have material
> effects on the registrant's financial condition or results of operation.

202.    Furthermore, the 1989 Interpretive Release provided the following test to determine
if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management
> must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come
> to fruition? If management determines that it is not reasonably likely to occur, no
> disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the
> consequences of the known trend, demand, commitment, event or uncertainty, on
> the assumption that it will come to fruition. Disclosure is then required unless
> management determines that a material effect on the registrant's financial condition
> or results of operations is not reasonably likely to occur.

203.    Campbell's 1Q18 and 2Q18 Forms 10-Q, which were filed with the SEC on
November 21, 2017 and February 17, 2018, and signed by Defendants Morrison and DiSilvestro,
omitted material information regarding known trends and uncertainties that Defendants were

required to disclose pursuant to Item 303. As alleged herein, Defendants failed to disclose the permanently damaged customer goodwill following the Bolthouse Recall, which resulted in lost shelf space, declining sales, and declining operating margins. Because Defendants failed to make the requisite disclosures, they failed to comply with Item 303.

## VI.    THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION

204.    Defendants' material misstatements and omissions complained of herein artificially inflated and/or maintained artificial inflation in the market price of Campbell's publicly traded common stock. The artificial inflation in Campbell's stock price was removed when the facts and risks misstated and omitted by Defendants were revealed to the market. Such corrective information was disseminated to investors through public disclosures on November 21, 2017, February 16, 2018, and May 18, 2018. Each such disclosure partially revealed the falsity of Defendants' materially false and/or misleading statements concerning, among other things, the FY18 Guidance and their ability to return C-Fresh to "profitable growth." Each disclosure, more particularly described below, removed a portion of the artificial inflation in the price of Campbell's publicly traded stock created or maintained by Defendants' materially false and/or misleading statements, causing economic injury to Lead Plaintiff and other members of the Class.

### A.    November 21, 2017

205.    On November 21, 2017, Campbell announced certain 1Q18 operating and financial results, including losses of $6 million for C-Fresh, as follows:

|  | Campbell | C-Fresh |
|---|---|---|
| **Net Sales** | $2,161 | $234 |
| **Operating Earnings/EBIT** | $412 | $(6) |
| **EPS** | $0.91 | -- |

57

206.    Morrison stated the following in the Company's 1Q18 Press Release:

This was a difficult quarter, particularly for our U.S. soup business. The operating environment remains volatile with a rapidly evolving retailer landscape and competitive activity pressuring the top line. Our bottom line performance was negatively impacted by a lower adjusted gross margin rate due in part to cost inflation, higher carrot costs and escalating transportation and logistics costs following the hurricane season.

207.    With respect to C-Fresh in particular, the 1Q18 Press Release stated:

Sales in the quarter were comparable to the prior year at $234 million as sales gains in carrot ingredients, Garden Fresh Gourmet and *Bolthouse Farms* salad dressings were offset by declines in carrots. Sales of *Bolthouse Farms* refrigerated beverages were comparable to the prior year.

Segment operating earnings in the quarter decreased from $1 million to a loss of $6 million, reflecting a lower gross margin percentage driven primarily by higher carrot costs.

208.    The 1Q18 Press Release also stated that the Company would be revising its FY18 Guidance downward as follows, attributable "primarily to Campbell's gross margin performance in the first-quarter and revised outlook for the balance of the fiscal year":

|  | Prior Guidance (Aug. 31, 2017) | Revised Guidance (Nov. 21, 2017) |
|---|---|---|
| **Change in EBIT** | -1% to 1% | -4% to -2% |
| **Change in EPS** | 0% to 2% | -3% to -1% |

209.    As a direct and proximate result of these partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, including their promise to deliver "profitable growth" for C-Fresh, shares of the Company's stock fell over 8%, from a close of $49.93 per share on November 20, 2017, to close at $45.84 per share on November 21, 2017.

210.    Analysts attributed the decline in the price of Campbell's common stock to the Company's lower than expected results, headwinds attributable to C-Fresh, and lowered FY18

Guidance. Deutsche Bank wrote: "Campbell Soup's Q1 results disappointed today." PiperJaffray

added: "Management cited weather disruptions on carrot supply as a headwind in its C-Fresh

segment, a drag that it cited as a key factor in the lower guidance." JPMorgan was similarly

circumspect: "Earnings were also impaired by higher carrot costs (the *Bolthouse* deal at this point

has to be seen as a disappointment) in addition to higher freight and logistics. Overall, this was a

poor print." UBS likewise expressed disappointment with the Company's revised guidance: "We

expect the stock to trade lower as Campbell cut full-year guidance after 1Q of results."

