## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————

Civil No. 18-14385 (NLH/JS)

IN RE CAMPBELL SOUP COMPANY
SECURITIES LITIGATION                    **OPINION**

———————————————————

**APPEARANCES:**

SHARAN NIRMUL
KESSLER TOPAZ MELTZER & CHECK, LLP
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087

JOHNSTON DE F. WHITMAN, JR.
KESSLER TOPAZ MELTZER & CHECK, LLP
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087

JONATHAN F. NEUMANN
KESSLER TOPAZ MELTZER & CHECK, LLP
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087

STEPHANIE M. GREY
KESSLER TOPAZ MELTZER & CHECK, LLP
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087

    *Lead Counsel for Plaintiffs.*

JAMES E. CECCHI
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO P.C.
5 BECKER FARM ROAD
ROSELAND, NJ 07068

DONALD A. ECKLUND
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO P.C.
5 BECKER FARM ROAD

1

ROSELAND, NJ 07068

    *Liaison Counsel for Plaintiffs.*

ROBERT A. MINTZ
MCCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
NEWARK, NEW JERSEY 07102

BRIAN W. CARROLL
MCCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
NEWARK, NEW JERSEY 07102

GREG A. DANILO
WEIL, GOTSHAL & MANGES LLP
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153

STACY NETTLETON
WEIL, GOTSHAL & MANGES LLP
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153

DAVID P. BYEFF
WEIL, GOTSHAL & MANGES LLP
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153

    *Counsel for Defendants.*

**HILLMAN, District Judge**

    In this consolidated putative securities class action, plaintiffs allege that defendants Campbell Soup Company and two of its senior executives made various materially false or misleading statements regarding their ability to deliver profitable growth to investors.  Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended

2

Consolidated Class Action Complaint.  For the reasons expressed herein, Defendants' motion will be granted with leave granted to amend.

## BACKGROUND

We take our brief recitation of the facts from Plaintiffs' First Amended Consolidated Class Action Complaint ("FAC").[1]

This is a putative securities class action asserted against Defendants Campbell Soup Company ("Campbell") and several of its top executives, including former President and CEO Denise M. Morrison ("Morrison") and Senior Vice President and CFO Anthony P. DiSilvestro ("DiSilvestro") (the "Individual Defendants") (collectively, "Defendants").  The putative class, led by court-appointed lead plaintiff the Oklahoma Firefighters Pension and Retirement System ("Plaintiffs"), consists of those who purchased Campbell common stock from July 19, 2017 through and

---

[1] Defendants ask this Court to consider various documents incorporated by reference into Plaintiffs' FAC.  See (ECF No. 46-1 ("Defs. Br.") at 4, n.1) (asking the Court to consider documents filed with the SEC, earnings call transcripts, and other documents allegedly incorporated into the FAC).  The Supreme Court instructs this Court to do so.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").  Therefore, to the extent such extrinsic material is incorporated into the FAC and relevant to this Court's analysis, it will consider such information in rendering this Opinion.

including May 17, 2018.  (FAC ¶263).

Plaintiffs' claims center around Campbell's public statements regarding one of its many divisions, a relatively new fresh foods division called Campbell Fresh ("C-Fresh").  (FAC ¶¶1, 9).  As alleged in the FAC, upon appointment as Campbell's CEO, Morrison promised to overhaul the company's image and began by creating C-Fresh.  (FAC ¶¶6-7).  Morrison embarked on a crusade of acquisitions to bolster the C-Fresh concept, ultimately acquiring Bolthouse Farms ("Bolthouse"), a fresh food producer, for $1.55 billion.  (FAC ¶8).  In June of 2016, Bolthouse recalled a protein drink it produced due to possible spoilage.  (FAC ¶10).  Thereafter the FAC alleges that C-Fresh's profit and sales declined.  (FAC ¶11).  Morrison, according to the FAC, "assured investors that the problems at Bolthouse had been corrected, and all was back to normal."  (FAC ¶11).  Plaintiffs argue that these assurances were false.

Plaintiffs aver that due to irreversible problems at C-Fresh, Morrison sought a "new blockbuster deal to disguise the problems of the prior acquisitions."  (FAC ¶¶14, 94).  That deal would be the acquisition of Snyder's-Lance, Inc. ("Snyder's").  (FAC ¶¶14-15).  The FAC alleges that, in order to facilitate Campbell's acquisition of Snyder's, Defendants propped up C-Fresh's earning potential in order to quell any doubt from investors.  (FAC ¶¶18, 21).

4

Defendants continued to claim that C-Fresh would return to profitability, claiming, for example, that (i) "we expect [C-Fresh] to return to profitable growth in fiscal 2018," (ii) "we do expect to see top line growth in Campbell Fresh in 2018," (iii) "the Campbell Fresh turnaround is progressing," and (iv) "we would expect to see profitability pretty quick in Campbell Fresh."  In November 2017, Morrison announced that C-Fresh had returned to normal beverage production and packaging, and again touted this in February 2018, also claiming that C-Fresh had returned to its normal promotional activities.  (FAC ¶¶17, 20). According to Plaintiffs, these statements were materially false or misleading.  (FAC ¶18).  Plaintiffs suggest that these allegations are supported by information obtained from "multiple" former Campbell employees serving as confidential witnesses ("CWs").  (FAC ¶18).

The FAC presents statements from thirteen non-party CWs. Those individuals and their statements are discussed as relevant through this Opinion.  The CWs statements generally focused on Defendants' knowledge regarding the status of C-Fresh's business-state and its knowledge relating to growth goals and outward-facing statements regarding C-Fresh's financial state. For example, CW statements include allegations that C-Fresh was "losing shelf space like crazy[,]" that its stated growth goals were "unrealistic[,]" and that Campbell's leadership team was

"overly optimistic with "all sales targets . . . and [p]rofit [m]argins [being] extremely aggressive[.]"  See, e.g.,(FAC ¶¶107, 110, 112).