211.    Nonetheless, as set forth in Section V above, despite the Company's November 21,

2017 disclosures and the related stock price decline, the price of Campbell common stock remained

artificially inflated as Defendants continued to misrepresent and conceal material information from

investors concerning Campbell's putative ability to return C-Fresh to "profitable growth."

**B.    February 16, 2018**

212.    On February 16, 2018, Campbell announced certain 2Q18 operating and financial

results, including losses of $11 million for C-Fresh, as follows:

|  | **Campbell** | **C-Fresh** |
|---|---|---|
| **Net Sales** | $2,180 | $257 |
| **Operating Earnings/EBIT** | $243 | $(11) |
| **EPS** | $0.95 | -- |

213.    Morrison stated the following in the Company's 2Q18 Press Release:

This was a disappointing quarter, driven by continued challenges in U.S. soup and
Campbell Fresh. The decline in organic sales was largely due to the performance
of Americas Simple Meals and Beverages, where U.S. soup sales decreased by 7
percent based on the key customer issue we discussed last quarter. We are making
progress with this customer and expect sales declines in soup to moderate in the
second half. Campbell Fresh did not meet expectations. Sales did not recover as
anticipated due in part to headwinds in the super premium juice category.

214.    With respect to C-Fresh in particular, the 2Q18 Press Release stated:

Sales in the quarter decreased 1 percent to $257 million driven primarily by sales declines in Bolthouse's refrigerated beverages.

Segment operating earnings declined from a loss of $3 million to a loss of $11 million, reflecting a lower gross margin percentage driven primarily by an increase in supply chain costs as well as higher carrot costs.

215.    Finally, the Company further reduced its FY18 Guidance as follows:

|  | **Revised Guidance (Nov. 21, 2017)** | **Revised Guidance Excluding Tax Reform and Pacific Foods Acquisition (Feb. 16, 2018)** | **Revised Guidance Including Tax Reform and Pacific Foods Acquisition (Feb. 16, 2018)[3]** |
|---|---|---|---|
| Change in EBIT | -4% to -2% | -6% to -4% | -7% to -5% |
| Change in EPS | -3% to -1% | -5% to -3% | +2% to +4% |

216.    As a direct and proximate result of these partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, including their promise to deliver "profitable growth" for C-Fresh, shares of the Company's stock fell approximately 10% over three trading days, from a close of $47.70 per share on February 15, 2018, to close at $42.90 per share on February 21, 2018.

217.    Analysts attributed the decline in the price of Campbell's common stock to the Company's lower than expected results, headwinds attributable to C-Fresh, and lowered FY18 Guidance. JPMorgan wrote: "Notably the C-Fresh business continues to disappoint." RBC called the results "disappointing," and lowered its "FY18 EBIT growth forecast by ~3pp (from +4% to

---

[3] During the quarter, Campbell acquired Pacific Foods and the Tax Cuts and Jobs Act was passed.  For purposes of an "apples-to-apples" comparison, the above chart utilizes the Company's guidance that excludes the impact of the acquisition of Pacific Foods and the Tax Cuts and Jobs Act.

+1% YOY), primarily to reflect F2Q's additional soup declines at WalMart and a sluggish recovery in Bolthouse beverages."

218.     UBS further noted that certain factors, including the newly enacted U.S. tax laws, might have prevented the stock from falling even further: "We expect the stock to trade ~flat as a favorable tax savings and cost plan update could mute disappointment over weaker gross margin."

219.     Nonetheless, as set forth in Section V above, despite the Company's February 16, 2018 disclosures and the related stock price decline, the price of Campbell common stock remained artificially inflated as Defendants continued to misrepresent and conceal material information from investors concerning Campbell's putative ability to return C-Fresh to "profitable growth."