Plaintiffs complain that statements made in press releases, SEC filings, and investor conferences by Defendants directly contradict the evidence of C-Fresh's failing state.  These statements will be discussed as relevant, infra.  Generally, Plaintiffs have separated these statements into date-driven categories, arguing that false or misleading statements occurred on the following dates: July 19, 2017; August 31, 2017; November 21, 2017; and February 16, 2018.

There are two additional actions related to the one before the Court, which this Court consolidated by Order dated January 8, 2019.  (ECF No. 20) (consolidating 1:18-cv-14385, 1:18-cv-15694, and 1:18-cv-16476).  By way of that same Order, this Court appointed Oklahoma Firefighters Pension and Retirement System as Lead Plaintiff, and appointed Kessler Topaz Meltzer & Check, LLP and Carella Byrne Cecchi Olstein Brody & Agnello, PC as Lead and Liaison Counsel, respectively.  (ECF No. 20 at ¶¶10-11).  Thereafter Plaintiffs filed the operative FAC on March 1, 2019.  (ECF No 33).  The FAC contains two counts.  First, Plaintiffs allege violations of Section 10(b) of Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 (codified at 17 C.F.R.

6

240.10b-5) against all Defendants.  Second, Plaintiffs allege
violations of Section 20(a) of the Exchange Act against the
Individual Defendants.

Defendants filed the present Motion to Dismiss on April 30,
2019.  (ECF No. 46).  The Motion to Dismiss has been fully
briefed.  Therefore, the motion is ripe for adjudication.

<u>DISCUSSION</u>

**A.   Subject Matter Jurisdiction**

This Court has subject matter jurisdiction over this case
because it presents a federal question under the Exchange Act.
<u>See</u> 28 U.S.C. § 1331; 15 U.S.C. § 78aa.

**B.   Motion to Dismiss Standard**

When considering a motion to dismiss a complaint for
failure to state a claim upon which relief can be granted
pursuant to Federal Rule of Civil Procedure 12(b)(6), a court
must accept all well-pleaded allegations in the complaint as
true and view them in the light most favorable to the plaintiff.
<u>Evancho v. Fisher</u>, 423 F.3d 347, 351 (3d Cir. 2005).  It is well
settled that a pleading is sufficient if it contains "a short
and plain statement of the claim showing that the pleader is
entitled to relief."  FED. R. CIV. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action will not do . . . ." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (alteration in original)
(citations omitted) (first citing Conley v. Gibson, 355 U.S. 41,
47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,
40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v.
Allain, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court
> must take three steps.  First, the court must "tak[e]
> note of the elements a plaintiff must plead to state a
> claim."  Second, the court should identify allegations
> that, "because they are no more than conclusions, are
> not entitled to the assumption of truth."  Third, "whe[n]
> there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether
> they plausibly give rise to an entitlement for relief."

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (alterations
in original) (citations omitted) (quoting Ashcroft v. Iqbal, 556
U.S. 662, 664, 675, 679 (2009)).  A court may "generally
consider only the allegations contained in the complaint,
exhibits attached to the complaint and matters of public
record."  Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)
(citing Pension Benefit Guar. Corp. v. White Consol. Indus.,
Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court, in weighing a motion to dismiss, asks
"not whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claim."

8

Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416
U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our
decision in Twombly expounded the pleading standard for 'all
civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d
203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in
the coffin for the 'no set of facts' standard that applied to
federal complaints before Twombly."). "A motion to dismiss
should be granted if the plaintiff is unable to plead 'enough
facts to state a claim to relief that is plausible on its
face.'" Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at
570).

Since this action involves claims covered by the Private
Securities Litigation Reform Act ("PSLRA"), heightened pleading
standards apply. "The PSLRA provides two distinct pleading
requirements, both of which must be met in order for a complaint
to survive a motion to dismiss." Institutional Inv'rs Grp. v.
Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009). First, under 15
U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly
misleading statement, why the statement was misleading, and, if
an allegation is made on information and belief, all facts
supporting that belief with particularity." Id. at 252-53
(quoting Winer Family Trust v. Queen, 503 F.3d 319, 325 (3d Cir.
2007)). Second, the complaint must, "with respect to each act
or omission alleged to violate this chapter, state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at 253 (quoting 15 U.S.C. § 78u-4(b)(2)). Both provisions require facts to be pled "with particularity." The Third Circuit has explained that this language echoes precisely Fed. R. Civ. P. 9(b). Id. (citing In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999)). Indeed, although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, Tellabs, Inc., 551 U.S. at 324, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." Id. (quoting Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 n.5 (1st Cir. 2008)). This standard "requires plaintiffs to plead the who, what, when, where and how[.]" Id. (quoting Advanta, 180 F.3d at 534).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Moreover, to allege a material misrepresentation, a plaintiff must "specify[] each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information or belief, all facts supporting that belief with particularity." Avaya, Inc., 564 F.3d at 252-53. Finally, to allege scienter, a plaintiff must "state with particularity facts giving rise to a

10

strong inference that the defendant acted with the required
state of mind." Id.