**C.     May 18, 2018**

220.     Finally, on May 18, 2018, the Company announced  disappointing financial results for the third straight quarter, including losses of $475 million and $19 million for Campbell and C-Fresh, respectively, as follows:

|  | **Campbell** | **C-Fresh** |
|---|---|---|
| **Net Sales** | $2,125 | $251 |
| **Operating Earnings/EBIT** | $(475) | $(19) |
| **EPS** | $(1.31) | -- |

221.     The Company further announced that it would be taking a pre-tax impairment charge of $619 million, or $1.65 per share, related entirely to C-Fresh. At the same time, Campbell announced that Morrison would be stepping down, effectively immediately.

222.     Finally, the Company again revised its FY18 Guidance downward as follows:

|  | Revised Guidance Including Tax Reform and Pacific Foods Acquisition (Feb. 16, 2018) | Revised Guidance Including Tax Reform and Pacific Foods Acquisition [Excluding Snyder's-Lance Acquisition] (May 18, 2018)[4] |
| --- | --- | --- |
| **Change in EBIT** | -7% to -5% | -11% to -9% |
| **Change in EPS** | +2% to +4% | -3% to -1% |

223.    DiSilvestro, the acting CEO, stated the following in the Company's press release announcing the results ("2Q08 Press Release"):

> [W]e are not satisfied with our financial results. Our performance has been impacted by both execution-related and external challenges. We are addressing these challenges with renewed urgency. Looking ahead, we will be reviewing all aspects of our strategic plans and portfolio composition. We anticipate that our review, which will take several months to complete, will lead to changes designed to improve our operating performance and create long-term shareholder value. We plan to discuss the outcome of this review when we report fourth-quarter and full-year results in late August.

224.    During a conference call to discuss the Company's 3Q18 financial results on the same day ("2Q18 Conference Call"), DiSilvestro stated:

> While our organic sales were stable in a difficult environment, our challenge in the quarter was clearly our adjusted gross margin performance, as the percentage decline by about 4 points compared to last year, including a 1 point negative mix impact from our recent acquisitions.  Gross margin performance was driven by higher-than-expected cost inflation, primarily higher transportation and logistic costs, higher supply chain costs in Campbell Fresh and increased promotional spending in U.S. Soup and Pepperidge Farms.

---

[4] During the quarter, Campbell acquired Snyder's-Lance.  For purposes of an "apples-to-apples" comparison, the above chart utilizes the Company's guidance that includes the impact of the acquisition of Pacific Foods and the Tax Cuts and Jobs Act, but excludes the impact of the Snyder's-Lance acquisition.

225.    As a direct and proximate result of these partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, including their promise to deliver "profitable growth" for C-Fresh, shares of the Company's stock fell over 12%, from a close of $39.22 per share on May 17, 2018, to close at $34.37 per share on May 18, 2018.

226.    Analysts attributed the stock drop to the Company's continued poor performance, particularly at C-Fresh, and openly questioned whether C-Fresh would ever be profitable. UBS for example, wrote: "Stock -12% in reaction to negative EPS revisions," and "[t]he immediate retirement of CEO Denise Morrison brings the Company's strategy into question." It went on, "One probable call to action is to divest its C-Fresh business, but C-Fresh has suffered from recalls, stagnant revenue trends and is not cash flow positive." PiperJaffray similarly wrote, "After repeatedly reiterating its commitment to the C-Fresh business, we expect a strategic portfolio review to lead to a sale of Campbell's C-Fresh business."

227.    Deutsche Bank summed up the results as follows:

Campbell Soup recorded an impairment charge of $619mm in the quarter related to the C-Fresh segment, which represents a ~40% impairment on Bolthouse Farms (acquired in 2012 for $1.55bn) and Garden Fresh Gourmet (acquired in 2015 for $231mm). Overall, the company dropped gross margin guidance for the fiscal year to down 300 bps y/y (from prior down 100 bp at Q2'18, comparable at Q1'18, and modestly up at Q4'17), with one point of the impact attributable to recent acquisition mix and two points from base business declines, driven by weakness in Campbell Fresh and worsening transportation and logistics cost inflation.

228.    As a result of Defendants' misstatements and omissions, which were corrected by the disclosures discussed above, the price of Campbell common stock ended the Class Period at $34.37 per share, more than 36% below its Class Period high of $54.19 on August 23, 2017, erasing more than $6 billion in market capitalization.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

229.    Campbell and the Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance of and/or control over Campbell's and the Individual Defendants' materially false and misleading statements and omissions of material fact.  Campbell, through its management and other senior level employees, and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V above were materially false and/or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the facts alleged in Section IV above, regarding Campbell's and the Individual Defendants' personal knowledge and/or reckless disregard of the materially false misrepresentations and omissions, Campbell's and the Individual Defendants' scienter is evidenced by the specific facts discussed below.