**C.   Motion to Dismiss**

To allege a Section 10(b) claim, a plaintiff must plead
"(1) a material misrepresentation or omission, (2) scienter, (3)
a connection between the misrepresentation or omission and the
purchase or sale of a security, (4) reliance upon the
misrepresentation or omission, (5) economic loss, and (6) loss
causation." City of Edinburgh Council v. Pfizer, Inc., 754 F.3d
159, 167 (3d Cir. 2014).  "Every person who, directly or
indirectly, controls any person liable under any provision of"
the Exchange Act will be held jointly and severally liable under
Section 20(a).  As is apparent from the statutory text, Section
20(a) liability may only be found if there is an underlying
violation of the Exchange Act – here Section 10(b).

Defendants advance several main arguments concerning
dismissal of Plaintiffs' claims.  Defendants first advance
arguments explaining why Plaintiffs cannot satisfy the first
element of a Rule 10(b)(5) claim: a material misrepresentation
or omission.  First, Defendants argue that the statements
complained of were neither material nor false or misleading, and
therefore, are not actionable.  Defendants argue that all of the
statements at issue were either (1) forward-looking statements
accompanied by meaningful, cautionary language, rendering them

within the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c);
(2) statements of opinion; or (3) non-actionable statements of
corporate puffery.  (Defs. Br. at 15-19).  Defendants also argue
that the CW's statements do not support any alleged fraud, and
that the facts actually establish that no fraud occurred.
(Defs. Br. at 19-27).  Plaintiffs, as could be expected, refute
each of these arguments.  First, Plaintiffs argue that the
statements complained of were false and misleading because
Defendants issued them without a reasonable basis.  See (ECF No.
48 ("Pls. Br.") at 11-20).  Second, Plaintiffs argue that the
PSLRA's safe harbor provision does not apply because: (1) the
statements complained of were misrepresentations and omissions
of *present* fact and thus not protected by the safe harbor
provision, which Plaintiffs argue only applies to forward-
looking statements; and (2) the statements complained of were
not accompanied by adequate cautionary language; and (3)
Defendants had actual knowledge that the statements complained
of were misleading when made.  (Pls. Br. 20-27).  Third,
Plaintiffs argue that any opinion statement is still actionable
because the opinion omits material facts which renders the
statement misleading to a reasonable investor.  Fourth,
Plaintiffs argue that the present statements of fact cannot be
mere puffery because they are half-truths and omissions of
material fact and thus, actionable statements at law.  (Pls. Br.

27-31).

Defendants additionally advance arguments that Plaintiffs cannot satisfy the second element of a Section 10(b) claim: scienter.  Defendants argue that Plaintiffs have not pled the strong showing of scienter required to survive dismissal. Defendants argue that (1) Plaintiffs have not presented competent evidence of any motive to commit fraud; and (2) that there was no conscious misbehavior or recklessness on behalf of any Defendant.  (Defs. Br. at 27-35).

In response, Plaintiffs argue it has pled a strong showing of scienter.  First, Plaintiffs argue Defendants knew of facts or had access to information suggesting that their public statements were not accurate and Defendants made repeated misstatements regarding C-Fresh in direct response to analyst questions.  (Pls. Br. at 31-33).  Second, Plaintiffs further argue the following support a strong inference of scienter: (1) Morrison's abrupt resignation the same day that an impairment charge of $619 million was revealed; (2) the core operations doctrine; (3) Defendants' motive to increase its credit reporting to secure funding for the Snyder's acquisition; and (4) the Individual Defendants' signing of Sarbanes-Oxley Certifications ("SOX certifications").  (Pls. Br. at 33-35).

Defendants make a final argument that as a result of dismissal under either of the above two grounds, the Section

20(a) claim must also be dismissed.  (Defs. Br. at 35).

Plaintiffs argue dismissal of the Section 20(a) claim is not

warranted because Plaintiffs have adequately pled a Section

10(b) claim.  (Pls. Br. at 35).

Here, even if the Court were to find the first element

sufficiently pled as to at least some of the statements

complained of, the second element is not sufficiently pled and

as a result Plaintiffs' Section 10(b) claim cannot proceed on

that basis.  Accordingly, the Court will not address the

material misrepresentation element and instead will only focus

on the scienter element, which is dispositive of both of

Plaintiffs' claims.

1. <u>Scienter</u>

Defendants challenge whether Plaintiffs have pleaded the

strong inference of scienter needed to propel Plaintiffs' FAC

past the pleading stage.  Under this PSLRA's pleading

requirement, a plaintiff must "state with particularity facts

giving rise to a strong inference that the defendant acted with

the required state of mind."  <u>Avaya, Inc.</u>, 564 F.3d at 267

(quoting 15 U.S.C. § 78u-4(b)(2)).  The scienter standard

requires a plaintiff to allege facts giving rise to a strong

inference "of either reckless or conscious behavior."  <u>Advanta</u>,

180 F.3d at 534-35.  "In order to state a Rule 10b-5 claim, '[a]

reckless statement is one involving not merely simple, or even

inexcusable negligence, but an *extreme departure* from the
standards of ordinary care, and which presents a danger of
misleading buyers or sellers that is either known to the
defendant or is so obvious that the actor must have been aware
of it.'"  Rahman v. Kid Brands, Inc., 736 F.3d 237, 242 (3d.
Cir. 2013) (quoting Belmont v. MB Inv. Partners, Inc., 708 F.3d
470, 493 (3d Cir. 2013) (emphasis added)).

In determining whether a strong inference of scienter has
been shown, courts must determine "whether all of the facts
alleged, taken collectively, give rise to a strong inference of
scienter, not whether any individual allegation, scrutinized in
isolation, meets that standard."  Tellabs, Inc., 551 U.S. at 323
(emphasis in original).  In making this determination, courts
must weigh the "plausible, nonculpable explanations for the
defendant's conduct" against the "inferences favoring the
plaintiff." Id. at 324.  A "strong inference" of scienter "need
not be irrefutable," but it must be one that is "cogent and
compelling."  Id.  "A complaint will survive only if a
reasonable person would deem the inference of scienter cogent *at
least as compelling* as any opposing inference of nonfraudulent
intent." Id. at 314 (emphasis added).