### A.    Defendants' Actual Knowledge

230.    The following facts, when viewed individually or holistically, provide a strong inference that Morrison, DiSilvestro, and Campbell knew throughout the Class Period that C-Fresh could not deliver "profitable" or "positive" growth in FY18, and their stated reasons regarding C-Fresh's ability to achieve "profitable" or "positive" growth were false.

231.    <u>Morrison</u>:  Morrison was personally aware that C-Fresh could not achieve "profitable" or "positive" growth in FY18, and the respective misstatements and omissions lacked any foundation based on internal data, as is evidenced by at least the following additional facts regarding C-Fresh's poor performance:

- Morrison hosted monthly internal Company-wide "Fireside Chats," which would be shared via Skype, between August 2017 and June 2018 in which she discussed C-Fresh's negative performance. ¶ 119.

- All attendees of Morrison's monthly meetings were well aware of how poorly C-Fresh was doing. ¶¶ 116-20.

- Morrison was briefed by Carolan about the MBR meetings C-Fresh held where the employees would discuss C-Fresh's declining performance, overall loss of confidence, and general inability to meet forecasted targets.  ¶¶ 116-18.

- Between August 2017 and May 2018, the C-Fresh division leaders discussed the loss of shelf space for the 32 oz. mid-size beverage, which was exacerbating the downward trend in sales, and C-Fresh President Carolan briefed Morrison on these issues. ¶¶ 116-18.

- During Morrison's monthly meetings, she similarly discussed ways to make up for lost revenue from the mid-size beverages. ¶ 121.

- Campbell generated reports on Daily Budget to Actual and Prior Year to Current Year through a BI platform which interfaced with ERP software.  This data created Sales Reports that were available to Morrison, which showed that C-Fresh sales were in a downward trend from 2017 to 2018. ¶¶ 109, 120.

232.    Moreover, Morrison directed and/or was aware of the C-Fresh reorganization and cost cuts that contributed to the division's inability to meet the sales and operating margins, as is evidenced by at least the following facts:

- In 2017, Campbell laid off C-Fresh Executives in California in favor of Soup Executives based in New Jersey. ¶¶ 127-30.

- In or around September 2017, the Company cut C-Fresh's marketing budget by as much as 70%.  ¶¶ 131-34.

- Campbell implemented quality control measures that were suitable for shelf-stable canned goods, but ill-suited for perishables.  ¶ 129.

- Experienced C-Fresh sales representatives were laid off and replaced with outsourced labor from Acosta, Inc., which lacked any C-Fresh product-specific knowledge. ¶ 130.

233.    DiSilvestro: DiSilvestro was personally aware that C-Fresh could not achieve "profitable" or "positive" growth in FY18, and the respective misstatements and omissions lacked any foundation based on internal data, as is evidenced by at least the following additional facts regarding C-Fresh's poor performance:

- Campbell generated reports on Daily Budget to Actual and Prior Year to Current Year through a BI platform which interfaced with ERP software. This data created Sales Reports that were available to DiSilvestro, which showed that C-Fresh sales were in a downward trend from 2017 to 2018. ¶¶ 109, 120.

- Morrison hosted monthly internal Company-wide "Fireside Chats," which would be shared via Skype, between August 2017 and June 2018 in which she discussed C-Fresh's negative performance. ¶ 119.

- DiSilvestro was briefed by Carolan about the MBR meetings C-Fresh held where the employees would discuss C-Fresh's declining performance, overall loss of confidence, and general inability to meet forecasted targets.  ¶¶ 116-18.

- Between August 2017 and May 2018 the C-Fresh division leaders discussed the loss of shelf space for the 32 oz. mid-size beverage, which was exacerbating the downward trend in sales, and C-Fresh President Carolan briefed DiSilvestro on these issues. ¶¶ 116-18.

- During Morrison's monthly meetings, she discussed ways to make up for lost revenue from the mid-size beverages. ¶ 121.

234.    Further, DiSilvestro directed and/or was aware of the C-Fresh reorganization and cost cuts that contributed to the division's inability to meet the sales and operating margins, as is evidenced by at least the following facts:

- In 2017, Campbell laid off C-Fresh Executives in California in favor of Soup Executives based in New Jersey. ¶¶ 127-30.