Here, the FAC alleges that Defendants knew or recklessly
disregarded that the projections and statements made by the
Individual Defendants were false and misleading.  Plaintiffs

claim the following allegations form a strong inference of scienter to survive dismissal: (1) Individual Defendants had access to information and were aware that their public statements were not accurate; (2) the SOX certifications; (3) Morrison's termination; (4) Defendants were motivated to increase its credit score to complete the Snyder's acquisition;[2] and (5) C-Fresh was a core operation of Campbell.

This Court will first discuss each basis for scienter. Then this Court will consider the complaint as a whole in determining whether Plaintiffs have shown a strong inference of scienter that is at least as compelling as Defendants' plausible nonculpable explanation for its conduct.

  i.   <u>Whether Internal Data May Support Scienter</u>

Plaintiffs first argue that Defendants were aware of information suggesting that their public statements regarding C-Fresh's profitability and top line growth for 2018 were

---

[2] In the FAC, Plaintiffs alleged an additional theory of Defendants' motive to commit fraud: the Individual Defendants were allegedly financially motivated to commit securities fraud and realized substantial benefits from their personal sales of Campbell stock at the same time that they and Campbell misrepresented and concealed the profitability of C-Fresh. (FAC ¶¶244-47). Defendants' argued this theory cannot support motive to commit fraud because these transactions were merely routine tax withholdings and not unusual in scope or timing. (Defs. Br. at 29-30). Plaintiffs did not respond to this argument in their opposition and thus have waived this theory. <u>Leisure Pass N. Am., LLC v. Leisure Pass Group, Ltd.</u>, No. 12-03375, 2013 WL 4517841, at *4 (D.N.J. Aug. 23, 2013) ("Plaintiff has waived its opposition to this argument by failing to respond to it.").

inaccurate.  (Pls. Br. at 31-32).  Defendants respond that
Plaintiffs failed to plead allegations that were known to the
Individual Defendants that were contrary to the public
statements.

     This Court first notes that, in their Opposition,
Plaintiffs frequently misrepresent allegations from its own FAC
that are relevant to this Court's analysis for this section and
scienter as a whole.  First, in their Opposition, Plaintiffs
contend Defendants public statements that they expected
profitability for the C-Fresh division is contradicted by the
"[l]oss of C-Fresh's largest and most important customers" and
[i]rreparable loss of shelf space following the Bolthouse
Recall."  (Pls. Br. at 1-2, 13, 27-28).  The actual allegations
from the FAC are that (1) "one of C-Fresh's most important
retailers, Kroger, stopped purchasing its *mid-sized (32 oz.)
beverages* in October 2017;" (2) "widespread belief within
Campbell was that Kroger had pulled the *mid-sized beverages* in
retaliation for the lost sales from the Bolthouse Recall;" and
(3) "shortly thereafter, Campbell's largest customer—WalMart—and
other large retailers, including Publix stopped purchasing *mid-
sized beverages* from C-Fresh." (FAC ¶¶113-14) (emphasis added).
Although the FAC does allege the loss of customers was
"permanent," no CW categorizes the loss of shelf life or loss of
Walmart and other customers purchasing mid-size beverages as

either permanent or irreparable.  This Court need not accept
"unsupported conclusions and unwarranted inferences," Baraka v.
McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted),
and "bald assertions . . . in a complaint when deciding a motion
to dismiss." Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007)
(quoting Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)).
Accordingly, this Court will consider that Walmart and other
large customers stopped purchasing mid-sized beverages after
October 2017, but will not consider the unwarranted inference
that C-Fresh suffered a "permanent" or "irreparable" loss
following the Bolthouse Recall nor the Plaintiffs' contention
that C-Fresh as a whole lost major customers.

Second, in their Opposition, Plaintiffs allege Defendants
"concealed the Company's operational problems that persisted
during the class period, including the drastic reduction of C-
Fresh's marketing budget by 70%." (Pls. Br. at 27).  The FAC
fails to include an actual percentage regarding the marketing
budget cut for C-Fresh as a whole and instead includes an
allegation that CW 3's own "marketing budget was slashed by 70%"
in January 2018.  (FAC ¶134).  Accordingly, this Court will not
consider the allegation that C-Fresh's marketing budget was
reduced by 70%.

Third, in their Opposition and specifically in response to
(1) Campbell's increase in sales throughout the class period;

and (2) Defendants' public statements that carrot yields were responsible for C-Fresh's negative results in FY18 , Plaintiffs focused on the fact that "C-Fresh *never* approached, let alone returned, to its pre-Bolthouse recall profit levels." (Pls. Br. at 2, 19-20) (emphasis in original).  The FAC fails to include any allegation addressing when and where an Individual Defendant promised to return profits to pre-Bolthouse recall profit levels.  Accordingly, this Court's analysis will not consider such statements and instead focus on the public statements that the Individual Defendants expected C-Fresh to be profitable and to see top line growth in C-Fresh in 2018.