- In or around September 2017, the Company cut C-Fresh's marketing budget by as much as 70%. ¶¶ 131-34.

- Campbell implemented quality control measures that were suitable for shelf-stable canned goods, but ill-suited for perishables.  ¶ 129.

- Experienced C-Fresh sales representatives were laid off and replaced with outsourced labor from Acosta, Inc., which lacked any C-Fresh product-specific knowledge. ¶ 130.

235.    Moreover, Morrison's and DiSilvestro's statements and/or omissions of material information were made on behalf of the Company.  Accordingly, their knowledge of the false and misleading nature of the alleged misstatements and omissions is imputed to and binding upon the Company.

## B.     The Fraud Concerns the Core of Campbell's Operations

236.    C-Fresh was one of the Company's core operations during the Class Period.  C-Fresh is one of the Company's three primary divisions, which accounted for 12% of its net sales in 2017. At the time of its creation, the Company itself stated: "The fresh opportunity is so compelling that we formed an entire division around it: Campbell Fresh, which we call C-Fresh." In addition, Bolthouse is one of the main components of C-Fresh. At the time of the acquisition, Campbell's purchase of Bolthouse was the largest acquisition in the Company's history.  Based on the importance of C-Fresh and Bolthouse to the Company's business, it would be absurd to suggest that Defendants were not aware of all material facts affecting C-Fresh's revenue generation potential.

237.    What's more, C-Fresh's (and, by extension, the Company's) sales and margins are two of Campbell's most closely watched and highly touted metrics, and critical components of the Company's  growth  strategy—i.e., increasing  sales and operating margins.  Indeed, throughout the  Class  Period,  Defendants  regularly  focused  investors'  attention  on  C-Fresh's  sales and operating margins as  evidence  of  Campbell's purported transition and growth potential in the fresh foods segment. Thus, the importance of C-Fresh's sales and operating margins to Campbell's business and bottom line raises a strong inference that the Individual Defendants knew their statements  about  C-Fresh's  sales  growth  and  margin  improvement (and, by extension, the Company's) were false and/or misleading or omitted material facts.

## C.     Defendants' High Level Positions

238.    As the Company's top executives, Morrison and DiSilvestro—the President and CEO, and CFO, respectively—controlled the Company's daily operations and were informed of and responsible for monitoring C-Fresh's sales and operating margins.

239.    As the Company's CEO and President, Morrison was responsible for all aspects of the Company's daily operations.   Morrison was also a member of the Company's Board of Directors.  Additionally, Morrison certified the Company's financial reporting filed with the SEC, which included Campbell and C-Fresh sales and operating margins.

240.    As the Company's CFO and Senior Vice President, DiSilvestro was responsible for reviewing and approving all of Campbell's financial reporting, and for signing and approving each of the monthly press releases.  DiSilvestro also certified the Company's financial reporting filed with the SEC, which included Campbell and C-Fresh's sales and operating margins.

**D.    The Individual Defendants Controlled the Contents of the Company's Public Statements During the Class Period**

241.    Due to their high-level positions, each Individual Defendant was also provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to and were being concealed from, the public, and that the positive representations that were being made to investors concerning C-Fresh's ability to deliver "profitable growth," were materially false, misleading, and incomplete.

242.    As a result, the Individual Defendants were responsible for the accuracy of Campbell's corporate statements.  Therefore, each is responsible and liable for the representations contained therein or omitted therefrom.   Campbell knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that Individual Defendants knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that

such statements were made.  Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

243.    Statements made by Campbell and the Individual Defendants during the Class Period strongly and plausibly suggest each had access to the disputed information.  Indeed, the vast majority of Defendants' material misrepresentations and omissions explicitly or implicitly pertain to the ability of C-Fresh to deliver "profitable" and "positive" growth, and could not have been made with any reasonable basis in fact, as the Company in large part admitted in May 2018 when it disclosed such representations were not attainable, as well as a $619 million dollar impairment charge for C-Fresh.

### E.    Defendants Were Motivated by Financial Gain

244.    <u>Insider Sales</u>: The Individual Defendants were financially motivated to commit securities fraud and realized substantial financial benefits from their personal sales of Campbell stock at the same time that they and the Company misrepresented and concealed from investors the profitability of C-Fresh.