With these clarifications in mind, the Court now turns to Plaintiffs' first argument.  Plaintiffs contend that Defendants knew of and had access to the following information that allegedly contradicted their statements promising profitable growth for C-Fresh: (1) forecasted targets were not being met; (2) C-Fresh's results and Bolthouse juices were largely trending down in profits and sales from late 2017 through 2018; (3) the institution of quality control measures increased costs; (4) 250 C-Fresh sales representatives were terminated and were replaced with out-sourced labor; and (5) marketing budgets for some employees were decreased.[3] (Pls. Br. at 31-32).  Plaintiffs infer

---

[3] In the case of confidential witness allegations, this Court applies the PSLRA's particularity requirement by evaluating the

that the previously mentioned facts were contrary to the
Individual Defendants' statements regarding their expectation of
profitable and top line growth for 2018. (Bls. Br. at 31-32).
Thus, according to Plaintiffs, they have sufficiently alleged
that the Defendants were aware of facts that suggested their
projections for growth were inaccurate to support a strong
inference of scienter.

To support such an inference, Plaintiffs rely on case law
where the court drew an inference of scienter where the
defendants made projections while also having access to facts
that indicated they could not meet such projections. However,
in those cases and unlike this matter, the plaintiffs included
enough allegations in their complaint to demonstrate the public

---

"detail provided by the confidential sources, the sources' basis
of knowledge, the reliability of the sources, the corroborative
nature of other facts alleged, including from other sources, the
coherence and plausibility of the allegations, and similar
indicia." Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d
126, 147 (3d Cir. 2004).  If anonymous source allegations are
found wanting with respect to these criteria, then this Court
must discount them steeply.  This is consistent with Tellabs's
teaching that "omissions and ambiguities count against inferring
scienter" under the PSLRA's particularity requirements.
Tellabs, 551 U.S. at 326.  Here, this Court will consider that
the individual marketing budget of CWs 3 and 10 were reduced
(FAC ¶¶132 & 134), but this court will not consider CW 13's
statement that the "C-Fresh marketing budget was 'wiped out.'"
The FAC fails to indicate *when* the marketing budget was "wiped
out" and any specific allegations regarding what CW 13 means by
the vague statement: "wiped out."  This is insufficient to
satisfy either Rule 9(b) or the PSLRA's particularity
requirements.

statements regarding projections were in fact contrary to the internal data known to the defendants.[4]

For example, in Swanson, the proposed class consisted of individuals who purchased the public traded securities of R.H. Donnelley ("RHD"). Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Swanson, 2011 WL 2444675, at *1 (D. Del. June 14, 2011). The complaint included CW statements about RHD's business, which included "advertising sales for print yellow pages, which generated a majority of RHD's revenue." Id. at *2. Company insiders allegedly "saw a 'secular shift' away from print yellow pages usage and towards online advertising, independent of widespread economic woes, causing RHD to lose millions of dollars each year." Id. Despite this inside knowledge, the defendants made public statements (1) about the yellow pages business "including that print directories had 'high usage'; the business was 'very strong,' 'very healthy,' and 'robust'; and there was a 'huge misperception' that 'no one uses the Yellow Pages anymore;'" (2) explaining that "RHD expected to resume growth in print advertising and denied the

---

[4] The same issue applies to the cases plaintiffs cite for the proposition that statements to analysts made in direct response to analyst questions bolster scienter. (Pls. Br. at 33). As Defendants' argue, and this Court agrees, the FAC fails to show that Defendants knew facts contradicting their statements in response to analyst questions. Thus, the Individual Defendants' answers to analyst questions do not support an inference of scienter.

existence of a secular shift;" and (3) explaining that "the decline in print advertising sales was 'predominantly cyclical' and attributable to the economic downturn." Id. Based on these facts, the court concluded that the "inference that Defendants withheld material information because they did not want the market to learn that a secular shift was eroding the commercial viability of their key product, the yellow pages, is at least as cogent and compelling as the opposing inference that Defendants did not know or did not believe a secular shift was occurring." Id. at *12.

In Curran, the defendants distributed products through branded refrigerators that were placed in retail locations, including Petco, PetSmart, Target, and Walmart. Curran v. Freshpet, Inc., No. 16-2263, 2018 WL 394878, at *1 (D.N.J. Jan. 12, 2018). Plaintiffs alleged that the "Defendants had extensive information about difficulties facing their largest customers, as well as challenges meeting demand due to manufacturing problems," including the following: (1) "Defendants Kassar and Morris were presented with production updates from the Bethlehem production facility that reflected manufacturing problems with the shredded product;" (2) "[t]hese manufacturing problems allegedly included the frequent breakdown of the equipment used to produce the shredded product" and "Defendants were also aware that the manufacturing issues

22

affected their ability to expand their Fridges because customers such as Walmart and BJ's had reprimanded Freshpet in the first half of 2015 about its  failure to keep their products sufficiently stocked in their stores;" (3) "the Amended Complaint details countless examples of financial troubles at Freshpet's leading customers, including the closure of Target's Canadian stores, A&P's bankruptcy, and declining growth at Petco and PetSmart." Id. at *5-6,

Here, unlike Swanson and Curran, the FAC fails to plead enough allegations that demonstrate the Defendants were aware of facts that were actually contrary to the Individual Defendants' expectations of top line growth and profitability for 2018. Plaintiffs' Opposition mainly focuses on the Bolthouse recall of mid-sized beverages, which is only one of the several C-Fresh products and made up a small percent of Bolthouse revenues. (FAC ¶113).  The focus on the recall and decrease in beverage sales following such recall is not the same as actual knowledge that C-Fresh's projections or the division as a whole were false.

Moreover, Plaintiffs argue the following allegation supports an inference of fraud: "Morrison also discussed ways for C-Fresh to make up for the lost revenue from Bolthouse's mid-sized beverages during her monthly meeting." (Pls. Br. at 27).  This Court disagrees.  This allegation belies their argument and further supports the idea that Campbell was

23

accounting for the drop in sales from the Bolthouse recall while at the same time trying to figure out a strategy to at least return to some profitability in FY18 and see top line growth.