245.    At the same time that Campbell issued materially false and misleading statements to investors, the Individual Defendants collectively sold 79,599 shares of their Campbell stock at artificially inflated prices as high as $47.05 per share, for illegal trading proceeds in excess of $3.7 million.

246.    Specifically, Morrison sold 66,970 shares of Campbell stock on or about September 28, 2017, at a price of $47.05, for total proceeds of $3,150,939. This sale was suspiciously timed because it followed Defendants' materially false and misleading statements regarding their ability to deliver "profitable" and "positive" growth for C-Fresh, which was issued on August 31, 2017.

What's more, it was suspicious in amount because it represented nearly 16% of the total number of shares owned by Morrison at the time.

247.   Additionally, DiSilvestro sold 12,629 shares of Campbell stock on or about September 28, 2017, at a price of $47.05, for total proceeds of $594,194.  This sale was suspiciously timed because it followed Defendants' materially false and misleading statements regarding their ability to deliver "profitable" and "positive" growth for C-Fresh, which were issued on August 31, 2017. What's more, it was suspicious in amount because it represented nearly 13% of the total number of shares owned by DiSilvestro at the time.

248.   <u>Defendants Were Motivated to Complete the Snyder's-Lance Acquisition</u>:  The Individual Defendants and Campbell were also financially motivated to commit securities fraud in in order to present the Company as financially stable and obtain the financing necessary to complete the Company's acquisition of Snyder's-Lance. Indeed, critical to Campbell being able to fund the Snyder's-Lance acquisition was Campbell's credit rating, which was hovering at a downgrade based on the several quarters of poor earnings and the debt burden of the prior acquisitions.  Campbell sought to raise debt to fund the acquisition and the cost of the debt—which was heavily dependent on the Company's and C-Fresh's, free cash flow—was critical to the deal's closing.

### F.   Campbell Revised its FY18 Guidance

249.   Campbell issued its initial FY18 Guidance on August 31, 2017. In just nine months, it revised that guidance downward three times: on November 21, 2017, February 16, 2018, and May 18, 2018. The timing of each announcement—just three, six, and nine months, respectively, after the original FY18 Guidance was issued—was highly suspicious and raises a strong inference that Defendants actually knew their promise to deliver "profitable" and "positive" growth for C-Fresh was unreasonable, unattainable, and lacking any foundational basis.

70

250.    Additionally, the magnitude of the downward revisions, as illustrated below, also raises a strong inference of scienter:

|  | Aug. 31, 2017 FY18 Guidance | Nov. 21, 2017 Revised FY18 Guidance | Feb. 16, 2018 Revised FY18 Guidance | May 18, 2018 Revised FY18 Guidance | Delta form Aug. 31, 2017 to May 18, 2018 |
|---|---|---|---|---|---|
| **Change in EBIT** | -1% to 1% | -4% to -2% | -6% to -4% | -11% to -9% | -10% to -8% |
| **Change in EPS** | 0% to 2% | -3% to -1% | -5% to -3% | -3% to -1% | -3% |

251.    The November 21, 2017, February 16, 2018 and May 18, 2018 revisions further confirm that Defendants' statements during the Class Period had no reasonable basis in fact. Indeed, as Campbell would later effectively admit, the Company never expected "profitable" or "positive" growth for C-Fresh.  In fact, as set forth above, Defendants were repeatedly provided with information showing C-Fresh's sales and margins were trending downward for 2017 and 2018, which contradicted their public statements.

**G.    Morrison's Resignation**

252.    The abrupt, and later revealed, forced resignation of Morrison, without any succession plan for a new CEO, at the same time as the Company revealed the true financial condition of C-Fresh, is further indicia of Morrison's culpability in misrepresenting C-Fresh's prospects during the Class Period.  On May 18, 2018—the same day Defendants revised the FY18 Guidance downward for the final time and took a $619 million pretax impairment charge related entirely to C-Fresh—Morrison abruptly resigned.  Notably, Morrison was the architect of C-Fresh and its product innovations, and speaker of numerous false and misleading statements during the Class Period.