In addition, it is undisputed that C-Fresh did see top line growth during FY18 and although C-Fresh did not return to profitability in FY18 there is not enough facts alleged as there were in <u>Curran</u> and <u>Swanson</u> to suggest Defendants, when the statements were made, knew of information that was contrary to their projections of profitable and top line growth in FY18. <u>See</u> (Ex. A to ECF 46-2 ("Ex. A") at A551, A843).

Moreover, although the Plaintiffs point to the CWs' disapproval with the Individual Defendants' cost-cutting strategies and innovative beverages plans,[5] the CW statements

---

[5] Defendants are correct that CWs' statements which appear to be based on rumor or conjecture do not meet the particularity requirement. <u>See</u> <u>Chubb Corp.</u>, 394 F.3d at 155 ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1)."). FE 7, a mid-level Research and Development ("R&D") executive, explained "that the 2017 and 2018 pipeline '***wasn't strong***.'" (FAC ¶126) (emphasis in original). Second, FE 12, a warehouse supervisor, explained that the plant protein milk, which Campbell sought to sell to increase sales, "wasn't very good" and that the "drink tasted so bad" that none of the warehouse workers would take a drink. Although this Court will consider the fact that warehouse workers chose to not drink the plant protein milk, this Court will not consider: (1) FE 7's opinion that Campbell's pipeline "wasn't strong;" or (2) FE 12's opinion that the plant protein milk "wasn't very good" or that warehouse workers chose to not drink because the drink tasted so bad in evaluating Plaintiffs' Section 10(b) claim.

currently as drafted at most suggest "mismanagement on the part
of" the Individual Defendants.  "Allegations of mismanagement
will only support a securities fraud claim if they are coupled
with allegations that the defendants were aware, or recklessly
disregarded, that their mismanagement created an environment in
which fraud was occurring."  In re Hertz Global Holdings, Inc.,
905 F.3d 106, 117 (3d Cir. 2018).  As detailed above, the FAC
lacks sufficient facts that the Individual Defendants were
consciously aware of any fraud at Campbell or that the
Individual Defendants' actions were "an extreme departure from
the standards of ordinary care."

An additional fundamental issue with the way the FAC is
currently drafted is that the Plaintiffs' attempt to plead an
inference of scienter through the Individual Defendants'
internal statements and knowledge is that this theory together
along with the other theories of inferring scienter fail to
yield an inference that is at least compelling as the competing
inference that the Individual Defendants' believed in their
profitability and top growth projections despite a decrease in
sales and cost-cuts following the Bolthouse Recall.  This is
discussed more fully below in Section C.1.vi.

 ii.  Whether Motive May Support Scienter

Plaintiffs argue the Individual Defendants were allegedly
financially motivated to mislead the market to increase

Campbell's credit rating, which the Plaintiffs allege was "critical to Campbell being able to fund the Snyder's-Lance acquisition." (FAC ¶¶100, 248). Defendants argue that this motive cannot support an inference of scienter because it is well-settled that the desire to complete a business transaction cannot give rise to a strong inference of scienter. (Defs. Br. at 28-29).

Courts within this district have recognized that "a company's desire to maintain a high bond or credit rating does not qualify as sufficient motive for fraud . . . because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." In re Interpool, Inc. Sec. Litig., No. 04-321, 2005 WL 2000237, at *11 (D.N.J. Aug. 16, 2005) (quoting Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002)). Similarly, the Third Circuit has held that "[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent." GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2014).

Although this court recognizes that subsequent decisions

26

have held "when corporate defendants materially misrepresent the financial status of a company to enable stock-based business acquisitions at the time of the alleged misrepresentations, that alleged motive can give rise to a strong inference of scienter," the acquisition at issue in this matter was entirely cash-based. See Hull v. Global Dig. Sols., Inc., No. 16-5153, 2017 WL 6493148 (D.N.J. Dec. 19, 2017); Interpool, 2005 WL 2000237, at *10 (distinguishing the cash-based transaction from stock-based acquisitions and holding "[n]one of the cases cited by Plaintiff stand for the proposition that a defendant corporation's cash-based acquisition made during the class period, without more, may state a sufficient motive and opportunity to raise a strong inference of scienter").  This is not a case where the acquisition was funded partially by the company stock. (FAC ¶¶96, 136).

However, as recognized in In re Toronto-Dominion, an alleged motive to make misleading statements directly before a company offering "to artificially inflate stock prices or better credit terms" may still be probative of scienter.  In re Toronto-Dominion Bank Securities Litigation, No. 17-1665, 2018 WL 6381882, at *19 (D.N.J. Dec. 6, 2018).  This court agrees that Campbell's alleged motive may support an inference of scienter, but also agrees with the Court in In re Toronto-Dominion that such a motive is "not particularly helpful."  Id.