71

### H.    Defendants' SOX Certifications

253.    The Individual Defendants' scienter is further evidenced by their signatures of Sarbanes-Oxley Act ("SOX") Certifications.  Morrison served as Campbell's CEO and President from August 2011 through May 2018, and signed SOX certifications and Rule 13a-14(a) certifications for the Company's first quarter, second quarter and third quarter 2018 Forms 10-Q. As a signatory of (i) the SOX certification representing that "the information contained in the Company's [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Campbell]," and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  Morrison had the duty to monitor any conduct that threatened to undermine the veracity of these filings.  Morrison, as Campbell's CEO, had access to sales and operating margin data for the Company's C-Fresh division, which contradicted Defendants' public statements.

254.    DiSilvestro has served as Campbell's CFO and Executive Vice President since May 2014, and signed SOX certifications and Rule 13a-14(a) certifications for the Company's first quarter, second quarter, and third quarter 2018 Forms 10-Q.  As a signatory of (i) the SOX certification representing that "the information contained in the Company's [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [Campbell]," and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  DiSilvestro had the duty to monitor any conduct that threatened to undermine the veracity of these filings.  DiSilvestro, as Campbell's CFO, had access to sales and operating margin data for the Company's C-Fresh division, which contradicted Defendants' public statements.

## VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

255.   At all relevant times, the market for Campbell's common stock was efficient for the following reasons, among others:

a) Campbell's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, Campbell filed periodic public reports with the SEC and the NYSE;

c) Campbell regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Campbell was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Indeed, more than 190 analyst reports on Campbell were published during the Class Period.

256.   As a result of the foregoing, the market for Campbell's common stock promptly digested current information regarding Campbell from all publicly available sources and reflected such information in the price of Campbell's stock.  Under these circumstances, all purchasers of Campbell's common stock during the Class Period suffered similar injury through their purchase of Campbell's stock at artificially inflated prices, and a presumption of reliance applies.

257.   Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Campbell's common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its

business, Lead Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

258.   The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

259.   None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

260.   To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

261.   To the extent that any materially false and/or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

262.   To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading statement because at the time such statement was made, the speaker knew the

statement was false and/or misleading, or the statement was authorized and approved by an executive officer of Campbell who knew that such statement was false and/or misleading.

## X.      CLASS ACTION ALLEGATIONS

263.    Lead Plaintiff bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Campbell from July 19, 2017 through and including May 17, 2018, and were damaged thereby.  Excluded from the Class are:  (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

264.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Campbell had more than 197 million shares of common stock outstanding and actively trading on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

265.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

75

266.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

267.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

- whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

- whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

- whether and to what extent the market price of Campbell's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

- whether Campbell and the Individual Defendants acted with the requisite level of scienter;

- whether the Individual Defendants were controlling persons of the Company;

- whether reliance may be presumed; and

- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

268.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   CAUSES OF ACTION

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Campbell and the Individual Defendants**

269.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

270.   This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder on behalf of Lead Plaintiff and all other members of the Class, against Campbell and the Individual Defendants.

271.   As alleged herein, throughout the Class Period, Campbell and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Campbell and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Campbell's common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

272.   The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

273.    As set forth above, Campbell and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

274.    In ignorance of the materially false and misleading nature of Campbell's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Campbell's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Campbell's common stock declined precipitously, and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

275.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

276.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of the Lead Plaintiff and all other members of the Class, against Defendants Morrison and DiSilvestro.

277.    As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and

omissions in connection with the purchase or sale of Campbell's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and Campbell is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

278.    As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.   As such, the Individual Defendants had regular access to non-public information about Campbell's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

279.    By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

280.    The Individual Defendants were culpable participants in Campbell's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to

constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

281. By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

a) Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

b) Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

c) Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

d) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

e) Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated:  March 1, 2019

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO P.C.**

/s/ *James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiff and the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ *Sharan Nirmul*
Sharan Nirmul
Kimberly A. Justice (*pro hac vice* forthcoming)
Johnston de F. Whitman, Jr. (*pro hac vice* forthcoming)
Jonathan F. Neumann (*pro hac vice* forthcoming)
Stephanie M. Grey (*pro hac vice* forthcoming)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
kjustice@ktmc.com
jwhitman@ktmc.com
jneumann@ktmc.com
sgrey@ktmc.com

*Lead Counsel for Lead Plaintiff and the Class*

**NUSSBAUM LAW GROUP, P.C.**
Linda P. Nussbaum (*pro hac vice* forthcoming)
Hugh Sandler (*pro hac vice* forthcoming)
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com
hsandler@nussbaumpc.com

*Additional Counsel for Lead Plaintiff*

81