27

iii. <u>Whether the SOX Certifications May Support Scienter</u>

Plaintiffs next argue that the Individual Defendants' "signing of the SOX certifications further supports scienter, given their knowledge that their statements were misleading." (Pls. Br. at 35 n.7).  Defendants respond that the Individual Defendants' signing of SOX certifications does not support an inference of scienter because there are no allegations that suggest the Defendants were aware they were signing a false SEC filing or recklessly disregarded inaccuracies in such a SEC filing. (Defs. Br. at 34-35 n.30).  Under the Sarbanes-Oxley Act, principal executive and financial officers of public companies must make a number of certifications about their financials.  <u>See</u> 15 U.S.C. §§ 78m, 78o(d), 7241(a)(4). Specifically, officers must certify the general truthfulness of the company's quarterly and annual reports and the establishment and adequacy of the company's internal controls.  <u>In re Intelligroup Sec. Litig.</u>, 527 F. Supp. 2d 262, 287 (D.N.J. 2007).  However, "[a]n allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant *knew* he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing." <u>In re Hertz Global Holdings, Inc.</u>, 905 F.3d 106, 118 (3d Cir. 2018).  For the

reasons expressed above, Plaintiffs have failed to allege facts
to support the conclusion that Defendants knew the information
in the SOX Certifications was false or recklessly disregarded
any inaccuracies contained in an SEC filing.

   iv.  Whether Morrison's Termination May Support Scienter

     Plaintiffs also argue Morrison's resignation on "the same
day Defendants revised the FY18 Guidance downward for the final
time and took a $619 million pretax impairment charge related
entirely to C-Fresh" supports an inference of scienter.  (FAC
¶252; Pls. Br. at 33-34).  Defendants respond that the
Plaintiffs have failed to include allegations to suggest that
the resignation was suggestive of fraud.

     Generally, "[t]he departure of corporate executive
defendants is a factor that can strengthen the inference of
scienter."  In re Hertz Global Holdings, Inc., 905 F.3d at 118
(citing City of Dearborn Heights Act 345 Police & Fire Ret. Sys.
v. Align Tech., Inc., 856 F.3d 605, 622 (9th Cir. 2017)).  But,
even the termination of an executive after the announcement of
so-called bad news requires "more than pleading a link between
bad news and an executive's resignation."  Id. at 119.  This is
because "[c]hanges in leadership is only expected when
leadership fails."  Id.  There must still be allegations which
"cogently suggest that the resignations resulted from the
relevant executives' knowing or reckless involvement in a

fraud." Id.  The FAC does not support an inference of scienter from these allegations and instead merely pleads a link between Morrison's resignation and the bad news that Campbell had to downgrade its financial guidance again and chose to take an impairment charge.

First, as a judge of this Court noted in In re Interpool, Inc., a court "may not infer scienter unless it is satisfied that the Defendants acted with reckless or conscious behavior" even when a corporation chooses to "terminate[] employees for making errors due to negligence, oversights, etc., or simply for incompetence." 2005 WL 2000237, at *17.  Here Morrison's resignation may very well have been related to incompetence and negligence in her failed attempts to resolve issues with C-Fresh following the Bolthouse Recall; however, that does not equate to fraudulent behavior.

Second, the fact that DiSilvestro retained a role at Campbell further undercuts Plaintiffs' scienter theory.  In re Toronto-Dominion Bank Securities Litigation, 2018 WL 638188, at *18.  A resignation may support a finding of scienter because it may be implied that the individual knew of the fraud being perpetrated.  Once those outside the fraud find out, supposedly, they terminate (or force to resign) all those who may have been responsible.  If DiSilvestro knew or were reckless in not knowing the alleged fraud, why would Campbell retain him?

Third, the FAC includes additional allegations regarding the fallout following Morrison's termination.  (FAC ¶¶157-68). However, it is well-settled in this District that it is never enough "to plead fraud by hindsight."  In re Hertz Global Holdings, Inc. Sec. Litig., No. 13-7050, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017).

The FAC as drafted fails to include additional evidence to infer that the resignation of Morrison had anything to do with her supposed knowledge or reckless involvement with any fraud.

v.   Whether the Core Operations Doctrine May Support Scienter

Plaintiffs also contend the core operations doctrine applies and strengthens the inference of Defendants' scienter given C-Fresh's central importance to Campbell's profitability and the Individual Defendants' statements regarding the importance of C-Fresh in general. (Pls. Br. at 34-35). Defendants respond that the allegations concerning the core operations doctrine are insufficient because (1) C-Fresh only represented 12% of Campbell revenues, which is less than 5% of Campbell's earnings; and (2) there are no additional allegations of specific information conveyed to the Individual Defendants that related to the alleged fraud.  (Defs. Br. at 34-35).

The "core operations doctrine" provides that a plaintiff may be able to allege a strong inference of scienter by alleging "that a defendant made misstatements concerning the 'core

31

matters' of central importance to a company." <u>Martin v. GNC Holdings, Inc.</u>, 757 Fed. App'x 151, 155 (3d Cir. 2018). However, the doctrine "does not support a finding of scienter . . . absent some additional allegation of specific information conveyed to management and related to the fraud." <u>Id.</u> (internal quotation marks omitted); <u>see</u> <u>Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.</u>, 720 F. Supp. 2d 517, 526 (D.N.J. 2010) (rejecting core operations doctrine in absence of "other individualized allegations"); <u>In re Amarin Corp. PLC</u>, No. 13-6663, 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) (refusing to infer scienter from core operations doctrine "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements"); <u>see also</u> <u>Rahman</u>, 736 F.3d at 246 (declining to apply core operations doctrine in the absence of allegations demonstrating that Defendants knew the information they disseminated was false). For the reasons expressed above, Plaintiffs have failed to allege facts upon which the Court can conclude, for the purposes of this Motion to Dismiss, that Defendants knew their statements were false.

   vi. <u>Failure to Plead a Strong Inference of Scienter</u>

     The Plaintiffs urge this Court to conclude that a holistic review of the FAC's allegations leads to a plausible string of inferences — that the Individual Defendants knowingly or at

least recklessly made statements while being aware of internal
data that was inconsistent with such statements to deceive
reasonable investors into purchasing stock for the purposes of
increasing Campbell's overall credit rating to complete C-
Fresh's acquisition of Snyder's.  The problem the Plaintiffs
face is that the inference of scienter it proposes based on (1)
Defendants' motive; and (2) the Defendants' internal knowledge
at the time the projections were made is simply not as
compelling as the opposing one that the Defendants propose: the
Individual Defendants actually believed that after the Bolthouse
recall through the sale of other products not affected by the
recall, introduction of new beverage products, increases in
capacity of beverages, and cost cuts the Company would be
profitable again in FY18.

This nonculpable explanation for Defendants' conduct is
supported by Morrison's discussion of ways for C-Fresh to make
up for the lost revenue from Bolthouse's mid-sized beverages
during her monthly meeting, which Plaintiffs believe is evidence
of Morrison's fraudulent conduct.  This allegation actually
supports the Defendants' position that the Individual
Defendants' projections were accounting for their changes in
strategy following the Bolthouse recall and had plans to improve
C-Fresh's performance for FY18.  Moreover, as Defendants note,
Plaintiffs do not even attempt to address the importance of the

C-Fresh's carrot sales in creating its financial projections. Nor do Plaintiffs address the evidence in the documents incorporated into the Complaint that the Individual Defendants believed C-Fresh could turn around a profit quickly because it believed C-Fresh would have been profitable in at least one quarter in FY18 had it not been for an issue with carrots, which was completely disconnected from the Bolthouse Recall. (Ex. A at A698; FAC ¶182).  Instead of addressing this evidence, Plaintiffs simply say Defendants' version of the facts cannot supplant the complaint at the motion to dismiss stage. Nevertheless, as the Supreme Court has noted this Court "must consider plausible, nonculpable explanations for the defendants' conduct, as well as inferences favoring the plaintiff" to determine whether the plaintiff has alleged facts giving rise to the requisite "strong inference" of scienter to survive dismissal. Tellabs Inc., 551 U.S. at 313.

Although this Court recognizes Plaintiffs' inference of fraud need not be the "of the 'smoking gun' genre", the FAC, as currently pled, simply does not include an inference of scienter that is at least as compelling as the non-fraudulent explanation of Defendants' conduct, which is necessary to propel Plaintiffs' beyond the pleading stage.

If this Court were to find FAC's inference of scienter sufficient to survive dismissal, then arguably any dissatisfied

investor who has purchased the stock of a company that was currently (1) suffering a negative and downward trend in sales and profit while still experiencing some top line growth; (2) implementing strategies and costs-cuts that employees did not agree were sufficient enough to increase sales and profits that ultimately did fail; (3) implementing high sales targets that employees ultimately failed to meet; and (4) making statements of expected growth in the same year would be able to satisfy the scienter element of a Rule 10(b)(5) claim at the pleading stage even when the defendants had a plausible nonculpable explanation for their actions.  Plaintiffs need to plead more facts demonstrating that Defendants were either aware of facts that were actually contrary to their statements similar to the plaintiffs in <u>Swanson</u> and <u>Curran</u> or at least that the Defendants' actions were an extreme departure from the standards of ordinary care.  Count One will, accordingly, be dismissed.

    2. <u>Control Person Claim Against Individual Defendants Under §</u>
       <u>20(a) of the Securities Exchange Act</u>

Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b).  15 U.S.C. § 78t(a); <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d 256, 284 (3d Cir. 2006).  Accordingly, liability under Section

20(a) is derivative of an underlying violation of Section 10(b)
by the controlled person. <u>Avaya, Inc.</u>, 564 F.3d at 252; <u>In re</u>
<u>Alpharma Inc. Sec. Litig.</u>, 372 F.3d 137, 153 (3d Cir. 2004)
("[P]laintiffs must prove not only that one person controlled
another person, but also that the 'controlled person' is liable
under the Act.") (internal quotation marks omitted).  Because
Plaintiffs have failed to state a claim for violation of § 10(b)
against Defendants, Plaintiffs' § 20(a) claims against the
Individual Defendants necessarily fail.  Count Two, accordingly
will be dismissed.

    **D.   Leave to Amend**

    In a footnote in their Opposition to Defendants' motion,
Plaintiffs request that the Court grant leave to amend the
complaint in the event the Court grants Defendants' motion in
full or part.  (Pls. Br. at 35 n.8.)   Amendments to pleadings
are governed by Federal Civil Procedure Rule 15, which provides
that the Court "should freely give leave when justice so
requires."  FED. R. CIV. P. 15(a)(2).  The Third Circuit has shown
a strong liberality in allowing amendments under Rule 15 in
order to ensure that claims will be decided on the merits rather
than on technicalities.  <u>Dole v. Arco Chemical Co.</u>, 921 F.2d
484, 487 (3d Cir. 1990); <u>Bechtel v. Robinson</u>, 886 F.2d 644, 652
(3d Cir. 1989).  An amendment must be permitted in the absence
of undue delay, bad faith, dilatory motive, unfair prejudice, or

futility of amendment.  <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d

103, 108 (3d Cir. 2002) (citing <u>Foman v. Davis</u>, 371 U.S. 178,

182 (1962)).

Here, the Court finds that Plaintiffs' request to file an

amended complaint does not present any undue delay, bad faith,

dilatory motive, unfair prejudice, or futility.  Consequently,

the Court will afford Plaintiffs 30 days to file an amended

complaint if they can do so in compliance with Rule 8,

<u>Twombly</u>/<u>Iqbal</u>, and Federal Rule of Civil Procedure 11.

<strong><u>CONCLUSION</u></strong>

For the reasons stated above, the Court will grant

Defendants' Motion to Dismiss with leave to amend.  An

appropriate Order will be entered.

Date: <u>November 30, 2020</u>          <u>s/ Noel L. Hillman</u>
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.