**CARELLA, BYRNE, CECCHI,**
  **OLSTEIN, BRODY &**
**AGNELLO P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiff*
*and the Class*

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Sharan Nirmul
Matthew L. Mustokoff
Johnston de F. Whitman, Jr.
Kevin E.T. Cunningham, Jr.
Henry W. Longley
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
kcunningham@ktmc.com
hlongley@ktmc.com

*Lead Counsel for Lead Plaintiff*
*and the Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE CAMPBELL SOUP COMPANY SECURITIES LITIGATION | Case No. 18-cv-14385-NLH-JS<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE ............................................................................10

III.    PARTIES AND RELEVANT NON-PARTIES ....................................................10

    A.    Lead Plaintiff .............................................................................................10

    B.    Defendants ..................................................................................................11

        1.    Campbell Soup Company ................................................................ 11

        2.    The Individual Defendants............................................................... 11

    C.    Relevant Non-Parties .................................................................................12

        1.    Former Employees ........................................................................... 12

IV.     OVERVIEW OF DEFENDANTS' FRAUD .........................................................19

    A.    Campbell's Role as a Soup Icon Grows Stale ...........................................19

    B.    The "Fresh Revolution": Morrison's Plan to Turn Campbell Around .................20

        1.    The Early Years ............................................................................... 20

        2.    The Company Acquires Bolthouse Farms in a Blockbuster Deal and Builds a New Campbell Fresh Division Around It ............................................................................ 22

        3.    Bolthouse's Structure and Revenue Sources ............................................. 24

    C.    The Bolthouse Recall: Widespread Product Deficiencies Start A Chain Reaction that Imperils Morrison's Ambitious Growth Strategy ...........................26

        1.    The Bolthouse Recall and Massive Production Declines.............................................................................................. 26

        2.    The Recall Resulted in Costly Changes That Also Impacted Bolthouse's Bottom Line ......................................... 29

        3.    The Bolthouse Recall Damages Bolthouse's Relationships With Its Major Retail Customers, Leading to Decreased Sales ................................................... 30

        4.    Heading Into FY 2018, Campbell Seeks To Raise Expectations About The Bolthouse Beverage Business ........................................................................................... 35

            a.    Campbell Maintains Its Lofty Valuation for Bolthouse Based Upon Its FY 2018 Growth Projections.................................................................... 35

i

b.      Campbell Lays Out Its Strategy for FY 2018
        Growth ........................................................................ 37

5.      During the Summer of 2017, Bolthouse Misses
        Critical Modular Resets for Its Largest Retail
        Clients .......................................................................... 40

        a.      Target Dramatically Reduces Bolthouse Beverage
                Products As Early As March 2017 and Continued To
                Miss Modular Resets Throughout FY 2018 ................................. 42
        b.      Walmart's Annual Modular Reset in August 2017
                Also Diminishes Critical Bolthouse Shelf-Space ........................ 43
        c.      Kroger, Bolthouse's Second Largest Customer,
                Curtails Shelf-Space in its Semi-Annual Modular
                Reset in Q1 2018 .......................................................... 44
        d.      Other Major Customers Also Reduced Shelf-Space
                for Bolthouse Products in Campbell's FY 2018 ......................... 45
        e.      The Modular Resets Were a Critical Event for the
                Company and the Defendants Were Aware of the
                Modular Resets for Bolthouse's Most
                Significant Customers .................................................... 46

6.      Campbell Outsources Significant Sales
        Responsibilities to Independent Contractors Lacking
        Critical Product Knowledge ............................................... 47
7.      Marketing Budget Cuts Hamstring C-Fresh Sales .................... 49
8.      The Touted C-Fresh Product "Innovations" Fall Flat .............. 51
9.      Known Carrot Quantity and Quality Problems
        Plague C-Fresh ............................................................ 56
10.     Numerous Former Employees Confirm that the
        August 31, 2017 Guidance Issued by Campbell's
        Was Unreasonable and Unattainable ...................................... 58
11.     Despite the Poor Performance in Q1 2018,
        Defendants Reaffirm Their Outlook for Bolthouse on
        November 21, 2017 ........................................................ 62
12.     Campbell Maintains its Drumbeat of Second Half FY
        2018 Profitability, After Once Again Disappointing
        On Quarterly Results ..................................................... 63
13.     Campbell Propped Up Its Stock to Fund its Largest
        Acquisition Ever ......................................................... 66
14.     The Bottom Falls Out: The Company Takes a $619
        Million Impairment Charge on C-Fresh, Fires its
        CEO and Announces That C-Fresh Will
        Be Divested .............................................................. 72

ii

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING
     STATEMENTS AND OMISSIONS ....................................................76

     A.   August 31, 2017 ....................................................................76
     B.   November 21, 2017................................................................80
     C.   February 16, 2018 ................................................................85
     D.   Defendants Violated Item 303 of Regulation S-K ................90

VI.  THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION .........................92

     A.   November 21, 2017................................................................92
     B.   February 16, 2018 ................................................................94
     C.   May 18, 2018 ........................................................................96

VII. ADDITIONAL ALLEGATIONS OF SCIENTER........................................98

     A.   Defendants' August 31, 2017 Misstatements ......................99

          1.   The FY 2018 Guidance Was Contradicted By
               Known Inadequate Carrot Yields as of August 31,
               2017.............................................................................. 99
          2.   The FY 2018 Guidance Was Contradicted By
               Known Adverse Modular Resets At Major
               Customers Prior to August 31, 2017 ........................ 100
          3.   The FY 2018 Guidance Was Contradicted By
               Diminished Margins for Bolthouse Beverages
               Caused by Post-Recall Production Modifications .................. 103
          4.   The FY 2018 Guidance Was Contradicted by Known
               Problems With the Claimed "Innovations" That
               Morrison Declared Would Contribute to Profitable
               Growth ...................................................................... 104

     B.   Defendants' November 21, 2017 Misstatements ................105
     C.   Defendants' February 16, 2018 Misstatements ................106
     D.   Defendants' Misrepresented and Concealed the Truth to Close the
          Snyder's-Lance Acquisition................................................108
     E.   Morrison's Abrupt "Resignation"......................................112
     F.   The Fraud Concerns the Core of Campbell's Operations ...................113
     G.   Defendants' High Level Positions ......................................114
     H.   The Individual Defendants Controlled the Contents of the Company's
          Public Statements During the Class Period ......................115

VIII. THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE
      APPLIES.................................................................................116

IX.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
     DOCTRINE ARE INAPPLICABLE.................................................................117
X.   CLASS ACTION ALLEGATIONS ..............................................................118
XI.  CAUSES OF ACTION.................................................................................120
COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
     Promulgated Thereunder Against Campbell and the Individual Defendants .................120
COUNT II For Violations of Section 20(a) of the Exchange Act Against the
     Individual Defendants...................................................................................121
XII. PRAYER FOR RELIEF .............................................................................123
JURY TRIAL DEMAND ........................................................................................123

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff"), by counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of Campbell Soup Company ("Campbell" or the "Company") from August 31, 2017 through May 17, 2018 (the "Class Period"), and were injured thereby (the "Class").

Lead Plaintiff's allegations herein are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based upon, among other things, the ongoing investigation conducted by and through its attorneys, which includes, among other things, interviews with dozens of individuals, including former employees of Campbell, a review of Campbell's public documents, conference calls concerning Campbell, the Company's United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Campbell, analyst reports and advisories about the Company, media reports concerning Campbell and information obtainable on the Internet. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.     This action arises from Defendants' materially false or misleading statements during the Class Period regarding Campbell's ability to deliver "profitable growth" for fiscal year 2018 ("FY18") in the Company's critically important Campbell Fresh ("C-Fresh") division, including by introducing "product innovations" that Defendants repeatedly touted. As alleged herein, Defendants consistently provided growth projections for Campbell's C-Fresh division that adverse facts known to Defendants, but concealed from investors, demonstrated were unrealistic and unattainable.

1

2.      Campbell has long been one of the country's blue-chip companies.  Founded in 1869, and propelled by its famous tomato soup, the Company quickly rose to prominence as a household name.  By 2009, however the Company's soup sales began to decline, with Campbell's share of the canned soup market declining to 53% from roughly 67% a decade earlier.

3.      Campbell's soup business and market share weakened in response to a shift in food consumption preferences.   Unlike their baby boomer predecessors—who were raised on Campbell's condensed soup—younger consumers, including so-called "millennials," prefer fresh foods that are easy to prepare.  Based on their observed purchasing habits, millennials became Campbell's most discerning and important consumers.

4.      As a company closely associated with its long-standing canned soup, Campbell needed a strategy to adapt to the noted consumer evolution toward fresh foods.  On August 1, 2011, the Company ousted its long-tenured prior Chief Executive Officer ("CEO"), and promoted Defendant Denise M. Morrison ("Morrison") to chart a new course for the Company.

5.      Shortly after taking the helm, Morrison promised to overhaul Campbell's image and product offerings.  She declared a "fresh revolution" designed to "drive a new era of growth for Campbell."  To deliver on Morrison's promise, the Company quickly needed to break into the fresh foods market.  Because Campbell was unable to produce fresh food products organically, the Company pursued acquisition candidates whose product portfolios Morrison believed would provide Campbell with an immediate presence on the fresh food shelves of the largest national food retailers, as well as the shelves of smaller regional food providers.

6.      To further Morrison's objective to transform Campbell into a significant player in the fresh foods market, Campbell embarked on an acquisition campaign between 2012 and the beginning of the Class Period in August 2017 that was unprecedented in the Company's history.

In August 2012, Campbell purchased Bolthouse Farms ("Bolthouse"), a fresh foods brand and producer of refrigerated beverages, refrigerated salad dressings, and carrots and carrot ingredients, for a staggering $1.55 billion.  At the time, it was the largest acquisition in Campbell's history.

7.      In January 2015, and with Bolthouse as the anchor, Morrison formed an entire division around Campbell's emerging fresh foods portfolio, dubbed Campbell Fresh, or "C-Fresh." With the creation of C-Fresh, Campbell reorganized its entire business operations into just these three divisions: (i) America's Simple Meals and Beverages; (ii) Global Biscuits and Snacks; and (iii) C-Fresh.  Continuing to build C-Fresh, Campbell followed the Bolthouse acquisition with purchases of additional fresh foods brands, including Plum Organics in June 2013, Garden Fresh Gourmet ("Garden Fresh") in June 2015, and Pacific Foods of Oregon ("Pacific Foods") in December 2017.

8.      Carrots and carrot ingredients accounted for 62% percent of Bolthouse revenues according to Campbell's Analyst Day presentation, given on July 24, 2013, by former Bolthouse CEO Jeff Dunn.  But, the carrot and carrot ingredients businesses were expected to generate only 4% carrot category growth.  The Bolthouse beverage and salad dressing businesses, on the other hand, represented 38% of revenues for Bolthouse, and were expected to provide 22% Consumer Packaged Goods category growth, according to the same Campbell's Analyst Day presentation.

9.      Carrots were an essential ingredient in more than half of the Bolthouse juices offered during the Class Period.  During Campbell's 2013 Analyst Day presentation, the Company shared information depicting that carrot yields were key to the Company's synergistic vision between Bolthouse's carrot and beverage businesses because a significant portion of each carrot grown was used in producing Bolthouse beverages or juice concentrate.

10.     Bolthouse derived the vast majority of its beverage revenues from major supermarket chains. Approximately 70-75% of Bolthouse's beverage sales during the Class Period came from Walmart, Kroger, Target, Ahold, Publix, Albertsons/Safeway, Meijer, and Wegmans. Of this amount, at least a third of Bolthouse beverage sales came from Walmart, Target, and Publix.

11.     During Campbell's fiscal years 2015 and 2016, C-Fresh reported solid net sales and earnings, mainly derived from distribution and sales of Bolthouse products through its major grocery chain customers. In turn, the Company ramped up production at Bolthouse and extolled the division as a growth driver. But C-Fresh's early success would quickly evaporate based on quality control problems infecting Bolthouse beverage products in the Protein/Low Acid Business line—which held 47% of the market share for super-premium protein beverages at the time.

12.     On June 22, 2016, Campbell's voluntarily recalled at least 3.8 million bottles of its beverage products nationwide "due to possible spoilage that may cause the beverages to appear lumpy, taste unpleasant, and have an off odor" (the "Bolthouse Recall" or "Recall"). Campbell instituted the Bolthouse Recall after receiving numerous "consumer complaints, including reports of illness," and had been repurchasing the tainted beverages from certain customers for approximately three months.

13.     Following the Bolthouse Recall, C-Fresh's sales and earnings plummeted. For the first quarter of 2016 alone, C-Fresh's operating profit dropped by approximately 62%, and its sales declined by 5%. The Bolthouse Recall triggered production disruptions and increased quality control costs, which reduced C-Fresh's ability to service Bolthouse's most important customers during a 15-month period, starting in July 2016 and lasting until at least October 2017.

14.     The negative impact of the Bolthouse Recall, however, was not limited to increased costs, production delays, and reduced beverage production capacity.  Far more damaging to C-Fresh heading into and during the Class Period was Bolthouse's resulting loss of critical shelf space from its largest supermarket chain customers, including Target, Walmart, Publix, Kroger, and Albertsons.  In this regard, each retailer has its own schedule—referred to in the food production and distribution industry as a "cadence"—for allocating shelf space for the products that it elects to offer to consumers.  These shelf space allocations, or "Modular Resets," occur infrequently, with some retailers resetting the shelf space only once per year for the forthcoming fiscal year.  It is vital for food producers and distributors, like Campbell, to be included in the Modular Resets to obtain and maintain shelf space for their products in the time period between a retailer's Modular Resets.  Retailers make their decisions regarding the Modular Resets typically two months before the Reset occurs, and the period leading up to the Modular Reset is called the "sell-in" period.  Thus, Campbell would know exactly how any Modular Reset would be impacting it months before the date of the Reset.

15.     As a result of the Bolthouse Recall and resulting reputational damage, leading into and during the Class Period, Bolthouse missed Modular Resets for its beverage products at some of its most significant supermarket chain customers, including at least Target, Kroger, Walmart, Publix, and Albertsons, making sales growth at these customers impossible in FY 2018. Compounding this devastating problem, in their Modular Resets, C-Fresh's largest customers often replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018.

16.     Given the critical importance of Modular Resets to Campbell's business, information concerning the Modular Resets at all retailers was maintained on a shared document, referred to herein as the "Modular Reset Tracker," which was accessible to all C-Fresh sales personnel, and tracked the results and impact of all Modular Resets.  Used for distribution and forecasting, as well as planning production runs, this critical document spelled out the impact of missed Modular Resets on C-Fresh's prospective profitability months in advance of the Modular Reset date.

17.     Based on the Bolthouse Recall, missed Modular Resets, and the dire need to "sell-in" to forthcoming Modular Resets Campbell executives, including Defendant Morrison, were "flying all over the country" through at least July 2017 to meet with Bolthouse's top customers to try to protect and attempt to regain shelf space.  During the Class Period, however, Defendants concealed from investors these material facts, and the severity and duration of their impact.

18.     Leading into the Class Period, Bolthouse's carrot business, which included the carrot ingredients required to manufacture numerous Bolthouse beverages, was also suffering behind the scenes.  In fact, internal reports concerning Bolthouse's carrot business posted on the Company's sales portal showed unmistakably that Bolthouse's carrot yields would be down for the remainder of 2017 based upon the impact of excessive rainfall that had occurred earlier in the year.  By no later than August 2017, Bolthouse's marketing and sales teams also knew that Bolthouse would have poor carrot yields, which would erode sales and profits through the rest of calendar year 2017.

19.     Shortly before the beginning of the Class Period, in July 2017, Morrison sought a solution to suppress the disastrous problems that the C-Fresh division was suffering as Campbell's fiscal year 2017 came to a close.  To support this objective, Morrison set her sights on one of

Campbell's largest competitors in its Global Biscuits and Snacks division, Snyder's-Lance, Inc. ("Snyder's-Lance").

20.     Campbell's efforts to acquire Snyder's Lance continued during the Class Period, and on October 3, 2017, Campbell's indicated to Snyder's-Lance that it was interested in acquiring it in an all cash transaction at a price ranging from $46.00 to $50.00 per share.  The upper price in that range ending up being Campbell's offer.  With a $6.1 billion price tag for the acquisition, which Campbell intended to fund with roughly $5 billion in debt, it was critical that Campbell maintain a prime credit rating, then hovering at Moody's Aaa3.  With a Debt/EBITA ratio of 2.2x, the proposed deal with Snyder's-Lance would raise that leverage ratio to 5.0x and without convincing rating agencies and investors that Campbell could service that debt with free cash flow without impacting its dividend or credit rating, Morrison's deal would fail.

21.     During the Company's July 19, 2017 Investor Day Conference, Morrison represented that C-Fresh "will significantly improve," and for FY18, "Campbell Fresh would be over the [1% to 3%] range."  Defendant Anthony P. DiSilvestro ("DiSilvestro") added: "We do anticipate I would call fairly significant margin expansion in C-Fresh in F'18."  Investors were impressed, and Campbell's stock shot up nearly 5% overnight.

22.     Throughout the Class Period, Defendants continued to convince the market that C-Fresh would return to profitability in 2018.  They claimed, for example: (i) "we expect [C-Fresh] to return to profitable growth in fiscal 2018," (ii) "we do expect to see top line growth in Campbell Fresh in 2018," (iii) "the Campbell Fresh turnaround is progressing," and (iv) "we would expect to see profitability pretty quick in Campbell Fresh."  In November 2017, Morrison announced that C-Fresh had returned to normal beverage production and packaging, and again touted this in February 2018, also claiming that C-Fresh had returned to its normal promotional activities.

23.     These statements were materially false or misleading when made.  Indeed, as multiple former employees ("FEs") have confirmed, the Company never recovered from the Bolthouse Recall, which severely damaged customer relationships, deprived Bolthouse products of critical shelf space, and led to a downward spiral at C-Fresh.  For example, Lead Plaintiff has learned the following facts, among others, through the course of its investigation:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018, Bolthouse products were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, including loss of the 32 oz. beverages which accounted for up to 30% of Bolthouse's beverage revenues.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018.

- Throughout 2017 and into 2018, as a consequence of the quality assurance standards instituted after the Bolthouse Recall, costs went "through the roof" and eroded margins on Bolthouse's Protein/Low Acid beverage line going forward, which combined with reduced demand, made profitable growth in FY 2018 impossible.

24.     While C-Fresh's performance continued to slide during the Class Period, Defendants continued to reaffirm their claim that C-Fresh was on the cusp of renewed profitability.  Among other things, Defendants cited a return to "normal capacity," and claimed "beverage innovations [that] will drive improved performance in the second half."

25.     In truth, as numerous FEs disclosed, retailers were spurning C-Fresh's existing premium beverages, Bolthouse products were excluded from critical Modular Resets, and putative "beverage innovations" that Defendants touted, including Bolthouse's fledgling Pea Protein Milk, were beset by production problems and never gained meaningful traction in the market.  In fact, the Pea Protein Milk was rushed to market in September 2017, despite the R&D team believing that 6-9 more months were needed to prepare the product for launch.  Moreover, customer

reception to the Pea Protein Milk was resoundingly negative, such that the product was so undesirable that unsold cases piled up in Bolthouse's warehouses, and were offered for free to warehouse employees, who also declined the product.

26.     Still Morrison was able to maintain the charade long enough to close her showcase acquisition of Snyder's-Lance.  Notably, as Moody's observed in rating the deal, Campbell's 2018 cash flow was a critical component in how the Company's debt would be rated, and thus the cost to Campbell.  In other words, Morrison could not close this deal if she exposed the true state of affairs at C-Fresh, which was barreling toward a shocking write-down.  The deal was approved by Snyder's-Lance shareholders on March 23, 2018, and closed on March 26, 2018.

27.     Barely two months later, Defendants could no longer sustain their efforts to out run and paper over the truth.  On May 18, 2018, Campbell recorded losses of $19 million for C-Fresh, and made the shocking announcement that it was taking a $619 million impairment charge on C-Fresh alone—two-thirds of which was specifically related to Bolthouse—despite having just claimed two months earlier that it would return to profitability in the second half of 2018.  Having just raised $5.1 billion from unsuspecting investors just six weeks before the close of the third quarter, on March 15, 2018, based on a credit rating from Moody's that kept Campbell's debt rating prime, the timing of this announcement was not just convenient, it smacked of intentional concealment.

28.     The Company further announced on May 18, 2018, that Morrison would be "retiring," effective immediately, with no permanent successor.  It would later be reported that Campbell's Board of Directors forced Morrison out of the Company.

29.     Market reaction to this negative news was swift and unforgiving.  Shares of the Company's common stock tumbled by more than 12%, erasing billions of dollars in market

capitalization.  Rather than being a growth engine poised for profitability, with a stable of innovative new beverages and operating at full capacity, C-Fresh's business was permanently impaired and ruined.  Investors now seek their resulting losses from this fraud through this lawsuit.

## II.    JURISDICTION AND VENUE

30.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

31.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

32.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because Defendant Campbell conducts business in this District and also maintains its administrative headquarters in this District.

33.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.    Lead Plaintiff

34.    Court appointed Lead Plaintiff Oklahoma Firefighters purchased shares of Campbell common stock on the New York Stock Exchange ("NYSE") at artificially inflated prices during the Class Period and suffered losses as a result of the conduct alleged herein.  Lead Plaintiff's Class Period transactions in Campbell common stock are reflected on the certification attached hereto as **Exhibit A**.

B. **Defendants**

1. **Campbell Soup Company**

35.     Defendant Campbell is a New Jersey corporation with its principal executive offices Camden, New Jersey.  Campbell is a global food company that manufactures and markets a range of soups and simple meals, beverages, snacks, and packaged fresh foods.  The Company operates in three divisions: (i) Simple Meals and Beverages, which includes Campbell's soups, broths, stocks, sauces, gravies, pasta, beans, canned poultry, V8 beverages, and tomato juices; (ii) Global Biscuits and Snacks, which encompasses Pepperidge Farm, Snyder's-Lance, Arnott's, and Kelsen products; and (iii) C-Fresh, which includes Bolthouse fresh carrots, carrot ingredients, refrigerated beverages, refrigerated salad dressings, Garden Fresh salsa, hummus, dips, tortilla chips, and the Company's U.S. refrigerated soup business. During the Class Period, C-Fresh maintained its principal executive offices in Santa Monica, California.

36.     Campbell's common stock trades on the NYSE under the ticker symbol "CPB." For the fiscal years 2017 and 2018, respectively, Campbell reported total net sales of $7.89 billion and $8.68 billion.  In 2017 and 2018, C-Fresh reported total net sales of $967 million and $970 million, respectively, or 12% and 11% of Campbell's total sales. During the Class Period, Campbell's five largest customers accounted for approximately 39% of the Company's consolidated net sales.  Campbell's largest customer, Walmart, accounted for approximately 20% and 18% of the Company's consolidated net sales in 2017 and 2018, respectively.

2. **The Individual Defendants**

37.     Defendant Morrison served as President and CEO of Campbell from August 2011 until May 2018.  Previously, Morrison served as Campbell's Executive Vice President and Chief Operating Officer.  Morrison also held a position on Campbell's Board of Directors from October 1, 2010 until her forced departure in May 2018.

38.     Defendant DiSilvestro served as Senior Vice President and Chief Financial Officer ("CFO") of Campbell from May 1, 2014 through the end of the Class Period.  In this role, DiSilvestro was responsible for Campbell's global finance group, encompassing controllers, treasury, external development, tax, real estate, corporate audit, investor relations, and the business unit finance functions.  DiSilvestro left Campbell in October 2019.

39.     The Defendants referenced above in ¶¶ 37-38 are referred to herein as the "Individual Defendants."

## C.     Relevant Non-Parties

### 1.     Former Employees[1]

40.     FE 1 worked in the Company's C-Fresh division as a mid-level Sales Support Manager throughout the Class Period.  In this position, FE 1 worked with C-Fresh's marketing and field sales teams to develop sales plans to get C-Fresh's products on the shelves of C-Fresh's retail store customers.  FE 1 worked to service many of C-Fresh's major retail customers.  With respect to those customers, FE 1 was responsible for developing national channel-specific trade strategies for C-Fresh's products concerning distribution, shelving, and merchandising. FE 1's responsibilities also included participating in quarterly review sessions with customers regarding Campbell's products at retail stores.  Additionally, FE 1 attended monthly meetings held by Defendant Morrison.  During these meetings, Morrison discussed trends impacting the sales and business strategies for the C-Fresh division.  FE 1 also worked with C-Fresh's sales strategy teams to identify and execute initiatives to meet sales targets.  As a mid-level Sales Support Manager,

---

[1] FEs will be identified herein by number (FE 1, FE 2, etc.) and by the uniform use of the pronouns "she/her."

FE 1 reported up through Damon Caton, Vice President ("VP") of Customer Planning & Business Development.

41.     FE 2 was a mid-level Financial Manager throughout the Class Period.  In this role, FE 2 often served as a liaison between C-Fresh and Campbell.  FE 2's responsibilities included assisting in consolidating C-Fresh's financial results into Campbell's financials and sending C-Fresh's profit and loss data to members of Campbell's finance team, including: Franco Paparo, Senior Manager Financial Reporting; and Jack Legge, Manager Financial Reporting. Additionally, FE 2 participated in monthly meetings with C-Fresh executives where the division's monthly financial data was discussed.  The executives in attendance at these monthly meetings were Dave Rooke, Senior VP of Farms Sales & Sales and Customer Management; Todd Putman ("Putman"), General Manager; Andrew Ross, VP of Bakersfield Plant Operations; Jim Caltabiano ("Caltabiano"), C-Fresh's CFO; Reyes Espinosa, C-Fresh Controller; and Financial Planning and Analysis forecasters Aaron Ramersa, Rob Stevens, and Josh Ochs.  During these meetings, Caltabiano informed the group that he would brief C-Fresh President Ed Carolan ("Carolan") on the discussions, who in turn briefed Defendants Morrison and DiSilvestro.  FE 2 reported up through the C-Fresh Controller, Reyes Espinosa.

42.     FE 3 was a mid-level Manager located in C-Fresh's Santa Monica office from before the Class Period until early 2018.  In this role, FE 3 oversaw the sales and promotion strategies, managed brands, and helped market products for one of Bolthouse's business lines.  FE 3 also attended monthly meetings, in which the C-Fresh division analyzed the FY18 sales trends and targets as well as the strategies aimed at increasing C-Fresh's revenues. Also in attendance at these meetings were the following C-Fresh executives: Carolan, President; Putman, General Manager; Suzan Saltzman Ginestro ("Ginestro"), Chief Marketing & Innovation Officer; Bill

13

Lange ("Lange"), VP of Marketing; as well as others.   Further, FE 3 attended quarterly performance reviews held by Caltabiano, C-Fresh's CFO, where Caltabiano discussed C-Fresh-wide financial performance, including the details for all of C-Fresh's product lines.   FE 3 ultimately reported up to Bolthouse's VP of Marketing, Lange.

43.     FE 4 was employed as a National Account Representative for the C-Fresh division from mid-2017 until the spring of 2018.   While at Campbell, FE 4 managed the Bolthouse and Garden Fresh brands with respect to Target.   In this role, FE 4 directed the development and execution of Campbell's business plans to achieve C-Fresh's sales targets for Target's stores. Additionally, FE 4 and FE 4's team worked with Campbell's Finance Department to develop C-Fresh's fiscal year 2019 ("FY19") projections for Target.

44.     FE 5 served as a Senior Sales Executive for the C-Fresh division throughout the Class Period.   FE 5's responsibilities included overseeing the sales strategies and execution for all C-Fresh and Garden Fresh products, except for raw carrots.   In this role, FE 5 was involved in forecasting sales and reported the sales trends to Campbell's management.   FE 5 reported to C-Fresh General Manager, Putman.

45.     FE 6 was employed as a Regional Sales Manager in the C-Fresh division throughout the Class Period.   FE 6 was responsible for C-Fresh sales in a large multi-state region of the country.   In this position, FE 6 reported up through a VP of C-Fresh's Sales.

46.     FE 7 was a mid-level Director of Research and Development ("R&D") for C-Fresh from summer 2017 through late 2018.   FE 7 was responsible for resolving commercialization and start-up issues related to C-Fresh's Pea Protein Milk Drink.   Additionally, FE 7 provided process development and packaging engineering support for C-Fresh.   In this role, FE 7 reported up through the VP of R&D for C-Fresh.

47.     FE 8 served as a mid-level Manager for Bolthouse and Garden Fresh.  During the Class Period, FE 8's customers included Kroger.  In this position, FE 8 worked with C-Fresh's sales team in an effort to meet Campbell's sales targets.  FE 8's duties included meeting with Kroger's representatives and discussing product performance, as well as analyzing product promotions, and selling Kroger's new products.  Additionally, FE 8 participated in monthly meetings with C-Fresh executives Carolan, Putman, and Imran Kahn, VP of C-Fresh sales.

48.     FE 9 worked in the C-Fresh division as a Creative Director throughout the entire Class Period.  FE 9's responsibilities included coordinating the sales and marketing divisions for Bolthouse and Campbell.  Additionally, FE 9 participated in monthly meetings regarding C-Fresh's declining sales with Campbell executives, which included Defendant Morrison.

49.     FE 10 was a Senior Marketing professional for C-Fresh during the Class Period.  FE 10 was responsible for bringing C-Fresh products to market, which included concept development, managing portfolios, brand management, and demand creation.  In this role, FE 10 interacted with Defendants Morrison and DiSilvestro.  FE 10 also interacted with C-Fresh President, Carolan, who reported to Defendant Morrison.

50.     FE 11 worked within R&D for C-Fresh until late 2017.  In this capacity, FE 11 worked with C-Fresh's R&D and Marketing teams to research, develop, and implement Bolthouse's products.  FE 11 was knowledgeable regarding the testing of Bolthouse's protein drinks for shelf stability and ingredient formulation.  Additionally, FE 11 knew about the ingredient formulation research for incorporating pea protein into C-Fresh's Plant Protein Milk.

51.     FE 12 was employed as a mid-level Manager at C-Fresh's warehouse in Bakersfield, California throughout the Class Period.  FE 12's responsibilities included receiving

15

product from the warehouse and loading it onto C-Fresh's trucks for delivery, as well as moving C-Fresh product within the warehouse facility for processing.

52.     FE 13 served as a Senior Marketing Executive for the Company's C-Fresh division during the entire Class Period.  FE 13's responsibilities included managing the marketing strategies for the entire C-Fresh product portfolio.  While at C-Fresh, FE 13 reported to C-Fresh General Manager, Putman.

53.     FE 14 was a Team Manager at Campbell throughout the Class Period.  FE 14 managed the team that dealt with Albertson's for C-Fresh and Bolthouse Products.  FE 14 was originally a Campbell's management employee that was brought to Bolthouse during a period of restructuring at Bolthouse in early 2017.

54.     FE 15 was a Regional Field Sales Manager for C-Fresh throughout the Class Period. FE 15 primarily worked in the Southeast market with Publix.  FE 15 worked for the Director of Field Sales for the Florida market, who reported to Tim Crane, VP of Sales.

55.     FE 16 was a Sales Representative for C-Fresh in Texas from before the Class Period until July 2017.  FE 16 reported to Field Sales Manager Kaitlyn Lavoie.

56.     FE 17 was the National Sales Director for Bolthouse's Walmart and Sam's Club accounts before the Class Period, from 2010 until 2015.  FE 17's primary Bolthouse business was carrots, beverages and juices, and salad dressing.  FE 17 also had previous experience working as a buyer for Walmart.

57.     FE 18 was a Regional Director for Bolthouse from 2017 until after the Class Period, and managed a region for grocery retailers, including Safeway, Albertsons, Sprouts, Bristol Farms, and Whole Foods, among others.  FE 18 reported to Dave Schoonmaker ("Schoonmaker"), VP of Sales, who reported to Ken Messick, Chief Customer Officer.  FE 18's responsibilities included

working to bring C-Fresh products, including Bolthouse and Garden Fresh products, to grocers, and was also tasked with repairing damaged relationships with customers in her region.

58.     FE 19 was a Regional VP from 2017 until after the end of the Class Period and worked in Campbell's Snack Division as a result of Campbell's acquisition of Snyder's-Lance, FE 19's then-employer.  FE 19 was familiar with Campbell's retailer customer relationships, and personally knew Defendant Morrison from their time working together at another company.

59.     FE 20 was a Senior Financial Analyst, working at Campbell corporate headquarters throughout the Class Period.  FE 20 initially worked in Global Financial Planning & Analysis ("FP&A"), then worked in Campbell's "Profit Center."  From early 2018 through the end of the Class Period, FE 20's duties at Campbell's Profit Center included handling corporate reporting for C-Fresh and Bolthouse, and FE 20 utilized Campbell's SAP Business Intelligence platform to create reports for Campbell executives.

60.     FE 21 was a North American Account Manager after the Class Period, from 2018 until 2019.  FE 21 was familiar with the Modular Reset process at Walmart during the Class Period, having reviewed historical data in preparation for her work on Walmart's Modular Reset occurring in August 2019.

61.     FE 22 was employed at Campbell for several decades.  FE 22 served as a Sales Director for Bolthouse and C-Fresh during the Class Period, during which time FE 22 managed a region for the Bolthouse business.  Among FE 22's accounts was Ahold, which included the Giant and Stop and Shop supermarket chains.

62.     FE 23 was an employee of Bolthouse's Accounting department from 2017 until after the Class Period.  Among FE 23's duties included assessing the previous sales history of Bolthouse's grocery chain customers and monitoring Bolthouse's corporate discounts and rebate

program.  FE 23 ensured that discounts and rebates provided to the large grocery chains that purchased from Bolthouse were properly accounted for and not over the allocation for any individual customer.

63.     FE 24 was a Manager at Campbell throughout the Class Period.  FE 24 was assigned to work with Publix regarding Campbell product categories.  In this capacity, FE 24 was familiar with Publix Modular Resets.

64.     FE 25 worked as a Manager for C-Fresh from early 2016 until mid-2017.  FE 25 was responsible for "arming" the sales team with information to help them sell new items and to expand the company's customer shelf presence.  FE 25 dealt with the following customers: Target (national), Albertson's, Safeway (Southern California), Hy-Vee (Mid-West).  Target was FE 25 biggest customer.  FE 25 initially reported to Stephen Wong, Director of Shopper Insights, and then to Sam Birks, Director of Category Management.

65.     FE 26 was employed at C-Fresh/Bolthouse throughout the Class Period.  FE 26 worked as a Senior Financial Analyst then later as a Manager.  FE 26's duties within the Sales/Finance Department included working with the sales teams to ensure they were in budget, and if they were out of budget, to try to get them back on budget.  FE 26 also indicated that he/she was involved with forecasting.

66.     FE 27 was a finance and sales analyst at C-Fresh during the entire Class Period.  FE 27 was primarily involved in analyzing sales and finance data for beverages and salad dressings at C-Fresh.  FE 27 reported to a member of the FP&A team named Jeff Ochs, who then reported to Robert Stevens, who in turn reported to Caltabiano.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    Campbell's Role as a Soup Icon Grows Stale

67.    Campbell first introduced its classic ready-to-eat tomato soup in 1895.  During the twentieth century, Campbell expanded its soup offerings to include its famous cream of mushroom and chicken noodle soups.  Campbell's soup offerings made the Company one of America's most iconic brands.

68.    Building on the success of its soups, through the decades, the Company added what also became some of the food industry's most popular brands, including: Pepperidge Farm, Godiva, V-8, Swanson, SpaghettiOs and Prego.  As the Company's offerings expanded, its focus broadened as well.  By the early 2000s, snack foods (chips, cookies, pretzels, goldfish etc.) had become just as important as soup to Campbell.

69.    As of 2009, soup sales began to decline.  Campbell's share of the canned soup market retreated as well, down to 53% from roughly 67% a decade earlier.

70.    By the first quarter of 2011, the Company's common stock was trading at a price that was more than 18% lower than it was in the first quarter of 2007.  Moreover, the Company's total stockholder return (including dividends) from the first quarter of 2001 to the first quarter of 2011 was just 31%.  During the same period, the Company underperformed relative to its peer group.  For example, similar American food products companies, like McCormick and Hormel, had increased total stockholder returns by well over 219% and 229%, respectively, while others like General Mills and Hershey increased total stockholder returns by over 108% and 84%, respectively, over the same period.

71.    The Company's woes were compounded by a large-scale macroeconomic shift towards healthy and organic products, which had been completely lacking from Campbell's portfolio.  Indeed, in the ten years preceding the Class Period, consumer buying habits shifted

towards convenient but fresh foods.  This was attributed to the millennial generation being more conscious of their food-buying options—and discerning in their choices—than any previous generation.  For example, a 2014 study by the International Food Information Council found that about 40% of millennials preferred fresh, packaged fresh, or organic food over frozen, canned, or condensed food.

72.     This significant change in food purchasing habits also impacted sales at traditional grocery stores.  Since 2013, consumption of packaged fresh food has grown by approximately 5.4% a year, compared to 1.4% for shelf-stable food.  In 2015, research firm Catalina reported that 90 of the top 100 brands in consumer packaged goods had lost market share.

73.     In short, as of 2011, it was clear that the Company's "iconic" brands did not resonate with younger consumers, who preferred fresh foods over Campbell's canned soup and snack food offerings.

**B.      The "Fresh Revolution": Morrison's Plan to Turn Campbell Around**

**1.      The Early Years**

74.     Campbell embarked on a strategy to respond to the changed macroeconomic and consumer trends.  In an effort to spur change, on August 1, 2011, the Company ousted its prior CEO—who had been entrenched for over a decade—and promoted an up and coming leader, Morrison, to steer its turnaround as President and CEO.

75.     Before her appointment as President and CEO, Morrison had been with Campbell since 2003, most recently as Chief Operating Officer.  At the time of her promotion, Morrison was considered by many to be a progressive and a visionary.  In her prior roles at Campbell, Morrison had championed controversial ideas, such as restoring higher sodium levels back to the Company's soups, while retaining a line of reduced-sodium products.  When she was appointed as CEO, Morrison promised dozens of new product offerings designed to win over younger customers.

76.     Upon her elevation to Campbell's CEO in 2011, Morrison announced a "new strategic direction for the company," designed to "drive a new era of growth at Campbell." Morrison's new business strategies provided Campbell with a new direction focused on three growth areas:

> (i) stabilize and then profitably grow North American soup and simple meals;
>
> (ii) expand the Company's international presence; and
>
> (iii) drive growth in healthy beverages and baked snacks.

77.     Discussing this plan, Morrison stated, "***Implementing our new strategic direction will require substantial investment*** to fund our new innovation process, accelerate innovation across our portfolio, and reinvigorate consumer-focused marketing to expand the equities of important brands."

78.     In the fall of 2011, Campbell began its specific targeting of millennial shoppers. In a little more than a year at the helm, Morrison introduced 100 new products, including a line of youth-targeted soups under the "Campbell's Go" soup brand. To complement its new offerings, Morrison redesigned Campbell's packaging, added exotic flavor combinations, and began offering microwaveable bags along with its traditional line of cans. The Company also hired a chief marketing officer, a rarity for a food company, to help it connect with this Internet-savvy generation.

79.     Despite these efforts, Campbell's sales and performance remained relatively flat. The Company needed another way to adapt to changing consumer preferences, and set its sights on the fresh foods market. Unable to produce fresh products organically, Morrison endeavored to diversify Campbell's product offerings through acquisitions.

### 2.   The Company Acquires Bolthouse Farms in a Blockbuster Deal and Builds a New Campbell Fresh Division Around It

80.     On August 6, 2012, Campbell paid $1.55 billion to acquire Bolthouse, which was a leading producer and supplier of super-premium fresh beverages, refrigerated salad dressings, and fresh carrots and carrot ingredients used in its beverages.  At the time, the deal was the largest acquisition in the Company's history.  Bolthouse was intended to provide Campbell with a significant presence on fresh food shelves in grocery stores and a new platform for expanding in the rapidly growing $12 billion market for packaged fresh foods.

81.     In announcing the deal on July 9, 2012, Morrison stated: "Bolthouse is a great strategic fit with Campbell.  Its business platforms, capabilities, and culture are well aligned with the core growth strategies we announced last year.  Its strong position in the high-growth packaged fresh category complements our chilled soup business in North America, and offers exciting opportunities for expansion into adjacent packaged fresh segments that respond directly to powerful consumer trends."

82.     With Bolthouse as its anchor, Campbell created in 2015 the Campbell Fresh division (referred to internally at Campbell as "C-Fresh").  Upon the creation of C-Fresh, Campbell reorganized its entire business operations into just three divisions focused on categories of food, as opposed to its previous geographic organization.  The new divisions were: (i) America's Simple Meals and Beverages; (ii) Global Biscuits and Snacks; and (iii) C-Fresh.

83.     In explaining its decision to create C-Fresh, the Company stated, "The fresh opportunity is so compelling that we formed an entire division around it: Campbell Fresh, which we call C-Fresh."  The Company further stated: "the creation of C-Fresh positions us to bring scale and a more diverse portfolio to help customers attract the desirable health-conscious shoppers they are seeking."

84. C-Fresh was to be a new growth platform for Campbell, and Morrison's objective was to ramp up product development at Bolthouse and increase its distribution channels. With $692 million of the $2.4 billion in goodwill on Campbell's balance sheet at the time of the acquisition attributable to Bolthouse, Campbell's growth objectives for Bolthouse were lofty.

85. According to Campbell's fiscal year Form 10-K filed with the SEC on September 26, 2013, the "goodwill was primarily attributable to future growth opportunities." At the time of the acquisition, Bolthouse had a reported 7% year-over-year compound annual growth rate ("CAGR"), and Campbell needed to ensure that the growth rate would continue at that clip or better to justify the staggering purchase price. The continued growth was predicated on Bolthouse being able to successfully innovate new products and roll them out.

86. For a brief time, Bolthouse maintained its pre-acquisition growth, but that was short-lived, as shown below:



87. After building C-Fresh around Bolthouse, Campbell would eventually acquire smaller fresh food businesses for the C-Fresh division, including: (i) Plum Organics, a provider of

organic foods and snacks for babies, toddlers, and children, which the Company acquired in June 2013 for $249 million; (ii) Garden Fresh, which produced hummus, dips, and tortilla chips, and was the number one brand for refrigerated salsa in the U.S., which Campbell acquired in June 2015 for $231 million; and (iii) Pacific Foods, a leading producer of organic broth and soup and shelf-stable plant based beverages, which the Company acquired in December 2017 for $700 million.

88.     Morrison's run of acquisitions to establish and grow C-Fresh was unparalleled in Campbell's history.  Before the Bolthouse acquisition in 2012, the Company had not acquired a new brand since 2009, when Pepperidge Farm bought Eccen Panis, a producer of gourmet artisanal breads.  In fact, the original Campbell soup division had not made a deal since 1998, when the Company acquired Fortun Foods, the maker of StockPot refrigerated soups.

89.     In seeking to validate the acquisitions made to grow the C-Fresh division, Morrison touted the Company's new "growth engines," which, she claimed, would serve the dual purpose of decreasing Campbell's reliance on soup and expanding the Company's health and well-being products to align with changed consumer preferences.

### 3.     Bolthouse's Structure and Revenue Sources

90.     Campbell's 2012 acquisition of Bolthouse included three businesses, the Bolthouse beverage business, the refrigerated salad dressings business, and the carrot and carrot ingredients business.

91.     Carrots and carrot ingredients accounted for 62% percent of Bolthouse revenues, according to Campbell's Analyst Day presentation given on July 24, 2013 by former Bolthouse CEO Jeff Dunn.  However, the carrot and carrot ingredients business expected only 4% carrot category growth.

92.    On the other hand, the Bolthouse beverage and salad dressing businesses represented 38% of revenues for Bolthouse, but had an expected 22% Consumer Packaged Goods category growth, according to the same Campbell's Analyst Day presentation.

93.    On July 17, 2017, shortly before the beginning of the Class Period, Bolthouse sold an array of beverages in various sizes, including: (i) thirteen smoothie beverages; (ii) six protein beverages; (iii) eleven juice beverages; (iv) three cafe beverages; (iv) two breakfast smoothie beverages; and (v) Bolthouse's 1915 cold-pressed juice beverage.  The Bolthouse beverages were available in three sizes, including single-serve 15.2 oz., 32 oz., and 52 oz.

94.    Carrots were an essential ingredient in the Bolthouse juice lineup.  As of July 17, 2017, six of the eleven Bolthouse juices featured on the Bolthouse website, www.bolthouse.com, contained carrot ingredients sourced from Bolthouse's carrot business.  These drinks were: (i) the 100% Carrot; (ii) Mango Ginger + Carrot; (iii) Orange + Carrot; (iv) Organic Carrot; (v) Tropical + Carrot; and (vi) Daily Roots beverages.

95.    The carrot and beverage businesses were "completely vertically integrated," according to FE 11.  Bolthouse grew carrots itself, processed them into baby carrots, and then used the shavings from the carrots for the juice products, FE 11 explained.

96.    Morrison viewed the slowly growing carrot and carrot ingredients business as foundational for the other C-Fresh businesses, including the Bolthouse beverage business.  During Campbell's September 1, 2016 earnings call conducted in connection with discussing the Company's financial results for its fiscal year 2015, Morrison explained that "carrots are a relatively low margin business.  However, it serves as the chassis for our higher margin value added CPG business. Carrots provide the scale for the refrigerated logistic system that we leverage for distribution and merchandising."

97.     In fact, carrot yields were key to this synergistic vision between the Bolthouse carrot and beverage businesses as well, considering that a significant portion of each carrot grown was used in the production of Bolthouse beverages or juice concentrate, according to the following slide that Campbell presented during its 2013 Analyst Day conference.



98.     Bolthouse derived the vast majority of its beverage revenues from large supermarket chains.  According to FE 1, approximately 70-75% of Bolthouse's beverage sales came from Walmart, Kroger, Target, Ahold, Publix, Albertsons/Safeway, Meijer, and Wegmans. FE 1 further stated that at least a third of Bolthouse beverage sales came from Walmart, Target, and Publix.

**C.      The Bolthouse Recall: Widespread Product Deficiencies Start A Chain Reaction that Imperils Morrison's Ambitious Growth Strategy**

**1.      The Bolthouse Recall and Massive Production Declines**

99.     In 2014, Campbell signaled that it would ramp up investment in the Bolthouse beverage business to increase its market share, announcing its "first marketing programs to build the Bolthouse Farms brand," and that it was "expand[ing] the distribution of Bolthouse products."

In 2015, Campbell flagged the Bolthouse beverage business as the Company's future champion, recording large capital expenditures for additional capacity expansion projects, including $33 million for beverage and salad dressing capacity expansion, $12 million for warehouse capacity expansion, and $11 million for a flexible beverage production line.

100.    Pressing its investment, Campbell made capital outlays to expand the Bolthouse beverage business in 2016, recording an additional $16 million in capital expenditures for Bolthouse's beverage and salad dressing capacity expansion. But soon, Campbell's dedicated growth plan for the Bolthouse beverage business would be thrown into disarray.

101.    On June 22, 2016, Campbell voluntarily recalled a selection of Bolthouse beverage products in the Protein/Low Acid beverage line, which held 47% of the market share for super-premium protein beverages, "due to possible spoilage that may cause the beverages to appear lumpy, taste unpleasant, and have an off odor" after receiving numerous "consumer complaints, including reports of illness." The Bolthouse Recall affected 3.8 million bottles, distributed nationwide. In fact, according to FE 16, Campbell had been purchasing the protein drink back from customers during the three months before it issued the formal recall notice.

102.    According to FE 11, the quality issues related to the protein drinks arose from higher counts of bacteria than allowable. The "micro" division of the Quality Assurance department, which ensures product safety and shelf stability, determined that the Bolthouse protein products did not meet spoilage standards for reasonably expected abuse by the consumer related to lack of refrigeration, FE 11 explained. The Bolthouse Recall impacted the Bolthouse Protein/Low Acid beverage line, which included the Chocolate Protein Plus, Vanilla Protein Plus, Coffee Protein Plus, Mocha, Latte, Vanilla Chai, and eggnog beverages, according to FE 11.

103.    The cascade of consequences from the Bolthouse Recall was extremely costly for Campbell. The Bolthouse Protein/Low Acid beverage line accounted for 25% of the Bolthouse beverage business, Morrison explained during the Q4 2016 Earnings Call on September 1, 2016.

104.    While trying to determine the source of the contamination, Bolthouse had to reduce production runs, which resulted in the loss of "massive production capacity", according to FE 11, who estimated that Bolthouse lost "90% of its capacity" on the Protein/Low Acid production line. Morrison further explained on the September 1, 2016 call that production runs had to be reduced from 72 hours to 24 hours.

105.    After an investigation into the cause of the non-marketable drinks, on the Q4 2016 Earnings Call on September 1, 2016, Morrison provided that the "manufacturing equipment and process" was the "primary cause of the spoilage." The Protein/Low Acid beverage line required the manufacturing environment to be sterile. As FE 11 explained, Bolthouse had only one manufacturing line that could be modified to meet the new aseptic standards required by Campbell. FE 11 further explained that Bolthouse needed to find a co-packer with a sterile environment. FE 11 reported that very few co-manufacturers/packers could meet the standards required to produce these beverages, because they lacked the equipment necessary to sterilize through high temperatures, cooling, and pressurization. These efforts drove costs "***through the roof***," further pressuring the Company's profit margins, according to FE 2.

106.    Due to the impact of quality control changes emanating from the Bolthouse Recall, production slipped in fiscal year 2017 ("FY17"), and was not fully restored until approximately October 2017, according to FE 4, which marked the end of 1Q18. Echoing this, FE 6 explained that the Recall was the beginning of a steady decline in the Bolthouse beverage business, because

the Recall triggered disruptions to production that limited Campbell's ability to service customers during a 15-month period, starting in July 2016 and lasting until October 2017.

### 2. The Recall Resulted in Costly Changes That Also Impacted Bolthouse's Bottom Line

107.   The Bolthouse Recall had the domino effect of necessitating strict quality control changes, which increased costs and caused production delays in the Bolthouse beverage business. According to FE 11, Campbell instituted the strict quality control requirements to guard against the risk of future recalls.  These changes increased production costs while reducing production speed, both of which negatively affected profitability.

108.   In particular, Campbell instituted new, onerous quality controls derived from the soup maker's experience with shelf-stable canned goods.  The new requirements changed the way products in the Protein/Low Acid beverage line were processed, slowing production output, according to FE 11.

109.   The implementation of quality assurance measures in the wake of the Bolthouse Recall represented a cost of $55 million to Campbell, according to FE 7.  In addition, as would later be revealed in the Company's 2018 Form 10-K filed with the SEC on September 27, 2018, C-Fresh's margins were reduced from positive .3% to negative 4.7%, driven primarily by cost inflation and supply chain costs in C-Fresh.

110.   The new production guidelines that Campbell instituted also prevented the Bolthouse beverage business from using certain vendors.  FE 9 explained that this led to additional production delays and put the Bolthouse beverage business at a disadvantage against fresh food competitors, which typically applied less cumbersome quality controls.

111.   The immediate financial impact from the Bolthouse Recall was undoubtedly severe.  As alleged below, however, the long-term impact caused by production delays, increased

costs, changes to supply lines, loss of shelf space at the Company's largest customers, and reputational harm from shaken customer confidence among Bolthouse's largest retail clients was calamitous.

### 3. The Bolthouse Recall Damages Bolthouse's Relationships With Its Major Retail Customers, Leading to Decreased Sales

112.    FE 1 explained that as soon as the Bolthouse Recall was announced in June 2016, all SKUs for the Protein/Low Acid beverage line were removed from the shelves of Bolthouse's major retail clients, such as Target, Albertsons, and Kroger, among others.  As FE 27 explained, after the Recall, Bolthouse's customers were left with empty shelves at their stores due to Bolthouse's inability to produce product in a timely fashion.  Thereafter, FE 1 added, the Bolthouse beverage business began to "pulse out" product as manufacturing resumed.  Because production recommenced with increased costs and longer production times, Campbell only delivered Bolthouse products in spurts as such products became available.

113.    Sputtering production meant that Bolthouse's biggest customers were not getting all the product that they ordered for placement on their valuable shelf space.  As FE 4 explained, declines in production forced Campbell to put such major retailers like Target and other customers on "allocation," whereby they would only receive a percentage of the products they had previously ordered to fill their national orders.  Moreover, FE 8 explained that Kroger, also one of the largest U.S. retailers and most significant of Bolthouse's customers, was put on allocation for a period lasting at least six months.  Indeed, as FE 4 explained, some customers received only 50% of their allocation of ordered goods until the Recall problem was remedied.

114.    As explained by FE 2, Campbell's inability to provide customers with their requested supply of Bolthouse beverages reduced the revenues that their most valuable clients,

including Target and Walmart, could earn from selling Bolthouse products.   Naturally, Campbell's ability to earn revenues was correspondingly reduced.

115.   The jarring disruptions that the Recall caused to Campbell's ability to service its key customers resulted in a backlash from such customers.   Soon after the Recall, Bolthouse's second largest customer, Kroger, stopped purchasing the single serve size (15.2 oz.) of Bolthouse's beverages for a period of six-months, according to FE 8.

116.   FE 2, a mid-level Financial Manager for C-Fresh explained: "If you don't keep the shelf full, they'll [customers] start to drop you," and "we were losing shelf space like crazy." The disruption caused customers to discontinue stocking Bolthouse items, resulting in a large decline in beverage sales, FE 6 explained.

117.   To address empty store shelving in the meantime, "Customers will space out" existing products, FE 1 explained.   Moreover, according to FE 27, after the Recall, customers were left with empty shelves at their stores due to Bolthouse's inability to produce product in a timely fashion.   The Customer Store Managers replaced Bolthouse Protein drinks with competitor's drinks on their empty shelves.   According to FE 1, competitor products, such as Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice, and GT Kombucha, were substituted for Bolthouse products on the shelf space ceded by the Bolthouse Protein/Low Acid beverage line, in the wake of the Bolthouse Recall and ensuing production declines.   FE 14 advised that this was the case at Albertsons, where Bolthouse beverage shelf space was vacant after the Recall, and competitor products Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), and GT Kombucha filled the vacuum.   At Target, it was primarily Naked Juice that took over the space relinquished by Bolthouse, according to FE 4.

118.    Making matters worse, the Bolthouse Recall hamstrung Campbell's ability to promote, market, price, and sell the entire Bolthouse beverage lineup.  In an analyst note published January 12, 2017, Wells Fargo observed that "[c]apacity is being built for Protein Plus and it's back on shelf and stocking, but volumes have not yet reached a scale sufficient to warrant merchandising.  The impact of the Recall is still limiting retail promotion to the extent that retailers execute line-wide programs."

119.    Reiterating a similar point on February 21, 2017, Wells Fargo reported that "[c]apacity is now expected to return by summer and PLUS will be re-launched during FQ4.  The timing will be significant given that *retailers have been generally unwilling to merchandise the Bolthouse beverages line without [Protein] PLUS being included*."

120.    Fallout from the Bolthouse Recall was not contained to the protein drinks, as problems promoting, marketing, pricing, and selling the entire Bolthouse beverage business drink lineup added another dimension, plaguing sales of Bolthouse's smoothies and juices in addition to the protein drinks.  FE 3 stated that "Buyers were pissed off about the Protein and they punished us on the Juice side."  FE 3 also stated that to the buyer, the protein drinks and the premium juice beverages were linked, as the packaging was virtually the same.

121.    According to FE 27, the idea from Campbell was to delay the new product introductions from the spring 2017 to July 2017 with the hope that lost shelf space would be regained by then, but it was not.  Customers cut back not only Protein drinks, but also on the whole beverage line including drinks like smoothies and the juice-based drinks.  Even after the supply of the Bolthouse protein drink was reestablished in the spring of 2017, customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need.

122.    According to FE 4, Bolthouse was only able to resume full production in approximately October 2017, which was already in Campbell's FY 2018.   By then, however, many of Bolthouse's largest retail clients, had already established their shelf-space for Campbell's FY 2018—the "Modular Reset" as termed in the industry—months before this date.   As a consequence, even though Bolthouse had resumed normal production by October 2017, the demand for Bolthouse's productions at its largest supermarket customers had already been pre-determined through the Modular Resets, and it was vastly lower than pre-Recall levels—foreclosing C-Fresh's ability to reach profitable growth for FY 2018.  Indeed, as FE 24 and FE 26 confirmed, once Bolthouse lost shelf space through the Modular Resets, it would take a year to try to get that shelf space back.

123.    According to FE 8 and FE 2, Bolthouse's second-largest customer, Kroger, discontinued Bolthouse's mid-sized (32 oz.) beverages in October 2017.   Shortly thereafter, Campbell's largest customer, Walmart, also stopped purchasing Bolthouse's mid-sized beverages, FE 1 explained.  In a cascade of exits, Ahold, Albertsons, and Target followed suit, according to FE 1, FE 18, and FE 4.

124.    As noted above, and as FE 1 confirmed, beverages account for approximately 40% of Bolthouse revenues, and mid-size beverages were 20% to 30% of the Bolthouse beverage business.  The termination of the 32 oz. beverage size across Bolthouse's largest national and regional clients, therefore, dealt a significant blow to C-Fresh's revenue and profit potential.

125.    Dwindling customer demand from Bolthouse's largest retail clients was not just limited to the 32 oz. beverages.  Retailers were also penalizing Bolthouse for its months-long failure to deliver products—and the empty shelves and lost revenue borne by retailers—by reducing shelf-space.  For example, according to FE 4, Bolthouse had promised Target a quick fix

to the problem and a prompt resupply of the drinks, but Bolthouse kept missing the deadline to resume resupply efforts and lost Target's trust over "months and months in a row" of disappointment.

126.   FE 4 explained that Bolthouse tried to negotiate with Target, pleading that C-Fresh had available inventory, and remembered a conversation with the Target buyer concerning how many units per store, per week, that the Bolthouse beverage business could supply.  However, according to FE 4, Target indicated that it did not think that the Bolthouse products would sell as many units as the Naked Juice products that Target substituted for Bolthouse, according to FE 4.

127.   Bolthouse even offered Target enticing promotions to win back shelf space, according to FE 4, but Target was unmoved because Bolthouse's consumption data was poor, having been degraded by the absence of its protein drinks on shelves for almost a year.

128.   According to FE 3, the connection between the poor performance of Bolthouse's Organic Juices and the empty shelf space at various grocers from the quality control problem that took months to fix, was evident in the market data that was reviewed at regular monthly meetings held among the "Beverage Team" and the "Salad Dressing Team" prior to and during the Class Period.  Among those who attended these monthly meetings was C-Fresh Chief Marketing and Innovation Officer Ginestro, C-Fresh General Manager Putman, and C-Fresh President Carolan. These teams at the monthly meetings discussed market data that Campbell regularly tracked, including consumption data supplied by analytics company IRI, actual data showing market share, increases and decreases in sales and other factors, all of which indicated a downward trend in Bolthouse beverages.  FE 3 explained that the Recall-driven maladies at Bolthouse impacted regional chains such as Diablo Foods, as well as big chains like Safeway.

129.    During the same monthly meetings, FE 3 further observed data showing that competitors were eating into the Bolthouse beverage business, with brands and drinks like Naked Juice, and Kombucha from GT and Health Aide.  FE 3 explained that the Bolthouse beverage business was late responding to the health trends, but indicated that the biggest problem causing declining beverage sales was, as FE 3 recalled from the meetings, the lost shelf space from the Bolthouse Recall, which forced Bolthouse customers to fill their shelves with competitors' products.

### 4.    Heading Into FY 2018, Campbell Seeks To Raise Expectations About The Bolthouse Beverage Business

#### a.    Campbell Maintains Its Lofty Valuation for Bolthouse Based Upon Its FY 2018 Growth Projections

130.    In FY 2017, Campbell knew that the window for a Bolthouse turnaround was closing.  In 2Q17, Campbell performed an interim impairment assessment on the carrot business that resulted in non-cash impairment charges of $127 million on goodwill and $20 million on trademarks, and reduced the value of non-tangible assets in the carrot business to $123 million from $270 million.

131.    In the third quarter of FY 2017, Campbell performed a sensitivity analysis for the Bolthouse trademark and goodwill as of the third quarter, explaining in the 3Q17 Form 10-Q for the quarter ended April 30, 2017, that "[Campbell] concluded that the trademark and reporting unit had risk of decreasing coverage," but that an interim impairment assessment was not required as the fair value of the trademark exceeded the carrying value by approximately 20%, and the fair value of the reporting unit exceeded the carrying value by approximately 25%, as of July 31, 2016.

132.    Campbell acknowledged, in the sensitivity analysis section of its third quarter 2017 Form 10-Q, that supply chain issues impacting the Bolthouse beverage business were the focus, stating, "During the third quarter of 2017, we reduced our expectations for 2017 Bolthouse Farms

refrigerated beverages and salad dressings sales performance, principally due to constrained production capacity related to the voluntary recall of *Bolthouse Farms Protein PLUS* drinks in the fourth quarter of 2016."

133.    However, despite lingering supply chain issues and the loss of customer goodwill, Campbell reported that the combined carrying value of the trademark and goodwill related to the Bolthouse refrigerated beverages and salad dressing unit was $664 million at April 30, 2017, and July 31, 2016.   Remarkably, Campbell found the non-tangible asset value in the Bolthouse beverage business intact, promising to "continue to monitor the performance of the business."



134.    Campbell further represented in the third quarter 2017 Form 10-Q that the valuation for the Bolthouse beverage business was based upon Management's projections of Bolthouse's future operating performance.   As reflected in the chart above, Campbell maintained an inflated non-tangible asset value on the Beverage and Salad Dressing unit throughout the Class Period, notwithstanding the known facts that made the FY 2018 projections unreasonable and untenable.

### b. Campbell Lays Out Its Strategy for FY 2018 Growth

135. As Campbell's disastrous fiscal year 2017 approached its end, with Bolthouse limping along, the market was focused on whether and how Campbell could return the business to profitable growth. On July 19, 2017, Campbell convened an Investor Day Conference, the purpose of which was to give guidance on Campbell's FY 2018 business plan—with FY 2018 set to begin on August 1, 2017. As alleged above and below, C-Fresh and Bolthouse faced significant headwinds going into FY 2018 from the impacts of the Bolthouse Recall, including reduced shelf space and missed Modular Resets, as well as difficulties with C-Fresh's carrot crops.

136. At the Investor Day Conference, Defendants laid out Campbell's strategic plan for renewed growth and profitability in C-Fresh. The Investor Day Presentation given by Carolan included slides on the carrot business, the return of beverage capacity, and product innovations. The key takeaways for FY 2018 were that there would be progress in carrots in terms of quality and supply, implementation of new quality standards for beverages and increased internal and external capacity, and a range of plant-based protein and alternative dairy beverage innovations.

137. Morrison expressed disappointment stemming from the string of execution issues at C-Fresh in FY 2017, but explained her view that "strategy was and is sound." Morrison lamented that Campbell had learned some "tough lessons with C-Fresh," but stated, "I believe it will significantly improve under the new C-Fresh leadership team."

138. The new C-Fresh Leadership Team reflected the takeover by Campbell's management of C-Fresh's operations under the leadership of Carolan, who succeeded Bolthouse's longtime President, Jeff Dunn. Other significant departures in 2017 included Chief Marketing and Innovation Officer, Ginestro and Chief Customer Officer, Scott Laporta.

139. Agreeing with Morrison's message on the soundness of the C-Fresh strategy, DiSilvestro explained, "We continue to believe our strategy is right and that C- Fresh operating

37

margins can reach 10% within the next few years."  DiSilvestro also provided that "the division generated 12% of sales . . . [but that] [r]ecently, sales and margins have been negatively impacted as we rebuild capacity following the recall of our Protein PLUS drinks last year and from quality-related share losses in our carrot businesses."

140.   Between the July 19, 2017 Investor Day Conference and August 31, 2017 when Campbell issued formal guidance for FY 2018, several new pieces of adverse information known to management, as alleged below, rendered impossible Campbell's ability to implement these strategic initiatives for FY 2018.

141.   Nevertheless, on August 31, 2017, Campbell delivered its fiscal 2018 guidance for C-Fresh, which was premised upon the strategic initiatives articulated during the July 2017 Investor Day Conference.  According to Morrison:

> I'm not happy with our performance in Campbell Fresh but remain encouraged by the progress we've made this year to address our key executional issues. C-Fresh delivered modest sales growth, and *we expect this business to return to profitable growth in fiscal 2018*.
>
> *        *        *
>
> Looking ahead, *we plan for the business to grow profitably in fiscal 2018* as we return to *more normal capacity* and *promotional activity* across the beverage portfolio. *We also have a robust innovation pipeline to help fuel additional growth*, *and we'll begin to introduce new beverage products to the market such as plant protein milk*.

142.   Later in the call, Defendant DiSilvestro was pressed on the viability of the guidance provided for Campbell's fiscal year 2018:

> **Q [Citigroup Analyst]:** But so can you just comment on the fullness of this guidance? Is there something else here? Because negative 2% to 0%, it just -- it doesn't seem to flip to some of the stuff that I thought you were saying at Analyst Day about the turnaround in C-Fresh and these opportunities in biscuits. I just feel like we were getting a bit more negative of a figure today, and maybe it's not only related to the soup issue, but would just love for you to elaborate if you can.

**A [DiSilvestro]:** Yes, so if I think about it and its components, we – as Denise said, ***we do expect to see top line growth in Campbell Fresh in 2018*** as we get the capacity for beverage back up to where we need to be. We turned on the promotional program. That's kind of happening now as we speak, ***so we do expect growth there***. Campbell further issued FY18 financial guidance (the "FY18 Guidance") for sales growth between -2% and 0%, EBIT growth between -1% and 1%, and adjusted EPS growth between 0% and 2% (equating to EPS of $3.04 to $3.11).

143.   In connection with the August 31, 2017 conference call, Campbell issued and published a series of slides on its corporate website. One of these slides entitled, "Outlook for F18," which was presented by Morrison, further touted C-Fresh's ability to reach "***profitable growth***."



144.   Analysts were quick to seize on Defendants' assurances. PiperJaffray, for example, said, "We expect C-Fresh segment margins to recover from poor carrot harvests and the costs of its voluntary recall of Bolthouse Farms' Protein Plus." UBS similarly noted: "Key drivers of CPB's 2H18 weighted EPS cadence will be the lack of negative soup results given seasonality as well as a return to profitability in the C-Fresh segment." Additionally, JPMorgan and Gabelli & Company each reiterated Campbell's FY18 Guidance, noting, respectively, "a return to sales growth in C-Fresh," and "we anticipate[] improvements across C-Fresh."

145.    As alleged below in Section V, Defendants' statements were materially false or misleading based upon the information that they knew, but misrepresented or concealed when making their August 31, 2017 statements.

### 5.    During the Summer of 2017, Bolthouse Misses Critical Modular Resets for Its Largest Retail Clients

146.    For Campbell, the 15-month period between the Bolthouse Recall and Bolthouse's return to more normal beverage production capacity in or around October 2017 was marked by disruptions to Bolthouse's production and customer service capabilities, and did not reposition Bolthouse for profitability.  To the contrary, Bolthouse was missing out on the Modular Resets at several of Campbell's largest customers, exacerbating the challenges that Bolthouse faced in returning to profitable growth.

147.    Each retailer has its own schedule—referred to in the food production and distribution industry as "cadence"—for its Modular Reset, with some retailers resetting the shelf space once annually for the forthcoming fiscal year.  It is critical for food producers and distributors, like Campbell, to be included in the Modular Resets to obtain and maintain shelf space for their products in the time period between a retailer's Modular Resets.

148.    For example, according to FE 17, a former Bolthouse National Sales Director familiar with the process, Bolthouse shelf space at Walmart was dictated by a Modular Reset, and if a particular product, like a 32 oz. beverage, was kept off the Modular Reset, Bolthouse would not be able to negotiate for more shelf space until the next year.

149.    FE 21, a former Campbell National Account Manager for Walmart, provided that the Walmart Modular Reset occurs once per year in the month of August.  Walmart accounted for 20% of Campbell's total sales during the Class Period.

150.     After a very disappointing FY 2017, the Bolthouse beverage business needed to successfully navigate the Modular Reset process at its biggest customers, many of which would be conducting their Modular Resets during the summer of 2017 (coinciding with Campbell's 1Q18).

151.     Inclusion in the Modular Resets was essential for Campbell's efforts to turn around the Bolthouse beverage business, as having products excluded from Modular Resets meant that lost shelf space would be locked in over longer time horizons.  More specifically, missing the Modular Resets at Bolthouse's largest customers would make it impossible for the Bolthouse beverage business to regain shelf space and reach profitable growth in FY 2018.

152.     The Modular Resets in the summer of 2017 were disastrous for C-Fresh as Bolthouse's largest customers, including Target, Walmart, Kroger, and others excluded Bolthouse beverages from their Modular Resets.

153.     As FE 25 explained, from at least July 2016 through July 2017, Defendant Morrison and other high-level employees such as Schoonmaker, were "flying all over the country" to play "defense and offense" in order to meet with key customers to prevent such customers from abandoning "sell-in" meetings, and to "re-instill faith" in C-Fresh and its products after the Bolthouse Recall and resulting loss of shelf space for Bolthouse products.

154.     At the same time, C-Fresh maintained a spreadsheet, which was in place as of February 2016 and updated by VP of Sales Schoonmaker and her team, that tracked customer Modular Resets (defined herein as the "Modular Reset Tracker"), which was housed on a shared drive at C-Fresh and was accessible to all C-Fresh sales personnel.  The Modular Reset Tracker provided data on, among other things: (i) all of the new items that C-Fresh was trying to "sell-in" to customers; (ii) the items that had already been presented to customers; (iii) the items the

41

customers were taking and not taking; (iv) the dates of customer sell-in meetings; and (v) lost sales opportunities/missed sell-in meetings (which usually occurred when a customer did not want to meet with C-Fresh).

155.    FE 25 further recalled that the Modular Reset Tracker was "incredibly important" for both distribution and forecasting, because it was used to plan production runs, including inventory planning and production line management, and was used to determine performance compared to fiscal year goals.  Moreover, the results of missing Modular Resets, as recorded in the Modular Reset Tracker, were incorporated into financial projections, which were available to Campbell's senior management, including Morrison.  FE 25 prepared presentations for Campbell's C-Level executives, including for Morrison's discussions with large customers, concerning the Modular Resets and getting Bolthouse beverages back onto shelves.

### a. Target Dramatically Reduces Bolthouse Beverage Products As Early As March 2017 and Continued To Miss Modular Resets Throughout FY 2018

156.    Target had one large Modular Reset per year, and allowed for small adjustments to the modular on a quarterly basis, FE 4 explained.

157.    At Target, a range of Bolthouse beverages was excluded from Target's 2017 Modular Reset for quality and supply deficiencies including those arising from the Bolthouse Recall, according to FE 4.

158.    In or around March 2017, Bolthouse suffered a "huge loss" when it lost nationwide distribution at Target for all carrot-based products, according to FE 18. This included beverages containing carrots.  The company lost distribution of carrot juices as a result of its substandard quality, which did not measure up to competitors' products.  FE 18 added that it was "pretty shocking" to hear that the company had lost Target's business because "Target was a huge customer."

159.    Target had grown frustrated with the Bolthouse beverage business due to its supply struggles, and resolved to remove Bolthouse beverages from its Modular Reset.  Accordingly, Target dropped all types of Bolthouse beverages including juices, smoothies and protein drinks, according to FE 4.  The Bolthouse beverages removed from Target's Modular Reset also spanned all drink sizes offered, FE 4 explained.

160.    Having Bolthouse beverages removed from Target's Modular Reset materially impacted Bolthouse's ability to sell its products.  FE 4 explained that lost shelf space varied depending on store layout, but estimated that ***Bolthouse lost approximately 50% of shelf space for its beverages at Target.***

161.    FE 4 explained that, prior to the Recall, if Bolthouse had approximately 18 beverages with shelf space, six may have been protein drinks.  After the Recall, Bolthouse was cut to eight total beverages with shelf space, according to FE 4.

162.    After having its beverage products dramatically reduced on the Target Modular Reset, attempts to regain the lost shelf space proved fruitless, according to FE 4, who also represented that Bolthouse never regained the lost shelf space during her tenure, which ended in April 2018.

### b.  Walmart's Annual Modular Reset in August 2017 Also Diminishes Critical Bolthouse Shelf-Space

163.    As set forth above, Walmart accounts for 20% of Campbell's total sales.  With respect to the Bolthouse beverage business specifically, Walmart, Kroger, Target, and Publix accounted for 70-75% of sales, according to FE 27.

164.    Walmart's Modular Reset occurred annually in August, coinciding with Campbell's fiscal first quarter, according to FE 21, a former Campbell National Account Manager for Walmart tenured in 2018-19.

165.   "Resets were the only time that Campbell's could regain lost shelf space at Walmart", FE 21 explained.   And Walmart was the Bolthouse beverage business's largest customer, making the stakes even higher.

166.   FE 22, a former Bolthouse National Sales Director for Ahold, explained that "Bentonville (Walmart and Sam's Club) is a tough customer to try to regain your SKUs."

167.   The Bolthouse beverage business experienced a decline in shelf space in the Modular Resets at Walmart from 2015 until at least 2019.  FE 21 reviewed historical data of past Modular Resets at Walmart, which showed that the Bolthouse beverage business performed either "flat or down" in Walmart's Modular Resets since the 2016 Bolthouse Recall until at least 2019, with an overall trend that was "flat to down" during the 2015-2019 timeframe.  FE 21 performed this research as part of their job working on the Modular Reset at Walmart in 1Q20.

### c.   Kroger, Bolthouse's Second Largest Customer, Curtails Shelf-Space in its Semi-Annual Modular Reset in Q1 2018

168.   Kroger adheres to a more flexible Modular Reset cadence than Walmart. According to FE 8, Kroger conducts Resets for the premium juice category twice per year, in March and mid/late-September.

169.   At Kroger, the Modular Reset process and the assortment decision usually take place approximately six months prior to implementation, according to FE 8.  "If you miss one reset you have to wait for the next reset" to try and get products on Kroger's shelves, FE 8 explained.

170.   The Bolthouse Recall primarily impacted the 15.2 oz. and 32 oz. drinks at Kroger. In the wake of the Recall, there was a "six-month-long empty spot on the wall" at Kroger stores, where the 15.2 oz. drink used to be, and the 32 oz. drink was completely excluded in October 2017, according to FE 8.

171.     Kroger's biannual Modular Resets represented critical junctures for Bolthouse to regain shelf space for its mid-sized (32 oz.) beverages.  At the first Modular Reset in October 2017, in Campbell's 1Q18, Kroger did not include the 32oz beverages on the modular.  FE 8 worked on a presentation for Kroger attempting to regain the lost shelf space for the 32 oz. drink for the next Modular Reset, in March 2018.  This too failed. Indeed, Bolthouse did not regain shelf space for 32 oz. beverages at Kroger until the post-Class Period Modular Reset in September 2018, according to FE 8.

### d.  Other Major Customers Also Reduced Shelf-Space for Bolthouse Products in Campbell's FY 2018

172.     Bolthouse failed to regain lost shelf space during the Modular Resets at Campbell's other largest customers, including Publix and Albertsons.

173.     In this regard, Publix reevaluated shelf space once per year, according to FE 19, a former Regional VP at Campbell, and FE 1 explained that Publix conducted its annual Modular Reset during the summer, in either July or August.

174.     At Publix, the Bolthouse beverage business suffered considerable declines in sales after the Bolthouse Recall, according to FE 15, a former Regional Field Sales Manager.  FE 15 further provided that Publix left the shelves empty, rather than replacing them with other products.

175.     Publix never allowed Bolthouse to regain its lost shelf space, according to FE 8, who was informed of the lost sales and shelf space at Publix during weekly Category Manager conference calls.

176.     Albertsons conducted its Modular Reset in July or August, FE 1 explained.

177.     Bolthouse lost shelf space at Albertsons after the Bolthouse Recall, and Bolthouse's share of the beverage market had decreased, according to FE 14, a Team Lead Category Manager for Albertsons.

178.    Once the shelf space was opened at Albertsons to competitor brands owned by Coke and Pepsi, "the space was gone," and the Bolthouse beverage business did not regain the lost shelf space during the Class Period, according to FE 14.

### e.    The Modular Resets Were a Critical Event for the Company and the Defendants Were Aware of the Modular Resets for Bolthouse's Most Significant Customers

179.    Defendants understood that Modular Resets were integral to Bolthouse's success, and maintained the Modular Reset Tracker to monitor sales and forecast future sales.  According to FE 18, employees were required to update this spreadsheet regularly, and it was shared at monthly Sales Leadership Team meetings in Santa Monica, CA, attended by the VPs of Marketing, Category, and the Chief Customer Officer.

180.    Because Modular Resets are the vehicles for getting products onto store shelves, the "Modular Reset [process] is being watched by everyone" at Campbell, FE 8 explained. According to FE 8, before a Modular Reset occurs at any retailer, there was always an important "state of the business" category review, in which brand performance and the introduction of new products were discussed.

181.    FE 19, a former Regional VP at Campbell in the Snack Division, indicated that the Company SVPs and CEO Morrison knew of the Modular Resets and further stated that "everyone was wired in" at Campbell with regard to the Modular Resets at Campbell's Top 10 customers.

182.    FE 19 explained that Campbell's top leaders, including SVPs, stayed abreast of Modular Resets by attending annual meetings called "Top-to-Top business review" meetings, in which Campbell management would meet with the customers' leadership.

183.    According to FE 19, the Top-to-Top business review meetings covered everything from new items to commitments to charity events, as well as consumption data and sales numbers.

There would be a 2-3 page slide deck provided in advance of the meetings so that there were no surprises and everyone attending was "in the know," FE 19 explained.

184.    At the Top-to-Top business review meetings, customers often sought assurances that Campbell was not slowing growth in the product lines that it had acquired, and all attendees were "absolutely" aware of consumption data such as that compiled by IRI, FE 19 explained. According to FE 19, the customer wanted to hear that Campbell was "not going to slow this engine down" in terms of the product's sales growth.

185.    FE 19, who also worked with Morrison at a prior employer, explained that Morrison relied on SVPs, who attended the Top-to-Top business review meetings, to report up to her.

### 6.    Campbell Outsources Significant Sales Responsibilities to Independent Contractors Lacking Critical Product Knowledge

186.    Beginning in mid-2017, the Company instituted widespread restructuring and layoffs.  It pushed out longstanding C-Fresh executives in California in favor of soup executives based in New Jersey.  Campbell also terminated roughly 250 seasoned C-Fresh sales representatives across the country, and replaced them with outsourced sales assistance from independent contractors provided by Acosta, Inc., a sales and marketing outsourcing company.

187.    Now, instead of a dedicated team of experienced Campbell employees with interpersonal relationships built on trust and mutual respect navigating the treacherous waters of negotiating the claw back of shelf space lost to competitors, those duties were outsourced to a mercenary marketing group, whose representatives had divided attention when making store visits, and were not knowledgeable about the fresh foods sector.  Multiple FEs, including FE 8, FE 10, and FE 18 confirmed that replacing Campbell-employed sales representatives with independent contractors from Acosta placed further strain on Campbell's post-Recall tenuous relationships with key customers.

188.     Confirming Acosta representatives' divided allegiances, FE 8 explained that Acosta representatives would enter stores with a tablet that had approximately 100 questions on it pertaining not only to C-Fresh product offerings, but also to other manufacturers, with products throughout the store, not just fresh goods or C-Fresh products.  FE 8 further explained Acosta representatives lacked specialized knowledge of the fresh goods industry and were unable to develop the same relationships with fresh goods personnel.

189.     While such broad-ranging personnel changes are disruptive in the best of circumstances, Campbell implemented these cost-cutting measures while C-Fresh was still reeling from the Bolthouse Recall.  Under these circumstances, removing employees with longstanding relationships with their counterparts at C-Fresh's biggest customers was particularly devastating because, as FE 18 put it, Bolthouse did not have any plans or incentives for retailers to embrace its products after the Recall, and Bolthouse relied on its employees to individually determine how to get the lost shelf space back, which could no longer occur due to the cost-cutting determination to outsource sales to Acosta.

190.     Furthermore, in the fall of 2017, C-Fresh planned on launching the Pea Protein Milk, which was intended to revitalize Bolthouse and bring C-Fresh back to the path to profitability.

191.     Not only were the newly-enlisted Acosta representatives unprepared to recover shelf space lost at Campbell's customers, FE 6 recalled that Acosta sales personnel were not visiting smaller independent customers. Although the larger supermarket chains such as Walmart, Kroger, Target, Ahold, Publix, Albertsons/Safeway, Meijer, and Wegmans may have accounted for the lion's share of beverage sales, a significant percent of sales that smaller, independent buyers generated were being completely ignored by Acosta representatives.

192.    FE 18 further recalled that a direct result of Acosta being brought onboard was the dismantling of the Bolthouse retail sales force.  Described by FE 18 as one of Bolthouse's greatest strengths, FE 18 believed that "tons of shelf space" was lost due to the dismantling of the sales force.

193.    Although it reduced costs, the decision to rely upon independent contractor sales representatives from Acosta made it more difficult for Campbell to recover from the Bolthouse Recall's wide-ranging impact.  According to FE 18, Campbell's customers were uniformly very upset about the switch to Acosta. FE 18 recalled that Campbell's customers wanted people who were familiar with produce, as Bolthouse's captive sales representatives were, and that when choosing which broker to use, Campbell chose Acosta, the generalists, as opposed to another broker that focused on fresh goods.  Therefore, not only were Campbell's customers shocked that Campbell fired several employees and switched to a mercenary marketing team, they were also upset that the marketing team was not sufficiently knowledgeable in fresh produce-related products.

194.    Acosta was not up to the task of quickly repairing damaged relationships to bring Bolthouse back on the shelves of its largest customers.  As FE 1 stated, the shelf space that Bolthouse lost as a result of the Recall was never regained during FE 1's tenure.  In fact, FE 1 stated that by the end of her tenure in 2018, 20% of the shelf space was permanently gone.  FE 4, FE 18, FE 14, and FE 8 also provided similar reports: by the end of their tenures at Campbell, the latest being after the end of the Class Period, the shelf-space lost from the Recall still had not been fully recovered.

### 7.    Marketing Budget Cuts Hamstring C-Fresh Sales

195.    When discussing the turnaround plan envisioned for C-Fresh in FY 2018, Carolan stated at the Investor Day Conference in July 17, 2017:

We're shifting to a consumer marketing model.  We have great brands and delicious products spanning 10 categories.  What we haven't done is consistently nurture them with meaningful brand-building investments.  We plan to increase our marketing spend with the intent to double it as a percent of sales over the next several years.  Our plan in fiscal '18 is to increase marketing by about 75%, moving our investment to more competitive levels.  That investment will be allocated in line with our portfolio roles.  In the year ahead, we'll focus on driving awareness and trial for our beverage and salsa businesses and on sharing new innovations with our consumers, like our Bolthouse Farms Plant Protein Milk.

196.   In a similar vein, according to FE 1, making up for the lost revenue from the Bolthouse Recall became a big topic for Morrison, Carolan and the Sales Team.  The plan, discussed at monthly town hall meetings during 2017 and 2018, was to heavily promote new product launches due out in April 2018.

197.   Despite committing to increasing marketing and promotion for existing products and increased funding for new product innovations as a plan for FY 2018, the Company severely restricted the expenditures needed to enable C-Fresh to recover and grow.  Campbell's drastic cost-cutting measures were antithetical to the increased investment that Campbell's management publicly proclaimed was required to turn C-Fresh around.

198.   After raising FE 3's marketing budget for Bolthouse salad dressings in mid-2017, by January 2018, Campbell slashed it by 70%.  FE 3 claimed that the impact of this budget cut was "huge," because sales goals "immediately became unachievable."

199.   FE 3 also stated that there was a 20-50% cut in the C-Fresh main beverages (Fruit and Protein) marketing budget in January 2018, money that initially would have gone to enticing customers to try new products.

200.   FE 13, a Senior Marketing Executive at C-Fresh, also said that right after the start of FY 2018, C-Fresh's marketing budget was "wiped out."  Indeed, as succinctly stated by FE 13,

"you can't cut your way to growth."  FE 5 added that Campbell was pulling back support for C-Fresh during the Class Period and stated, "If you are not supporting the unit, it will not grow."

201.   The timing for the massive marketing budget cuts could not have been worse: Bolthouse was preparing to launch its new Pea Protein Milk, which the Company consistently flagged during the Class Period as a key to returning Bolthouse to profitability.

### 8.   The Touted C-Fresh Product "Innovations" Fall Flat

202.   Campbell rested its hopes for a turnaround on forthcoming products, including the Pea Protein Milk product and the new Bolthouse B Line of sugar free versions of existing juices. The Pea Protein Milk product launched in September 2017 after several months of delays, and the Bolthouse B Line was announced on the February 16, 2018 Earnings Call for 2Q18.  Internally, Morrison discussed the low sugar beverages scheduled for release in Spring 2018, describing them as "key to jumpstarting things," according to FE1.

203.   Consistent with FE 1's recollection, the plan to make up for revenues lost as a result of the Bolthouse Recall, as discussed at monthly town hall meetings during 2017 and 2018, was to heavily promote new product launches due out in 2018.  Defendants frequently referenced new product launches, or "innovations," when providing overly optimistic guidance to the market. For example:

- During the Company's 4Q17 earnings call held on August 31, 2017, Morrison stated, "We also have a robust innovation pipeline to help fuel additional growth, and we'll begin to introduce new beverage products to the market such as plant protein milk."

- During the Company's 1Q18 earning call held on November 21, 2017, Morrison stated, "We have strong innovation plans in place with the continued rollout of Bolthouse Farms Plant Protein Milk."

- In the 2Q18 Form 8-K filed with the SEC on February 16, 2018, Morrison stated, "We expect our beverage innovation plans to drive improved beverage performance in the second half" of the Company's fiscal 2018.

51

- And during the 2Q18 earnings call also held on February 16, 2018, Morrison stated, "To address this [loss of Bolthouse farms beverage shelf space], we're launching our most robust beverage innovation line. . . We believe it will begin to rejuvenate the super-premium segment . . ."

204.    In February of 2018, Morrison explained that, "Additionally, we're building on the initial success of our alternative dairy drink, Bolthouse Farms Plant Protein Milk, by expanding our plant-based offerings."

205.    Despite Morrison's public promotion of the new Pea Protein Milk as a key product that would help turn Bolthouse's fortunes, the significant marketing budget cuts and cost-saving decision to use an inferior pea ingredient severely hampered the new product's ability to gain any meaningful traction in the market.

206.    More specifically, FE 11 reported that the new Pea Protein Milk suffered from procurement problems. Bolthouse had initially selected a premium pea protein supplier for its Pea Protein Milk, and the Bolthouse R&D was conducted using the ingredients from the premium pea protein supplier.  Despite the drink's issues with chalkiness and less than ideal taste, as described by FE 7, samples of the Pea Protein Milk made using the premium peas were sent out to customers.

207.    Campbell corporate warned Bolthouse that the cost of the Pea Protein Milk using the higher quality peas was too high, and that if used, Campbell would not meet its profit margin, FE 11 explained.  Campbell attempted to negotiate with the premium pea supplier for lower pricing, but that the supplier did not budge, as there was strong marketplace demand for the premium peas, FE 11 explained.  Campbell eventually returned to the supplier and paid for the more expensive premium peas.  However, cost considerations drove changes to the formula, leading to a blend of premium and inferior peas used in the Pea Protein Milk.

208.    According to FE 11, the Pea Protein Milk ultimately was a blend which included the use of less expensive peas than had been provided in customer samples.  FE 7 noted that the

blend of the two types of pea protein powders, when combined with water, created an unavoidable clumping issue.  FE 11 recalled that Campbell was made aware that the Pea Protein Milk made using the pea protein powder blend was subpar, but ordered the beverage to be made with the blend regardless.

209.    Campbell foisted the Pea Protein Milk upon its customers in September 2017. Kroger was an "early adopter" of the product, yet FE 1 indicated that other large supermarket retailers were hesitant to carry the product, not wanting to be the first to take a chance on Campbell's new product.  This apprehension was understandable, especially given that Campbell was still struggling with the aftermath of the Bolthouse Recall, which included serious questions concerning Campbell's ability to fill orders.

210.    Campbell's supply chain issues were well known to its customers who previously experienced product shortages in the wake of the Bolthouse Recall.  Supply problems reemerged in relation to the distribution of the newly-launched Pea Protein Milk.  FE 1 recalled issues regarding distribution of the Pea Protein Milk discussed at a Monthly Business Review (MBR) meeting, namely that the Pea Protein Milk product distribution did not meet Campbell's expectations.  These MBR meetings were attended by C-Fresh President Carolan, General Manager CPG Putman, the Commercial Office in Santa Monica, Brand Marketing Teams, Sales Leadership Teams (Directors & VPs), the Customer Development Teams, Category Management Teams, and others, according to FE 1.

211.    The issues surrounding distribution arose from short supplies of the Pea Protein Milk.  FE 18 stated that she learned about the short supply of the Pea Protein Milk from Schoonmaker, VP of Sales, only after distribution deals had already been secured with customers. FE 18, for instance, had secured distribution of the Pea Protein Milk to Albertsons in several states,

only to find out later that Campbell was unable to fill those orders because they did not have enough product.   FE 18 added that other sales people across Bolthouse had also secured distribution deals only to find out later that Campbell did not have enough supply when the time came to deliver.

212.    Despite the tepid demand for the Pea Protein Milk, FE 18 stated that Bolthouse could not deliver milk products in time for the June 2017 annual Modular Resets at Safeway and Albertsons, which caused Bolthouse to miss out on having its Pea Protein Milk products on Safeway and Albertsons' shelves for the FY 2018 year.

213.    Prior to the Protein Pea Milk launch date, in late spring of 2017, Bolthouse was experiencing problems with its co-manufacturer Jasper Products, located in Jasper, MO.  FE 7 directed an R&D team comprised of Campbell and Bolthouse personnel that was sent to Jasper to resolve production issues related to the new Pea Protein Milk.  Beyond the known clumping issues, Campbell discovered by summer 2017 that the Pea Protein Milk had further production issues. According to FE 7, the batching cycle times for the Pea Protein Milk were costed at 3-4 hours but were taking 5-6 hours, and the sacks of protein used in the manufacturing of the drink were tearing during movement because Bolthouse did not use a sufficiently graded plastic.

214.    During the summer of 2017, it was the consensus opinion of the R&D team working in Jasper that the Pea Protein Milk was probably 6-9 months from launch.  However, VP of R&D at C-Fresh Menexia Tsoubeli told FE 7 that Campbell did not have that much time, and that the Pea Protein Milk needed to go to launch as soon as possible, within a week or a month.  Tsoubeli reported to both C-Fresh President Carolan and Vice President of Global R&D Carlos Barroso, both of whom reported to Morrison.  At the start of FY 2018, the Pea Protein Milk was not properly positioned for launch, according to FE 7.

215.    The Pea Protein Milk ultimately was stocked in grocery stores including Kroger, Shaw's, Publix, and Safeway's eastern division, however, as FE 7, a C-Fresh mid-level R&D executive explained, the new Pea Protein Milk simply was not selling.  FE 7 explained that C-Fresh's grocery chain customers refused to reorder the product, and other stores declined to pick up the product.  FE 7 personally observed in late 2017 and early 2018, that the Pea Protein Milk sales were not hitting their targets.

216.    FE 18 also recalled that the Pea Protein Milk "was unsuccessful."  FE 18 stated that plant-based protein drinks were a challenge under normal circumstances to get on customers' shelves due to heavy competition, but the failure to deliver the drink damaged C-Fresh's opportunities to get other milk products into customers' stores.

217.    According to FE 7, although Bolthouse sent shipments of initial orders of the Pea Protein Milk to certain customers, there were no reorders because consumers were not buying the product.  FE 7 recalled that Kroger did not want 48 oz. bottles, and that other supermarket chains were not purchasing the product.

218.    FE 12, a Warehouse Supervisor, explained that shipments of the Pea Protein Milk slowed shortly after the warehouse first received the product from the manufacturing facility.  She further stated that the Pea Protein Milk was received so poorly that unsold cases were put out for warehouse employees with an "Employee Giveaway" sign.  She also recalled that "they couldn't give it away."  As such, excess Pea Protein Milk sat in FE 12's warehouse on numerous occasions because no one wanted the product.  FE 12 explained that shipments of the Pea Protein Milk "never got going."

219.    Beyond the Pea Protein Milk, FE 7 added, "I was in R&D and knew their pipeline."  FE 7 then explained that instead of being centered on new and innovative products, the new juices

Morrison touted for 2018 were simply the same product line without any sugar.  FE 7 emphasized that there was "not a big wow to the consumer."  At best, FE 7 explained, the new juices would simply cannibalize existing juice sales, not expand them.

220.    Despite the abject failure of the Pea Protein Milk that was widely recognized internally at C-Fresh by late 2017, during the February 16, 2018 earnings call for 2Q18, Morrison falsely pointed to the "initial success" of the Pea Protein Milk in claiming that "we expect our spring beverage innovations will drive improved performance in the second half."  Beyond the fact that the Pea Protein Milk failed to enjoy the "initial success" that Morrison pointed to as supporting the revenue promise of forthcoming Bolthouse beverage products, Morrison's statement implied that there would be adequate shelf space available for the forthcoming products.

221.    According to FE 18, the Pea Protein Milk was meant to be an anchor on the dairy aisle, and was to lead the way for a plant-based yogurt and snack bar as well.  FE 18 said that the failure of the Pea Protein Milk effectively killed these products, and that there was "no way" to get these products onto retailers' shelves after the failure of the Pea Protein Milk.

### 9.    Known Carrot Quantity and Quality Problems Plague C-Fresh

222.    By the late summer of 2017, it was recognized internally that the carrot crop yield would be poor.  The poor yields from the carrot business increased carrot costs, which increased costs for the vertically integrated Bolthouse beverage business.

223.    At the Investor Day Conference on July 17, 2017, Carolan stated:

"Let's start with carrots. I opened by explaining that we're proud of our heritage as farmers. That means we need to apply smart agricultural strategies to ensure we grow the highest-quality conventional and organic carrots. We're now applying new planting and harvesting strategies while optimizing our growing regions to more predictably and consistently deliver the quality and supply that our customers and consumers expect. We're already starting to see results as of Q3 fiscal '17. *In quality, we've dramatically improved the percentage of carrots meeting our*

*customers' expectations. **In supply, we've increased our customer service levels to 99%**.*"

224.    Despite knowing that carrot crop yields would be poor for the remainder of calendar year 2017, Campbell issued guidance on August 31, 2017 that failed to take into account these factors.

225.    According to FE 18, internal reports posted to the company's sales portal contained slides showing that excessive rain to date would impact carrot crops for the remainder of calendar year 2017, and that Bolthouse struggled to meet demand that entire time.

226.    According to FE 3, the marketing and sales teams knew by August 2017 that the carrot yield was bad, which would negatively affect sales and profits.

227.    The truth about the risk of the carrots business negatively impacting C-Fresh's revenues, which was known no later than August 2017, was revealed when Campbell made its 1Q18 earnings announcement on November 21, 2017.  On the earnings call, Morrison stated that

> Sales of carrots declined in the quarter. Our carrot crops were negatively impacted by adverse weather. Due to these low yields, we placed customers on allocation in the quarter. Learning our lesson from a similar experience in 2016, the new Campbell Fresh team did not compromise the quality of carrots we deliver to customers. As stated earlier, we expect that we'll be off allocation by December. We continue to expect Campbell Fresh to return to profitable growth this fiscal year.

228.    During the same earnings call, DiSilvestro pulled back the guidance issued just a quarter earlier, specifically noting that the poor carrot yields made the guidance issued on August 31, 2017 unattainable.  DiSilvestro stated

> We now expect our adjusted gross margin percentage to be comparable to last year, ***lower than previously anticipated, primarily due to higher transportation and logistics cost and the cost impact of lower carrot yields***.  Reflecting the reduced expectation on gross margin, we now expect adjusted EBIT to decline by minus 4% to minus 2% and adjusted EPS to decline by minus 3% to minus 1%. Both earnings ranges are 3 percentage points below our previous expectation.

229.    DiSilvestro and Morrison assured the market, however, that C-Fresh would return to profitability in the second half of 2018 claiming that:

> If we didn't have this [carrot] yield issue in Q1, Campbell Fresh's division would've generated a profit.  So yes, it can turn around pretty quickly.  We'll have a little bit of a lingering impact of the carrot yield issue into the second quarter. Denise mentioned we're on allocation.  That should be behind us by December.  So we would expect to see profitability pretty quick in Campbell Fresh.  And as we've said before, on a full year basis, we would expect to deliver both top and bottom line growth.

### 10.    Numerous Former Employees Confirm that the August 31, 2017 Guidance Issued by Campbell's Was Unreasonable and Unattainable

230.    By the time Morrison delivered Campbell's FY 2018 guidance to the market on August 31, 2017, it was widely recognized internally, at all levels of the Company, that the strategic goals expressed for Bolthouse at the Investor Day conference in July 2017 were unattainable and unrealistic.

231.    For example, FE 4, sales manager for Target Stores, stated that the entire Target sales team believed that their sales goals were unrealistic.  Further, FE 4 stated that she pushed back against the finance team's projections, but that her suggested downward alterations were never incorporated into any financial reports prepared by the finance team.  FE 4 further stated that her supervisor challenged the unrealistic sales targets, and brought her concerns to VP David Burke.

232.    FE 1 explained that the C-Fresh performance trend was negative during the period from August 2017 through June 2018, generally with respect to both Sales and Earnings.  FE 1 stated the basis for her remarks originated from her review of Sales and Earnings reporting, as well as presentations she witnessed at the MBR, quarterly meetings, and "Fire Side Chats" held monthly by Morrison.

233.    FE 5, who was involved in C-Fresh forecasting, "absolutely" pushed up to management that sales were slowing and trending down since the Bolthouse Recall.  Still, the numbers FE 5 was told to hit were never achievable following the Bolthouse Recall.  FE 5 added that Campbell was a "top-down organization," meaning management said, "here's the number you need to deliver."

234.    According to FE 1, based upon the sales numbers reported in C-Fresh's Business Intelligence ("BI") reports, the issues from the Bolthouse Recall were known to Defendants "for sure," when they told the market in August 2017 that C-Fresh would deliver "positive growth."

235.    FE 20, a Senior Financial Analyst at Campbell, recalled that her team generated BI reports by pulling data from Campbell's SAP system.  FE 20 recalled that she and her team did not conduct any other analysis on these figures, and simply "churn[ed] out" reports, which would then go to C-Fresh's CFO and Finance Director.  These BI reports would also go to Campbell's Director of Corporate FP&A on a monthly basis, and would be shared with Campbell's corporate controller, its CFO and its CEO.

236.    FE 20 further stated that Morrison and DiSilvestro, would see total sales and EBIT for both C-Fresh as a whole and Bolthouse in particular.  It was FE 20's recollection that Campbell's CEO and CFO could see that things weren't going well with C-Fresh and Bolthouse and that they were "in the loop" concerning the problems facing the C-Fresh division.  FE 20 also said that the Campbell executives would discuss the numbers with the C-Fresh executives.

237.    Moreover, the Company had systems in place to closely track its sales and margins.  According to FE 1, the Daily Budget to Actual and Prior Year to Current Year report was also generated through the BI platform, through the SAP data, to produce "Sales Reports."  The Sales Reports were generated for everyone in Sales, Marketing and other supporting roles.  Notably,

Defendants also had access to the Sales Reports, which showed a downward trend from 2017 to 2018.

238.    FE 1 further explained that to indicate any growth at least for the first six months of FY 2018 would have been a "miscategorization" based on the loss of customer confidence from the Bolthouse Recall.  FE 3 likewise said C-Fresh Executives like Chief Marketing and Innovation Officer Ginestro, General Manager Putman, and President Carolan knew by late 2017 or early 2018 that C-Fresh sales targets for 2018 could not be met.

239.    FE 6 similarly called C-Fresh's growth goals "unrealistic" as of August 2017. FE 7, C-Fresh's mid-level R&D executive with responsibilities for troubleshooting commercialization and start-up issues, added that the C-Fresh leadership team was overly optimistic going into 2017 and 2018, and "all sales targets, EBIT, and Profit Margins were extremely aggressive" for FY 2018 in order to "make up for prior year" shortfalls.  FE 4 agreed there was no way to meet FE 4's sales goals.

240.    Numerous additional FEs have confirmed that the Company's troubles were well known to Defendants before issuing the August 31, 2017 guidance.  For example, FE 1 attended Monthly Business Review Meetings ("MBR Meetings") wherein poor performance at C-Fresh was discussed with Carolan, Putman, Sales Leadership, Brand Leadership, and others at the Santa Monica office.  Likewise, FE 3 confirmed that Carolan, Putman, Ginestro and C-Fresh Marketing Leadership would attend these same MBR Meetings.  At the end of these meetings, FE 2 confirmed that C-Fresh CFO Caltabiano regularly informed the attendees that he would confer with C-Fresh President Carolan concerning what was discussed at the meeting, who would then brief Morrison and DiSilvestro.

241.    According to FE 1, the attendees of the MBR Meetings would discuss declining performance, overall loss of customer confidence and a general inability to meet forecasted targets, despite the initiatives in place to help the team "claw back to plan."  In particular, FE 1 recalled that C-Fresh's performance—including sales and earnings—was negative between August 2017 and June 2018.

242.    Such accounts are corroborated by numerous additional FEs who also attended MBR Meetings.

243.    FE 3, a mid-level Manager overseeing sales, managing brands, and promotion strategies for C-Fresh, stated C-Fresh, including its critically-important Bolthouse juices, was "largely trending down" in sales and profits in late 2017 and early 2018.

244.    According to FE 2, nearly every month's results were worse than the previous month, and every quarter was worse than the previous quarter.  FE 2 stated there was a steady decline, adding FY17 was bad, but FY18 was worse

245.    FE 8 recalled PowerPoint slides presented at MBR Meetings which showed C-Fresh as a whole was trending down from the same period year-over-year ("YOY").

246.    FE 9 recalled discussing declining sales during 2017 and 2018.  FE 9 added that projections were likewise always discussed at MBR Meetings, and there was always "a lot to catch up on."

247.    Such negative performance was also discussed by Defendant Morrison during monthly internal "Fireside Chats," which would be shared with the entire company via Skype. According to FE 1, it was clear from Morrison's own comments between August 2017 and June 2018 that C-Fresh was not performing to its sales or its earnings plan.

248.    The uncertainty among employees caused by Campbell's downward spiral boiled over on occasion: FE 23, a Bolthouse accountant, recalled that during the Q&A segments of numerous company-wide meetings, several employees asked whether there would be imminent layoffs.  Though FE 23 could not recall who fielded those questions, FE 23 described the answers as vague and evasive.   Furthermore, FE 23 explained that there were questions concerning imminent layoffs within FE 23's own department, as well.

### 11.    Despite the Poor Performance in Q1 2018, Defendants Reaffirm Their Outlook for Bolthouse on November 21, 2017.

249.    On November 21, 2017, Campbell hosted a conference call to discuss the Company's 1Q18 financial results.  As widely understood internally, at the start of the first quarter, Bolthouse's performance for 1Q18 would be poor.  Defendants, however, blamed the negative performance on reduced carrot yields—a fact they knew when they issued the FY18 Guidance.  During this call, Morrison stated, in part:

> *For fiscal 2018, our outlook for sales remains unchanged*.  We continue to expect net sales to be in the range of minus 2% to flat for the year.

> *    *    *

> *We're now back to normal beverage capacity*. Our new co-packer was fully operational midway through the quarter and our service levels steadily improved, *helping us instill confidence with customers. As a result, we started to return to more normal levels of promotional activity late in the quarter and expect that trend to continue in the second quarter*.

> Looking ahead, we have *strong innovation plans* in place with the continued rollout of Bolthouse Farms Plant Protein Milk, new Garden Fresh Gourmet fresh soup and salsa products in the first half and a range of Bolthouse Farms [indiscernible] and beverages in the back half.

> *    *    *

> Simple Meals, Canada and Foodservice performed well and *the Campbell Fresh turnaround is progressing*.

250.    Later in the call, Defendants were asked again about the Company's ability to deliver positive results for FY18:

> **Q [Goldman Sachs Analyst]:** And then, the second question, I think, comes back to a lot of the questions you've gotten today. They all sort of tether back to the believability of your ability to get the acceleration you're talking about in the back half. . . . I mean, at minimum, it sounds like your guidance implies 150 basis points of expansion, minimum in the back half of the year. Can you give us a little more teeth or a little more meat on the bone in terms of the drivers of those dynamics to help restore some credibility in that path of acceleration?

> **A [DiSilvestro]:** Yes. I would say, typically, our cost productivity program is more kind of, I would say, back-end weighted as opposed to front end, given the seasonality of the business and our ability to get into some of the plants when there's some downtime. So that's certainly more back half than front half. The other thing is this mix issue of soup in the first quarter, in effect, should turn as we go through the balance of the year, so that's a positive. And the third, as I said before, on our cost savings program, which is an addition to the productivity program, a lot of that should be coming in the back half as well. ***So we do expect to see improved gross margin performance in the back half***.

251.    Immediately following DiSilvestro's statement, Morrison reaffirmed his answer concerning when gross margin would improve, stating "***Yes. In the back half, we have a greater mix in*** our Global Biscuits and Snacks business ***and Campbell Fresh***."

### 12.    Campbell Maintains its Drumbeat of Second Half FY 2018 Profitability, After Once Again Disappointing On Quarterly Results

252.    By the time the Company reported its 2Q18 results, on February 16, 2018—which included C-Fresh losses of $11 million—the Company was more circumspect.  On the same day, Campbell filed a Form 8-K, signed by DiSilvestro, with the SEC.  The press release attached to the Form 8-K ("2Q18 Press Release"), stated in no uncertain terms, "Campbell Fresh did not meet expectations."  Morrison was also quoted in the release as saying, "This was a disappointing quarter, driven by continued challenges in U.S. soup and Campbell Fresh."  With the Company's sales and margins again on the decline, it again revised the FY18 Guidance for C-Fresh downward.

253.    Nevertheless, in the 2Q18 Press Release, Morrison stated:

Looking ahead to the spring, ***we expect our beverage innovation plans to drive improved beverage performance*** in the second half. We are committed to returning this business to ***profitable growth***.

254.    On February 16, 2018, Campbell hosted a conference call (the "2Q18 Conference Call") to discuss the Company's second quarter 2018 financial results.  During this call, Morrison stated:

As I mentioned at the outset, ***the C-Fresh team has made progress in overcoming several of its operational challenges, namely we've improved beverage and carrot quality, addressed capacity constraints in beverages, and returned the CPG business to competitive promotional levels***.

\*    \*    \*

Several customers recently reset their premium juice category, reducing space in the super premium segment.  ***Because of these resets and our previous supply constraints, Bolthouse Farms lost some shelf space, which hurt beverage sales in the quarter***.

***To address this, we're launching our most robust beverage innovation line in 2 years***.  Our upcoming beverage innovation suite is designed to address the sugar issue and evolve our beverage portfolio to be in step with consumer preferences. . . . . We're launching 19 beverage SKUs this spring compared to just 3 a year ago.

***Additionally, we're building on the initial success of our alternative dairy drink, Bolthouse Farms Plant Protein Milk***, by expanding our plant-based offerings in the ultra-premium segment with 3 new protein varieties of 1915 by Bolthouse Farms.  ***We expect our spring beverage innovations will drive improved performance in the second half***.

\*    \*    \*

In closing, this was a difficult quarter, and I'm not satisfied with our performance. ***We're continuing to take actions to improve our execution and expect better results in the second half***.  We've made progress with our key customer around soup, and we now expect sales declines in soup to moderate in the second half.  We have plans in place to combat the headwinds in the super-premium beverage category segment and expand our presence in the ultra-premium segment of the market.  ***We expect our robust beverage innovation and marketing to lead to improved performance in the back half for Campbell Fresh***.

255.    The 2Q18 Press Release showed an $11 million loss for C-Fresh.  As alleged above, Morrison claimed during the same day Conference Call that the loss in C-Fresh was primarily driven by "headwinds in the super premium juice segment" and that "the primary drivers are concerns about sugar and consumers migrating to functional beverages that deliver benefits such as protein, gut health, energy and hydration."  She also admitted that, "Several customers recently reset their premium juice category, reducing space in the super premium segment.  Because of these resets and our previous supply constraints, Bolthouse Farms lost some shelf space, which hurt beverage sales in the quarter."  As alleged, however, the Modular Resets that substantially reduced demand for Bolthouse beverages occurred *before* the second quarter of 2018.

256.    Indeed, FE 1 attributed the $11 million loss to the loss of the mid-sized (32 oz.) beverage segment in October 2017, before the beginning of Campbell's 2Q 2018.

257.    During the 2Q18 Conference Call, Morrison added, "At the highest level, we know that consumer preferences for fresh and healthier food continues to be strong, and we remain confident in the growth potential of the packaged fresh category.  ***We're focused on improving our execution and returning C-Fresh to profitable growth***."

258.    Later in the call, Defendants were asked specifically about C-Fresh's ability to recover in the second half of 2018:

> **Q [Citigroup Analyst]:** But C-Fresh, is profit recovery tied to sales growth?  And then just explaining that a little further, what I'm trying to get at is, shouldn't we see profit recovery from these depressed levels even if sales are constant?  And then related to C-Fresh, but on the sales line specifically, what is the second half expectation?  It sounds like you're telling us that there should be a sizable boost with all the new product activity. But I'd really like to calibrate expectations well. The segment's been hard for us to forecast.
>
> **A [Morrison]:** What we have going on in the second half of the year is we have ***much more robust innovation in beverages***, coupled with our supply constraints behind us and a normal promotional schedule.  ***It's the first time that we had all 3 legs of the stool going for us, and that's why we're optimistic that we can make***

*significant gains in the beverage business in the back half of the year. And the rest of our CPG business in Campbell Fresh is positive growth.* So getting beverages back to growth and continuing that momentum in the other parts of the business -- and that's the higher-margin part of the business, is an important idea. In carrots, carrots and carrot ingredients actually grew. However, because of the yield issue we had due to the adverse weather, it cost us more and, therefore, affected our profitability. Given that, we have very robust plans in the supply chain, and with improve [sic] productivity, to make margin improvements in this business. And we are very, very focused on executing those. *So the growth of the top line in the CPG business, coupled with the improvement of margins from the supply chain and productivity programs, should give us a much more profitable growth algorithm on this business*.

259.     In response to the same question, DiSilvestro also stated in part, "But just to add to that, the margin recovery is not sales dependent. *And we would expect to see top line growth and positive EBIT in Campbell Fresh in the second half of the year*."

260.     Analysts reiterated Campbell's claim.   Wells Fargo, for example, noted: "Following a turbulent few years, Ms. Morrison reiterated that C-Fresh's growth potential remains strong as evidenced by the leading importance of fresh products in consumer surveys of health claims."   And JPMorgan added: "Campbell plans to combat these losses with innovation and announced plans to launch 19 new SKUs this spring (versus three last year), including lower sugar smoothies and juices, and plant-based beverages."

### 13.     Campbell Propped Up Its Stock to Fund its Largest Acquisition Ever

261.     By the beginning of the Class Period, the Company's sales and margins had been on the retreat for the better part of two years.  At the same time, a confluence of internal headwinds had combined to effectively foreclose any organic path forward.

262.     On October 31, 2017, Moody's VP Senior Credit Officer, Brian Weddington, CFA ("Weddington"), observed that the factors that could lead to a downgrade of Campbell's credit rating included "significant deterioration of operating performance," "major leveraging share repurchase or acquisition," or "retained cash flow/net debt sustained below 18%."

263.    With her acquisitions failing, soup sales declining, and mounting internal evidence that C-Fresh was plagued with potentially irreversible problems, Morrison sought a new blockbuster deal to disguise the problems of the prior deals.  By the beginning of the Class Period, discussions were well under way with one of Campbell's biggest competitors in its Global Biscuits and Snacks division, Snyder's-Lance.

264.    Snyder's-Lance is one of the largest snack food companies in the U.S., and includes snack brands such as Snyder's of Hanover pretzels, Kettle chips, and Pop Secret popcorn.  In 2016, it generated more than $2.2 billion in net revenue, with a market capitalization of approximately $3.9 billion.

265.    On July 15, 2017, Morrison called the CEO of Snyder's-Lance, Bryan Driscoll, to begin discussing a potential acquisition.  Morrison and Driscoll met on August 23, 2017 in Charlotte, North Carolina to discuss the matter.

266.    Campbell provided Snyder's-Lance with a letter on October 3, 2017 indicating the Company's interest in acquiring Snyder's-Lance in an all cash transaction at a price ranging from $46.00 to $50.00 per share.  The written proposal provided that the price range represented a premium of 25.6% to 36.5% based on Snyder's-Lance's 30-day volume weighted average stock price.

267.    Campbell contemplated that it would fund its acquisition of Snyder's-Lance, which would cost $6.1 billion, by raising debt through a bond offering.  It also contemplated a bridge loan that would finance the transaction until that debt could be raised.

268.    Because Campbell sought to raise debt to fund the acquisition, and the cost of the debt was critical to the deal's closing, maintaining its credit rating was critical to Campbell's financing strategy.  At the time, Campbell's credit rating was hovering at a downgrade based on

several quarters of poor earnings and the debt burden of the prior acquisitions.  Campbell, therefore, needed to show credit agencies that it would have profitable growth in FY 2018 in order to service its debt, since weak operating performance would imperil Campbell's credit rating, cost of capital, and potentially scuttle the Snyder's-Lance deal.

269.    On December 14, 2017, Campbell and Snyder's-Lance issued a joint press release reporting that that Campbell would acquire Snyder's-Lance for $50.00 per share, or $6.1 billion in cash, the largest deal in the Company's 148-year history.  The purchase price represented a premium of approximately 27% to Snyder's-Lance's closing stock price on December 13, 2017, the last trading day prior to the announcement.  In the joint press release, Morrison stated, "This acquisition will dramatically transform Campbell, shifting our center of gravity and further diversifying our portfolio into the faster-growing snacking category."

270.    Analyst reaction was largely positive, but many were quick to point out the Company's recent struggles in integrating acquired companies.  Barclays, for example, "estimate[d] a potential acquisition of LNCE could drive ~+8% EPS accretion to CPB, once synergies have been achieved."  But it went on to explain:

> Over the past several years, CPB has made a number of acquisitions in both the snacking and packaged fresh arenas, most of which have come at relatively lofty deal multiples, but move the company's portfolio further towards areas that are more consistent with current consumer desires and therefore, better long term growth profiles.  We believe moves like these probably make strategic sense, over time, however, closer in, *the purchase multiples paid have been relatively high, in our view, execution around some of the recent C-Fresh deals has been more spotty*, and LNCE, in its own right, remains somewhat of a work in progress that CPB would need to learn to manage going forward -- which could call into question our assumed synergy target.

271.    Morgan Stanley similarly took a "generally favorable view of this transaction," but noted, "[f]or the time being, however, we maintain our UW rating given," among other things, "[a] mixed track record on recent acquisitions (e.g., Bolthouse, Garden Fresh)."

272.   And Gabelli & Company wrote:

Campbell continues to strive for stronger top-line growth as it stabilizes soup, reinvests to expand its product portfolio, introduces new products, improves its marketing/merchandising mix and focuses on geographic expansion and adjacencies. These efforts, coupled with the acquisition of Snyder's-Lance should generate significant earnings improvement over the next few years; however, without asset sales which may be considered over time management loses its flexibility near-term to continue to make acquisitions or repurchase shares.

273.   Moody's similarly placed Campbell's A3 senior unsecured debt ratings under review.  In a press release issued on December 18, 2017, Moody's stated, the "review for downgrade primarily reflects the significant increase in financial leverage that would result from the proposed transaction."  Weddington was further quoted as saying: "Campbell should be able to reduce financial leverage steadily through core operating cash flow and cost savings, which will provide important support of the company's credit profile."

274.   In discussing its financing plans with respect to the Snyder's-Lance acquisition on a December 18, 2017 conference call conducted in connection with announcing the deal, DiSilvestro stated:

*We will leverage our strong cash flow and balance sheet to finance the transaction with debt.* With the transaction, Campbell's pro forma leverage, measured as net debt to adjusted EBITDA and including the recently closed acquisition of Pacific Foods, increases to 4.8x. We are committed to deleveraging and are targeting a reduction in our leverage ratio to 3x by fiscal 2022. To assist the deleveraging, we are suspending our share repurchase program going forward. Consistent with our past practice, we will maintain our current dividend policy in which we target a payout ratio competitive with the peer group and expect to increase the dividend over time with earnings*. Based on these plans, we expect to maintain an investment grade rating. In fact, both Moody's and S&P have issued press releases this morning, with S&P assigning a rating of BBB and Moody's indicating a rating of no less than BAA2.*

275.   Following the conference call, Moody's added, on December 21, 2017, that:

Campbell's commitment to maintaining investment-grade credit quality includes prioritizing debt reduction after leveraging acquisitions until it restores its credit

metrics. The company should be able to sustain a steady pace of deleveraging through debt reduction following the acquisition, ***supported by the suspension of share buybacks and earnings growth.***

276.     In explaining the merits of the deal, Campbell had to explain to investors that it could handle the debt, and the rationale fed to investors was that Campbell's cash flows would allow it to deleverage the balance sheet from 4.8X to 3X in four years.  For rating agencies, this representation was key to maintaining an investment grade rating for Campbell.

277.     Campbell provided in its Form 8-K filed March 26, 2018:

On December 29, 2017, Campbell entered into a Three-Year Credit Agreement with Credit Suisse AG, Cayman Islands Branch ("Credit Suisse") as administrative agent, and the other lenders named therein (the "Credit Agreement").  The Credit Agreement provided Campbell with a single draw, unsecured, senior term loan credit facility (the "Term Loan Facility") in an aggregate principal amount of up to $1.20 billion.  The Credit Agreement contains customary covenants and events of default for credit facilities of this type. The Term Loan Facility can only be used in connection with the acquisition by the Company of Snyder's-Lance and to pay fees and expenses in connection therewith and with respect to the Credit Agreement. The Term Loan Facility became available to Campbell concurrently with the closing of the Merger, and on the date hereof, Campbell borrowed an aggregate principal amount of $900 million under the Term Loan Facility to finance a portion of the aggregate merger consideration.

278.     Ratings agencies expressed concern at the level of debt Campbell was assuming. A day after the deal was announced, S&P Global Ratings downgraded the Company's credit rating to BBB, just two notches above junk status.  In a statement, S&P Global said: "We believe the proposed acquisition will substantially increase Campbell's debt obligations and meaningfully weaken its credit protection measures."

279.     In a prospectus, dated March 12, 2018, Campbell offered the following debt instruments to fund the Snyder's-Lance acquisition:

$500,000,000 Floating Rate Notes due 2020 (the "2020 Floating Rate Notes")
$400,000,000 Floating Rate Notes due 2021 (the "2021 Floating Rate Notes")
$650,000,000 3.300% Notes due 2021 (the "2021 Notes")

$1,200,000,000 3.650% Notes due 2023 (the "2023 Notes")
$850,000,000 3.950% Notes due 2025 (the "2025 Notes")
$1,000,000,000 4.150% Notes due 2028 (the "2028 Notes")
$700,000,000 4.800% Notes due 2048 (the "2048 Notes")

280.   When Moody's review was completed, on March 9, 2018, it downgraded Campbell's senior unsecured debt rating to Baa2 from A3.  Still, Moody's concluded that the outlook for the Company going forward was "stable," which "reflects Moody's expectation that Campbell will be able to reduce debt/EBITDA below 4.0x within 24 months through core operating cash flow and cost synergies."  Mr. Weddington was again quoted in the press release: "Despite Campbell's recent disappointing operating performance due to weak soup and premium beverage sales and increased carrot and transportation costs, core cash flow should remain relatively strong."

281.   On March 15, 2018, the Company completed the $5.3 billion debt offering to fund the deal.  The deal was approved by Snyder's-Lance shareholders on March 23, 2018, and closed on March 26, 2018 for $50 per share in an all-cash transaction, which represented an enterprise value of approximately $6.1 billion.

282.   On March 26, 2018, in an updated report, Moody's further explained that one of the "Detailed Credit Considerations" that it had evaluated for Campbell's rating was C-Fresh's anticipated return to profitability in the second half of 2018.  According to Moody's, and echoing statements that Defendants made on February 16, 2018:

> The company believes that it has remediated the [sic] most of the problems in C-Fresh after modifying production processes, reorganizing the division and replacing several managers. However, it will take more time to fully recover or replace business lost due to poor service levels, some of which was likely bid away on a long-term basis. However, the C-Fresh division's sales and profitability should improve incrementally in the second half of fiscal 2018.

71

283.    After 18-months as President of C-Fresh, three weeks before the close of 3Q FY 2018 on April 5, 2018, Campbell announced that Carolan would be leaving the company "to pursue another opportunity."

284.    Following Morrison's sudden exit, during the Company's May 18, 2018 conference call, Campbell announced a strategic reorganization that impacted the highest levels of its leadership.  The Company elevated Luca Mignini, Campbell's President of Global Biscuits and Snacks to the position of Chief Operating Officer.  Campbell also let go of longtime Campbell's executive, Mark Alexander, President of Americas Simple Meals and Beverages, effective April 2, 2018.

**14.    The Bottom Falls Out: The Company Takes a $619 Million Impairment Charge on C-Fresh, Fires its CEO and Announces That C-Fresh Will Be Divested**

285.    On May 18, 2018, Campbell reported its 3Q18 results, which included C-Fresh losses of *$19 million*, more than had been recorded for the entire year to that point.  In addition, Campbell announced that it was recording a massive *$619 million* pretax impairment charge, related *entirely* to C-Fresh.

286.    The $619 million C-Fresh impairment charge to goodwill and trademark value effectively confirmed that customers would never return following the Bolthouse Recall, attributing $514 million or 83% to the Bolthouse Beverage and Salad Dressing unit alone.

287.    Campbell also announced that Morrison—the architect and Class Period champion of C-Fresh—had abruptly "retired."  As the Company would later disclose in a definitive proxy statement filed with the SEC on October 4, 2018, however, Morrison's "retirement" was hardly voluntary.  Instead, she was pushed out by the same Board that had gained a reputation for being overly tolerant and complacent:

Following a review, which took place prior to the release of the Company's third-quarter results, the Board initiated a dialogue with Denise M. Morrison, the then-President and Chief Executive Officer of the Company, ***expressing its dissatisfaction with the performance and execution of the business***. After further discussion with the Board, Ms. Morrison agreed with the Board that she would retire, effective as of May 18, 2018.

288.   Commenting on the results during a conference call conducted on May 18, 2018, DiSilvestro stated, "We are all disappointed with the results of C-Fresh, and we acknowledge that they are ***unacceptable***."

289.   During the same conference call, Campbell interim CEO and Independent Director Keith R. McLoughlin ("McLoughlin") offered the following admission of ongoing long-standing problems in C-Fresh:

> As disclosed in our earnings release this morning, we delivered results that were ***below expectations, ours and yours***.  Our company has clearly faced challenges.  Some of those are external factors that are impacting the entire industry, and others stem from our execution.  As a board member and interim CEO, ***these results are unsatisfactory and disappointing to us as well as our shareholders***.
>
> *     *     *
>
> ***What must change and will change is our execution and our financial performance***.  Our mandate is to create long-term value for our shareholders.  We intend to take appropriate and decisive actions to ensure that Campbell is positioned to compete and win in the marketplace.  ***That means we must take a fresh look at our strategies, our operations and our portfolio and to do so with urgency***.

290.   McLoughlin further promised the Company would "undertake a thorough and critical review of all aspects of our strategic and operating plans, including the composition of our entire portfolio."  He assured investors that "[e]verything is on the table," and "[t]here are no sacred cows."

291.   Analysts were incensed.  Credit Suisse called the Company's 3Q18 results "of ***exceedingly low quality***."  UBS similarly wrote: "The immediate retirement of CEO Denise Morrison ***brings the Company's strategy into question***."  Some analysts even suggested that the

Company look into divesting C-Fresh.  PiperJaffray, for example, wrote, "After repeatedly reiterating its commitment to the C-Fresh business, we expect a strategic portfolio review to lead to a sale of Campbell's C-Fresh business."

292.    As alleged below in Section VI, Campbell's stock price dropped precipitously in response to the C-Fresh losses and impairment charge announced on May 18, 2018, falling more than 12%, from a close of $39.22 per share on May 17, 2018, to close at $34.37 per share on May 18, 2018.

293.    On May 21, 2018, after Campbell announced its 3Q18 earnings, and the resignation of Morrison and the impairment of Bolthouse, Moody's placed all ratings of Campbell's debt instruments, approximately $10 billion of debt, under review for downgrade, based on "an unexpectedly sharp decline in Campbell's profitability in the fiscal third quarter and the sudden resignation of the company's chief executive officer." Weddington explained that Campbell's "sharp and unexpected decline in profitability in the third quarter casts serious doubt that Campbell will be able to meet its deleveraging plans following the Snyder's-Lance acquisition."

294.    Moody's also provided that the review of Campbell's credit rating for downgrade would "focus on developing a forward view of Campbell's operating performance taking into consideration the increasing challenges it faces in its core operations and ongoing integration risks related to the Snyder's-Lance acquisition," as well as "assess[ing] Campbell's overall credit profile in light of deteriorating credit metrics that are likely to sustain high financial leverage for longer than Moody's had previously expected."

295.    Three months later, the Company announced the results of its internal review.  The announcement was again accompanied by an admission that Campbell had been less than

forthcoming with respect to C-Fresh during the Class Period. During a conference call on August

30, 2018, McLoughlin stated:

> Simply put, we lost focus. We lost focus strategically. **We had too many initiatives that made the company unnecessarily complex**. We were in the food business and the ag business. We had growth businesses and we had cash businesses. We are focused on startup businesses and venture capital investment. **We aggressively pursued the important consumer megatrend of health and well being without having clarity on our source of uniqueness or whether we brought a competitive advantage to the space**. And we depended too much on M&A to shape our business strategy.

> \*       \*       \*

> Lastly, we lost focus in process and execution. Our management processes lack the necessary operating discipline. We created too many silos throughout the company where decision rights were unclear. We lacked agility, and we're [sic] slow to react to customer needs. And finally, **we didn't have a culture of accountability**, which led to poor execution.

296.    In perhaps the most damning admission of all, McLoughlin further announced that

the Company would be divesting itself of C-Fresh:

> Moving to the next slide, a major lever to drive our more focused portfolio is divesting noncore businesses. **We are pursuing the sale of** . . . **our Campbell Fresh business**, which includes Bolthouse Farms, Garden Fresh Gourmet and the refrigerated soup business. These proposed divestitures represent approximately $2.1 billion in net sales in fiscal year 2018. We have engaged top-tier financial advisers to run a disciplined process that will achieve maximum value.

297.    Later, McLoughlin was asked to comment on any lesson learned from C-Fresh, and

offered the following:

> I think what I would say is my experiences that **deal making works and really only works when acquired brands fit well into the buyer's capabilities and strengths**. And we've got some good example of that right now in the case of Pacific, right, and soup and the case of Snyder's-Lance and connecting that to the strengths and capabilities of Pepperidge Farm snacking. But -- and we've had some examples where that wasn't the case, carrots and, potentially, other areas. So I think that's the key learning, right? And that's how we'll leverage these most recent acquisitions and while we're getting good traction on them, candidly.

298.     The message was clear:  C-Fresh had been a failure, and these failings were hidden from the market during the Class Period by Defendants' false assurances of imminent profitability. Market reaction confirming as much was swift and to the point.  In a segment titled "Ripping Off the Band-Aid," Wells Fargo remarked: "The review frowned on CPB's marrying of legacy CPG assets with Ag-focused businesses and C-Fresh's pursuit of health & wellness-oriented consumers occurred absent a clear source of competitive advantage.  Given its ***striking fall***, from a 9% EBIT margin in FY13 to five consecutive operating losses through Q4 FY18, ***the Board is ready to cut cord*** and we'd agree; ***it's just not worth the trouble***."

299.     Then, two weeks later, on September 12, 2018, Moody's announced that the ratings outlook for the Company were "negative."  In a press release, it further stated that its "review was prompted by an unexpectedly sharp decline in profitability in Campbell's fiscal third quarter and the sudden resignation of the company's Chief Executive Office."  In a report later that month, commenting on Campbell's announcement that it was now attempting to sell C-Fresh, Moody's lamented, "Notably, C-Fresh had been described by the company as recently as last year as the future of Campbell Soup Company."  In fact, more than a year of trying to find a buyer for Bolthouse, Campbell finally sold Bolthouse in 2019 to a private equity group run by Bolthouse's former CEO, Jeff Dunn, for merely $510 million, after having purchased it for $1.55 billion seven years earlier.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     August 31, 2017

300.     On August 31, 2017, Campbell filed a Form 8-K with the SEC, setting forth Campbell's financial results for the fourth quarter and full year FY 2017, signed by DiSilvestro. In the press release attached to the Form 8-K ("4Q17 Press Release"), Morrison stated:

In the fourth quarter, Global Biscuits and Snacks was soft on the top line but generated a solid double-digit earnings increase versus the year-ago quarter. Americas Simple Meals and Beverages continued to deliver against its portfolio role, with sales performance in line with the categories in which we compete and margin expansion. ***While Campbell Fresh sales increased slightly and the bottom line was disappointing, we expect to return to profitable growth going forward***.

In fiscal 2017, we have made progress in several key areas, including increasing our successful multi-year cost savings initiative to $450 million by the end of fiscal 2020. The pending acquisition of Pacific Foods will add a purpose-driven, real food brand with a solid track record of growth to our portfolio. ***Additionally, our new Campbell Fresh leadership team has taken steps to enhance our quality processes and address capacity constraints toward our objective of returning the division to growth***.

301.   On that same date, Campbell hosted a conference call to discuss the Company's fourth quarter 2017 and full year operating and financial results ("4Q17 Conference Call"). During this call, Morrison reiterated that C-Fresh would return to profitable growth in 2018:

> I'm not happy with our performance in Campbell Fresh but remain encouraged by the progress we've made this year to address our key executional issues. C-Fresh delivered modest sales growth, and ***we expect this business to return to profitable growth in fiscal 2018***.
>
> *       *       *
>
> Looking ahead, ***we plan for the business to grow profitably in fiscal 2018*** as we return to ***more normal capacity*** and ***promotional activity*** across the beverage portfolio. ***We also have a robust innovation pipeline to help fuel additional growth***, *and we'll begin to introduce new beverage products to the market such as plant protein milk.*

302.   On the call, DiSilvestro provided the FY18 Guidance, stating, "Now I'll review our 2018 outlook. We expect sales to change by minus 2% to 0%, adjusted EBIT to change by minus 1% to plus 1%, and adjusted EPS to change by 0% to plus 2%."

303.   Later in the call, Defendants were pressed on the viability of the FY18 Guidance. In response to an analyst question, DiSilvestro responded:

> **Q [Citigroup Analyst]:** But so can you just comment on the fullness of this guidance? Is there something else here? Because negative 2% to 0%, it just -- it

doesn't seem to flip to some of the stuff that I thought you were saying at Analyst Day about the turnaround in C-Fresh and these opportunities in biscuits. I just feel like we were getting a bit more negative of a figure today, and maybe it's not only related to the soup issue, but would just love for you to elaborate if you can.

**A [DiSilvestro]:** Yes, so if I think about it and its components, we – as Denise said, ***we do expect to see top line growth in Campbell Fresh in 2018*** as we get the capacity for beverage back up to where we need to be. We turned on the promotional program. That's kind of happening now as we speak, ***so we do expect growth there***.

304.    In connection with this 4Q17 Conference Call, Campbell issued and published a series of slides on its corporate website. One of these slides entitled, "Outlook for F18," which was presented by Morrison, further touted C-Fresh's ability to reach "***profitable growth***."



305.    The statements contained in ¶¶ 300-04 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, when Defendants told the market, among other things: (i) "we expect [C-Fresh] to return to profitable growth going forward"; (ii) "we expect this business [C-Fresh] to return to profitable growth in fiscal 2018"; (iii) "we plan for the business [C-Fresh] to grow profitably in fiscal 2018"; (iv) "we do expect to see top line growth in Campbell Fresh in 2018"; (v) "we plan for the business to grow profitably

78

in fiscal 2018 as we return to more normal capacity"; and (vi) that C-Fresh FY18 Guidance included sales growth between -2% and 0%, EBIT growth between -1% and 1%, and adjusted EPS growth between 0% and 2% (equating to EPS of $3.04 to $3.11), Defendants had actual knowledge of at least the following:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018, Bolthouse beverages were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf-space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, as evidenced by the fact that: (i) 50% of Bolthouse beverage SKUs were lost at Target and never regained as of April 2018; and (ii) "the space was gone" for Bolthouse products at Albertsons through the end of the Class Period. ¶¶ 115-17, 156-78.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018. Many of C-Fresh's largest customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need. ¶¶ 115-17, 121-29, 178.

- Internal reports available at Campbell no later than August 2017, concluded that carrot production would be down for calendar year 2017, negatively impacting carrot sales and sales of beverages that included carrots as an ingredient, based upon prior excessive rainfall, which was known by marketing and sales teams by August 2017. ¶¶ 222-26.

- Throughout 2017 and into 2018, as a consequence of the quality assurance standards instituted after the Bolthouse Recall, costs went "through the roof" and eroded margins on Bolthouse's Protein/Low Acid beverage line going forward, which combined with reduced demand, made profitable growth in FY 2018 impossible. ¶¶ 101-11, 128, 157.

306.    Moreover, none of the statements alleged in ¶¶ 300-04 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "profitable growth" for C-Fresh, as Defendants had outlined, including the risks created by the Bolthouse Recall (resulting in impaired customer goodwill and lost shelf space), layoffs and drastic cost-cutting.

307.    Additionally, the statements contained in ¶¶ 300-04 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, when

Defendants told the market, among other things, "[w]e also have a robust innovation pipeline to help fuel additional growth, and we'll begin to introduce new beverage products to the market such as plant protein milk," Defendants knew, or were deliberately reckless in not knowing, at least the following:

- After providing customers samples of the Pea Protein Milk using the premium pea ingredient, Campbell's switched to a less expensive pea ingredient to meet its profit margins, which reduced the overall quality of the product. ¶¶ 205-08.

- Problems with manufacturing and distribution led to C-Fresh losing contracts and missing Modular Resets for the Pea Protein Milk at Safeway and Albertsons for the entire FY 2018. ¶¶ 210-18.

- During the summer of 2017, it was the consensus of the R&D Team that, based on production issues, the Pea Protein Milk was approximately 6-9 months from launch, but Campbell management demanded that the product go to market within a week or a month, resulting in a product that was not properly positioned for its launch in September 2017. ¶¶ 210-18.

### B.    November 21, 2017

308.    On November 21, 2017, Campbell hosted a conference call (the "1Q18 Conference Call") to discuss the Company's 1Q18 financial results.  During this call, Morrison stated, in part:

*For fiscal 2018, our outlook for sales remains unchanged*.  We continue to expect net sales to be in the range of minus 2% to flat for the year.  For fiscal 2018, our outlook for sales remains unchanged.  *We continue to expect net sales to be in the range of minus 2% to flat for the year*.  However, we have lowered our earnings outlook, reflecting our gross margin performance in the first quarter and our outlook for the remainder of the year.  *We now expect adjusted EBIT to change by minus 4% to minus 2%, previously minus 1% to plus 1%, and adjusted EPS to change by minus 3% to minus 1%, previously flat to plus 2%.*

*         *         *

*We're now back to normal beverage capacity*.  Our new co-packer was fully operational midway through the quarter and our service levels steadily improved, *helping us instill confidence with customers.  As a result, we started to return to more normal levels of promotional activity late in the quarter and expect that trend to continue in the second quarter*.

Looking ahead, we have **strong innovation plans in place with the continued rollout of Bolthouse Farms Plant Protein Milk**, new Garden Fresh Gourmet fresh soup and salsa products in the first half and a range of Bolthouse Farms [indiscernible] and beverages in the back half.

\*     \*     \*

Simple Meals, Canada and Foodservice performed well and **the Campbell Fresh turnaround is progressing**.

309.    Additionally, during the 1Q18 Conference Call, Defendants were questioned concerning when C-Fresh would begin generating a profit.  In response, DiSilvestro stated, in part:

**Q [Stifel, Nicholaus Analyst]:** And then if I could just ask a quick question on the margin recovery in the C-Fresh division . . . . [I]it seems like that business should get back to profit -- generating operating profit, does that happen as quickly as Q2? Or is there an upfront investment that may kind of slow that rebuild in profitability in that division?

**A [DiSilvestro]:** Yes, a couple of things. I would say if we didn't have this yield issue in Q1, Campbell Fresh's division would've generated a profit.  **So yes, it can turn around pretty quickly.**  We'll have a little bit of a lingering impact of the carrot yield issue into the second quarter. Denise mentioned we're on allocation. That should be behind us by December. **So we would expect to see profitability pretty quick in Campbell Fresh. And as we've said before, on a full year basis, we would expect to deliver both top and bottom line growth**.

310.    As alleged above, Defendants knew no later than August 2017 that the carrot yield was poor for calendar year 2017, because of prior excessive rain, and their guidance issued on August 31, 2017 predicated, in part, on carrot profitability partially revealed the falsity of their previous statements.  Defendants continued to mislead about their ability to generate a profit at C-Fresh over the successive quarters, as alleged below.

311.    Later during the 1Q18 Conference Call, Defendants were asked again about the Company's ability to deliver positive results for FY18:

**Q [Goldman Sachs Analyst]:** And then, the second question, I think, comes back to a lot of the questions you've gotten today.  They all sort of tether back to the believability of your ability to get the acceleration you're talking about in the back half. . . . I mean, at minimum, it sounds like your guidance implies 150 basis points

of expansion, minimum in the back half of the year.  Can you give us a little more teeth or a little more meat on the bone in terms of the drivers of those dynamics to help restore some credibility in that path of acceleration?

**A [DiSilvestro]:** Yes. I would say, typically, our cost productivity program is more kind of, I would say, back-end weighted as opposed to front end, given the seasonality of the business and our ability to get into some of the plants when there's some downtime.  So that's certainly more back half than front half.  The other thing is this mix issue of soup in the first quarter, in effect, should turn as we go through the balance of the year, so that's a positive.  And the third, as I said before, on our cost savings program, which is an addition to the productivity program, a lot of that should be coming in the back half as well.  ***So we do expect to see improved gross margin performance in the back half***.

312.    Immediately following DiSilvestro's statement, Morrison reaffirmed DiSilvestro's promise: "***Yes.  In the back half [we do expect to see improved gross margin performance], we have a greater mix in*** our Global Biscuits and Snacks business ***and Campbell Fresh***."

313.    The statements contained in ¶¶ 308-09, 311-12 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made.  Specifically, when Defendants told the market, among other things: (i) "[f]or fiscal 2018, our outlook for sales remains unchanged"; (ii) "the Campbell Fresh turnaround is progressing"; (iii) "we would expect to see profitability pretty quick in Campbell Fresh. And as we've said before, on a full year basis, we would expect to deliver both top and bottom line growth"; and (iv) "we do expect to see improved gross margin performance in the back half," Defendants had actual knowledge of at least the following:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018 Bolthouse beverages were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf-space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, including loss of the 32 oz. beverage which accounted for up to 30% of Bolthouse beverage revenues, as evidenced by the fact that: (i) 50% of Bolthouse beverage SKUs were lost at Target and never regained as of April 2018; and (ii) "the space was gone" for Bolthouse products at Albertsons through the end of the Class Period. ¶¶ 115-17, 156-78.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018.  Many of C-Fresh's largest customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need. ¶¶ 115-17, 121-29, 178.

- Throughout 2017 and into 2018, as a consequence of the quality assurance standards instituted after the Bolthouse Recall, costs went "through the roof" and eroded margins on Bolthouse's Protein/Low Acid beverage line going forward, which combined with reduced demand, made profitable growth in FY 2018 impossible. ¶¶ 101-11, 128, 157.

- During the summer of 2017, it was the consensus of the R&D Team that the Pea Protein Milk based on production issues was approximately 6-9 months from launch, but Campbell management demanded that the product go to market within a week or a month, resulting in a product that was not properly positioned for its launch in September 2017. ¶¶ 210-18.

- In the first quarter of FY 2018, C-Fresh had begun delivering its first orders of the Pea Protein Milk to customers, and the reception from customers to the Pea Protein Milk was resoundingly negative.  Shipment of the Pea Protein Milk was slow and began to pile up in the warehouse.  As of fall 2017, C-Fresh's new Pea Protein Milk simply was not selling and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either. ¶¶ 215-18.

314.   Moreover, none of the statements alleged in ¶¶ 308-09, 311-12 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "profitable growth" for C-Fresh as Defendants had outlined, including the risks created by the missed Modular Resets at Campbell's largest customers stemming from the Bolthouse Recall and ensuing production declines, loss of shelf space to competitor products because of the Modular Resets, higher costs for production of the Protein/Low Acid beverage line impacting margins, and the failure of the Pea Protein Milk in generating sales in FY 2018.

315.   In addition, the statements alleged above in ¶¶ 308-09, 311-12 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made.  Specifically, when Defendants told the market, among other things: (i) "We're now back to normal beverage capacity"; and (ii) "Our new co-packer was fully operational midway through the quarter and our service levels steadily improved, helping us instill confidence with customers," Defendants knew

or were deliberately reckless in not knowing that, irrespective of their capacity and operational levels, C-Fresh would not deliver "profitability pretty quick in Campbell Fresh" or "on a full year basis . . . expect to deliver both top and bottom line growth" in FY 2018 based on at least the following:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018 Bolthouse beverages were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf-space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, including loss of the 32 oz. beverage which accounted for up to 30% of Bolthouse beverage revenues, as evidenced by the fact that: (i) 50% of Bolthouse beverage SKUs were lost at Target and never regained as of April 2018; and (ii) "the space was gone" for Bolthouse products at Albertsons through the end of the Class Period. ¶¶ 115-17, 156-78.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018. Many of C-Fresh's largest customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need. ¶¶ 115-17, 121-29, 178.

316.    Finally, the statements alleged above in ¶ 308 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things, "we have strong innovation plans in place with the continued rollout of Bolthouse Farms Plant Protein Milk," Defendants knew, or were deliberately reckless in not knowing, at least the following:

- During the summer of 2017, it was the consensus of the R&D Team that the Pea Protein Milk based on production issues was approximately 6-9 months from launch, but Campbell management demanded that the product go to market within a week or a month, resulting in a product that was not properly positioned for its launch in September 2017. ¶¶ 210-18.

- In the first quarter of FY 2018, C-Fresh had begun delivering its first orders of the Pea Protein Milk to customers, and the reception from customers to the Pea Protein Milk was resoundingly negative. Shipment of the Pea Protein Milk was slow and began to pile up in the warehouse. As of fall 2017, C-Fresh's new Pea Protein Milk simply was not selling and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either. ¶¶ 215-18.

- After providing customers samples of the Pea Protein Milk using the premium pea ingredient, Campbell's switched to a less expensive pea ingredient to meet its profit margins, which reduced the overall quality of the product. ¶¶ 205-08.

- Problems with manufacturing and distribution led to C-Fresh losing contracts and missing Modular Resets for Pea Protein Milk at Safeway and Albertsons for the entire FY 2018. ¶¶ 210-18.

### C.    February 16, 2018

317.    On February 16, 2018, Campbell filed a Form 8-K, signed by DiSilvestro, with the

SEC.  In the press release attached to the Form 8-K ("2Q18 Press Release"), Morrison stated:

> Looking ahead to the spring, ***we expect our beverage innovation plans to drive improved beverage performance*** in the second half. We are committed to returning this business to ***profitable growth***.

318.    On February 16, 2018, Campbell hosted the 2Q18 Conference Call to discuss the

Company's second quarter 2018 financial results.  With respect to C-Fresh, Morrison said:

> The anticipated improvement in Campbell Fresh's performance did not materialize as we expected, with sales declining 1%.  While we're making progress in addressing several execution issues, we face new challenges in the quarter with headwinds in the super-premium juice segment.  Additionally, the carrot yield issue we discussed last quarter extended into the second quarter."  During this call, Morrison attributed the headwinds in the super-premium juice segment to "***Several customers recently reset their premium juice category, reducing space in the super premium segment.  Because of these resets and our previous supply constraints, Bolthouse Farms lost some shelf space, which hurt beverage sales in the quarter***.

319.    The statements alleged above in ¶¶ 317-18 were materially false and misleading,

omitted material facts, and lacked a reasonable basis when made.  As set forth above, Defendants

had known about the missed Modular Resets and supply constraints for Bolthouse beverages

before August 2017 and into the first quarter of FY 2018, but misled investors concerning the

known impact the Modular Resets and supply constraints would have on Campbell's performance.

Morrison, however, continued to mislead investors about C-Fresh's ability to restore profitable

growth for the remainder of FY 2018. Morrison's statement about losing "some shelf space" hurting beverage sales in the quarter was materially misleading, because, at the time, Morrison knew or was deliberately reckless in not knowing at least the following:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018 Bolthouse beverages were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf-space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, including loss of the 32 oz. beverage which accounted for up to 30% of Bolthouse beverage revenues. The missed Modular Resets would have negative impacts on Bolthouse beverage sales for the entire FY 2018, including the fact that: (i) 50% of Bolthouse beverage SKUs were lost at Target and never regained as of April 2018; and (ii) "the space was gone" for Bolthouse products at Albertsons through the end of the Class Period. ¶¶ 115-17, 156-78.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018. Many of C-Fresh's largest customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need.¶¶ 115-17, 121-29, 178.

- Morrison's reference to the loss of "some shelf space" misleadingly minimized the drastic reduction in shelf space at Campbell's largest customers resulting from the ongoing effects of the Bolthouse Recall and missed Modular Resets. ¶¶ 115-17, 121-29, 156-85.

320. During the 2Q18 Conference Call, when addressing the impact of the missed Modular Resets, Morrison claimed that:

> To address this, we're launching our most robust beverage innovation line in 2 years. Our upcoming beverage innovation suite is designed to address the sugar issue and evolve our beverage portfolio to be in step with consumer preferences. . . . . We're launching 19 beverage SKUs this spring compared to just 3 a year ago.

> Additionally, ***we're building on the initial success of our alternative dairy drink, Bolthouse Farms Plant Protein Milk***, by expanding our plant-based offerings in the ultra-premium segment with 3 new protein varieties of 1915 by Bolthouse Farms. ***We expect our spring beverage innovations will drive improved performance in the second half***.

*     *     *

In closing, this was a difficult quarter, and I'm not satisfied with our performance. ***We're continuing to take actions to improve our execution and expect better results in the second half***. We've made progress with our key customer around soup, and we now expect sales declines in soup to moderate in the second half. We have plans in place to combat the headwinds in the super-premium beverage category segment and expand our presence in the ultra-premium segment of the market. ***We expect our robust beverage innovation and marketing to lead to improved performance in the back half for Campbell Fresh***.

321.    Later during the 2Q18 Conference Call, Defendants were asked specifically about

C-Fresh's ability to recover in the second half of 2018:

**Q [Citigroup Analyst]:** But C-Fresh, is profit recovery tied to sales growth? And then just explaining that a little further, what I'm trying to get at is, shouldn't we see profit recovery from these depressed levels even if sales are constant? And then related to C-Fresh, but on the sales line specifically, what is the second half expectation? It sounds like you're telling us that there should be a sizable boost with all the new product activity. But I'd really like to calibrate expectations well. The segment's been hard for us to forecast.

**A [Morrison]:** What we have going on in the second half of the year is we have ***much more robust innovation in beverages, coupled with our supply constraints behind us and a normal promotional schedule. It's the first time that we had all 3 legs of the stool going for us, and that's why we're optimistic that we can make significant gains in the beverage business in the back half of the year. And the rest of our CPG business in Campbell Fresh is positive growth.*** So getting beverages back to growth and continuing that momentum in the other parts of the business -- and that's the higher-margin part of the business, is an important idea. In carrots, carrots and carrot ingredients actually grew. However, because of the yield issue we had due to the adverse weather, it cost us more and, therefore, affected our profitability. Given that, we have very robust plans in the supply chain, and with improve productivity, to make margin improvements in this business. And we are very, very focused on executing those. ***So the growth of the top line in the CPG business, coupled with the improvement of margins from the supply chain and productivity programs, should give us a much more profitable growth algorithm on this business***.

322.    In response to the same question, DiSilvestro also stated in part, "But just to add to

that, the margin recovery is not sales dependent. ***And we would expect to see top line growth and***

***positive EBIT in Campbell Fresh in the second half of the year***."

323.    The statements set forth above ¶¶ 320-22 were materially false and misleading omitted material facts, and lacked a reasonable basis when made. Specifically, when Defendants told the market, among other things: (i) "we expect our spring beverage innovations will drive improved performance in the second half"; (ii) "we would expect to see top line growth and positive EBIT in Campbell Fresh in the second half of the year"; and (iii) "we expect our robust beverage innovation and marketing to lead to improved performance in the back half for Campbell Fresh," Defendants had actual knowledge of at least the following:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018 Bolthouse beverages were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf-space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, including loss of the 32 oz. beverage which accounted for up to 30% of Bolthouse beverage revenues, as evidenced by the fact that: (i) 50% of Bolthouse beverage SKUs were lost at Target and never regained as of April 2018; and (ii) "the space was gone" for Bolthouse products at Albertsons through the end of the Class Period. ¶¶ 115-17, 156-78.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018. Many of C-Fresh's largest customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need. ¶¶ 115-17, 121-29, 178.

- Throughout 2017 and into 2018, as a consequence of the quality assurance standards instituted after the Bolthouse Recall, costs went "through the roof" and eroded margins on Bolthouse's Protein/Low Acid beverage line going forward, which combined with reduced demand, made profitable growth in FY 2018 impossible. ¶¶ 101-11, 128, 157.

- In the first quarter of FY 2018, C-Fresh had begun delivering its first orders of the Pea Protein Milk to customers. The Pea Protein Milk had been rushed to market despite the R&D team believing that 6-9 months more were needed to prepare the product for launch, and the reception from customers to the Pea Protein Milk was resoundingly negative. Shipment of the Pea Protein Milk was slow and began to pile up in the warehouse. ¶¶ 215-18.

- As of fall 2017, C-Fresh's new Pea Protein Milk simply was not selling and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either. ¶¶ 215-18.

324.    Moreover, none of the statements alleged in ¶¶ 320-22 above were accompanied by any meaningful cautionary language identifying the known risks of not delivering "profitable growth" for C-Fresh as Defendants had outlined, including the risks created by the Bolthouse Recall (resulting in impaired customer goodwill and lost shelf space), layoffs, and drastic cost-cutting, including to marketing budgets.

325.    In addition, the statements contained in ¶¶ 320-22 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made.  Specifically, when Defendants told the market, among other things: (i) "the C-Fresh team has made progress in overcoming several of its operational challenges, namely we've . . . addressed capacity constraints in beverages"; (ii) "our supply constraints [are] behind us"; (iii) "we're building on the initial success of our alternative dairy drink, Bolthouse Farms Plant Protein Milk"; and (iv) "what we have going on in the second half of the year is we have much more robust innovation in beverages," Defendants knew or were deliberately reckless in not knowing that, irrespective of their capacity and operational levels, C-Fresh would not increase profitability in the second half of Campbell's FY 2018 for at least the following reasons:

- Because of the Bolthouse Recall and associated production declines, leading into FY 2018 Bolthouse beverages were excluded from the Modular Resets at C-Fresh's largest customers, which foreclosed valuable shelf-space at, and associated revenues from, at least Target, Kroger, Walmart, and Albertsons, and made sales growth at these customers impossible in FY 2018, including loss of the 32 oz. beverage which accounted for up to 30% of Bolthouse beverage revenues, as evidenced by the fact that: (i) 50% of Bolthouse beverage SKUs were lost at Target and never regained as of April 2018; and (ii) "the space was gone" for Bolthouse products at Albertsons through the end of the Class Period. ¶¶ 115-17, 156-78.

- In their Modular Resets, C-Fresh's largest customers in many instances replaced Bolthouse beverages with competitor products including Naked Juice (PepsiCo.), Odwalla Juice (Coca-Cola), Suja Juice and GT Kombucha, making it highly unlikely that Bolthouse could win back that shelf space in FY 2018.  Many of C-Fresh's largest customers had moved on and owed allegiance to the suppliers who helped them fill their empty shelves in a time of need.¶¶ 115-17, 121-29, 178.

- Problems with manufacturing and distribution led to C-Fresh losing contracts and missing Modular Resets for Pea Protein Milk at Safeway and Albertsons for the entire FY 2018. ¶¶ 210-18.

- In the first quarter of FY 2018, C-Fresh had begun delivering its first orders of the Pea Protein Milk to customers. The Pea Protein Milk had been rushed to market despite the R&D team believing that 6-9 months more were needed to prepare the product for launch, and the reception from customers to the Pea Protein Milk was resoundingly negative. Shipment of the Pea Protein Milk was slow and began to pile up in the warehouse. ¶¶ 215-18.

- As of fall 2017, C-Fresh's new Pea Protein Milk simply was not selling and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either. ¶¶ 215-18.

326.    Moreover, the statements contained in ¶ 321 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, when Defendants told the market, among other things, they had resumed a "normal promotional schedule," Defendants knew, or were deliberately reckless in not knowing, at least the following:

- Campbell cut CPG business marketing budgets in or around January 2018, including budget cuts of 20-50% to the Bolthouse beverage business and budget cuts up to 70% to the Bolthouse salad dressing business. ¶¶ 197-201.

**D.    Defendants Violated Item 303 of Regulation S-K**

327.    Defendants also violated their obligations pursuant to Item 303 of SEC Regulation S-K by failing to disclose known material adverse trends. More specifically, pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer must disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Such disclosures are required to be made by an issuing company in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" for every Form 10-Q filed by public companies.

328.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

> * * *

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

329.    Furthermore, the 1989 Interpretive Release provided the following test to determine whether disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

330.    Campbell's 2017 10-K, and 1Q18 and 2Q18 Forms 10-Q, which were filed with the SEC on September 27, 2017, December 8, 2017 and March 5, 2018 respectively, and signed by Defendants Morrison and DiSilvestro, omitted material information regarding known trends and uncertainties that Defendants were required to disclose pursuant to Item 303.  As alleged herein, Defendants failed to disclose with respect to the C-Fresh division, that Campbell's largest customers including at least Walmart, Kroger, Target, Albertsons, and Publix, had materially reduced their shelf space for Bolthouse beverages in Modular Resets impacting FY 2018, thereby

increasing the risk of an impairment charge in the Bolthouse beverage business.  As would be revealed, in Campbell's 3Q18 10-Q, the concealed risk materialized with the write-down of the entire goodwill in the Bolthouse Beverage and Salad Dressing reporting unit in 3Q18.

## VI.   THE TRUTH EMERGES:  ALLEGATIONS OF LOSS CAUSATION

331.   Defendants' material misstatements and omissions complained of herein artificially inflated and/or maintained artificial inflation in the market price of Campbell's publicly traded common stock.  The artificial inflation in Campbell's stock price was removed when the facts and risks misstated and omitted by Defendants were revealed to the market.   Such corrective information was disseminated to investors through public disclosures on November 21, 2017, February 16, 2018, and May 18, 2018.  Each such disclosure partially revealed the falsity of Defendants' materially false and/or misleading statements concerning, among other things, the FY18 Guidance and Campbell's ability to return C-Fresh to "profitable growth."  Each disclosure, more particularly described below, removed a portion of the artificial inflation in the price of Campbell's publicly traded stock created or maintained by Defendants' materially false and/or misleading statements, causing economic injury to Lead Plaintiff and the other members of the Class.

### A.   November 21, 2017

332.   On November 21, 2017, Campbell announced certain 1Q18 operating and financial results, including losses of $6 million for C-Fresh, as follows:

|  | **Campbell** | **C-Fresh** |
| --- | --- | --- |
| **Net Sales** | $2,161 | $234 |
| **Operating Earnings/EBIT** | $412 | $(6) |
| **EPS** | $0.91 | -- |

333.    Morrison stated the following in the Company's 1Q18 Press Release:

This was a difficult quarter, particularly for our U.S. soup business. The operating environment remains volatile with a rapidly evolving retailer landscape and competitive activity pressuring the top line.  Our bottom line performance was negatively impacted by a lower adjusted gross margin rate due in part to cost inflation, higher carrot costs and escalating transportation and logistics costs following the hurricane season.

334.    With respect to C-Fresh in particular, the 1Q18 Press Release stated:

Sales in the quarter were comparable to the prior year at $234 million as sales gains in carrot ingredients, Garden Fresh Gourmet and *Bolthouse Farms* salad dressings were offset by declines in carrots.  Sales of *Bolthouse Farms* refrigerated beverages were comparable to the prior year.

Segment operating earnings in the quarter decreased from $1 million to a loss of $6 million, reflecting a lower gross margin percentage driven primarily by higher carrot costs.

335.    The 1Q18 Press Release also stated that the Company would be revising its FY18 Guidance downward as follows, attributable "primarily to Campbell's gross margin performance in the first-quarter and revised outlook for the balance of the fiscal year":

|  | Prior Guidance (Aug. 31, 2017) | Revised Guidance (Nov. 21, 2017) |
| --- | --- | --- |
| **Change in EBIT** | -1% to 1% | -4% to -2% |
| **Change in EPS** | 0% to 2% | -3% to -1% |

336.    As a direct and proximate result of these partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, including their promise to deliver "profitable growth" for C-Fresh, shares of the Company's stock fell over 8%, from a close of $49.93 per share on November 20, 2017, to close at $45.84 per share on November 21, 2017.

337.    Analysts attributed the decline in the price of Campbell's common stock to the Company's lower than expected results, headwinds attributable to C-Fresh, and lowered FY18

Guidance.  Deutsche Bank wrote: "Campbell Soup's Q1 results disappointed today." PiperJaffray added: "Management cited weather disruptions on carrot supply as a headwind in its C-Fresh segment, a drag that it cited as a key factor in the lower guidance."   JPMorgan was similarly circumspect: "Earnings were also impaired by higher carrot costs (the *Bolthouse* deal at this point has to be seen as a disappointment) in addition to higher freight and logistics.  Overall, this was a poor print."  UBS likewise expressed disappointment with the Company's revised guidance: "We expect the stock to trade lower as Campbell cut full-year guidance after 1Q of results."

338.    Nonetheless, as set forth in Section V above, despite the Company's November 21, 2017 disclosures and the related stock price decline, the price of Campbell common stock remained artificially inflated as Defendants continued to misrepresent and conceal material information from investors concerning Campbell's putative ability to return C-Fresh to "profitable growth."

**B.     February 16, 2018**

339.    On February 16, 2018, Campbell announced certain 2Q18 operating and financial results, including losses of $11 million for C-Fresh, as follows:

|  | **Campbell** | **C-Fresh** |
|---|---|---|
| **Net Sales** | $2,180 | $257 |
| **Operating Earnings/EBIT** | $243 | $(11) |
| **EPS** | $0.95 | -- |

340.    Morrison stated the following in the Company's 2Q18 Press Release:

This was a disappointing quarter, driven by continued challenges in U.S. soup and Campbell Fresh.  The decline in organic sales was largely due to the performance of Americas Simple Meals and Beverages, where U.S. soup sales decreased by 7 percent based on the key customer issue we discussed last quarter.  We are making progress with this customer and expect sales declines in soup to moderate in the second half.  Campbell Fresh did not meet expectations.  Sales did not recover as anticipated due in part to headwinds in the super premium juice category.

341.    With respect to C-Fresh in particular, the 2Q18 Press Release stated:

Sales in the quarter decreased 1 percent to $257 million driven primarily by sales declines in *Bolthouse Farms* refrigerated beverages.

Segment operating earnings declined from a loss of $3 million to a loss of $11 million, reflecting a lower gross margin percentage driven primarily by an increase in supply chain costs as well as higher carrot costs.

342.    Finally, the Company further reduced its FY18 Guidance as follows:

|  | **Revised Guidance (Nov. 21, 2017)** | **Revised Guidance Excluding Tax Reform and Pacific Foods Acquisition (Feb. 16, 2018)** | **Revised Guidance Including Tax Reform and Pacific Foods Acquisition (Feb. 16, 2018)[2]** |
|---|---|---|---|
| Change in EBIT | -4% to -2% | -6% to -4% | -7% to -5% |
| Change in EPS | -3% to -1% | -5% to -3% | +2% to +4% |

343.    As a direct and proximate result of these partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, including their promise to deliver "profitable growth" for C-Fresh, shares of the Company's stock fell approximately 10% over three trading days, from a close of $47.70 per share on February 15, 2018, to close at $42.90 per share on February 21, 2018.

344.    Analysts attributed the decline in the price of Campbell's common stock to the Company's lower than expected results, headwinds attributable to C-Fresh, and lowered FY18 Guidance.  JPMorgan wrote: "Notably the C-Fresh business continues to disappoint." RBC called the results "disappointing," and lowered its "FY18 EBIT growth forecast by ~3pp (from +4% to

---

[2] During the quarter, Campbell acquired Pacific Foods and the Tax Cuts and Jobs Act was passed.  For purposes of an "apples-to-apples" comparison, the above chart utilizes the Company's guidance that excludes the impact of the acquisition of Pacific Foods and the Tax Cuts and Jobs Act.

+1% YOY), primarily to reflect F2Q's additional soup declines at Walmart and a sluggish recovery in Bolthouse beverages."

345.   UBS further noted that certain factors, including the newly enacted U.S. tax laws, might have prevented the stock from falling even further: "We expect the stock to trade ~flat as a favorable tax savings and cost plan update could mute disappointment over weaker gross margin."

346.   Nonetheless, as set forth in Section V above, despite the Company's February 16, 2018 disclosures and the related stock price decline, the price of Campbell common stock remained artificially inflated as Defendants continued to misrepresent and conceal material information from investors concerning Campbell's putative ability to return C-Fresh to "profitable growth."

**C.   May 18, 2018**

347.   Finally, on May 18, 2018, the Company announced  disappointing financial results for the third straight quarter, including losses of $475 million and $19 million for Campbell and C-Fresh, respectively, as follows:

| | **Campbell** | **C-Fresh** |
|---|---|---|
| **Net Sales** | $2,125 | $251 |
| **Operating Earnings/EBIT** | $(475) | $(19) |
| **EPS** | $(1.31) | -- |

348.   The Company further announced that it would be taking a pre-tax impairment charge of $619 million, or $1.65 per share, related entirely to C-Fresh.  At the same time, Campbell announced that Morrison would be stepping down, effectively immediately.

349.   Finally, the Company again revised its FY18 Guidance downward as follows:

|  | Revised Guidance Including Tax Reform and Pacific Foods Acquisition (Feb. 16, 2018) | Revised Guidance Including Tax Reform and Pacific Foods Acquisition [Excluding Snyder's-Lance Acquisition] (May 18, 2018)[3] |
|---|---|---|
| **Change in EBIT** | -7% to -5% | -11% to -9% |
| **Change in EPS** | +2% to +4% | -3% to -1% |

350.    DiSilvestro, the acting CEO, stated the following in the Company's press release announcing the results ("2Q18 Press Release"):

> [W]e are not satisfied with our financial results.  Our performance has been impacted by both execution-related and external challenges.  We are addressing these challenges with renewed urgency.  Looking ahead, we will be reviewing all aspects of our strategic plans and portfolio composition.  We anticipate that our review, which will take several months to complete, will lead to changes designed to improve our operating performance and create long-term shareholder value.  We plan to discuss the outcome of this review when we report fourth-quarter and full-year results in late August.

351.    During a conference call to discuss the Company's 3Q18 financial results on the same day ("2Q18 Conference Call"), DiSilvestro stated:

> While our organic sales were stable in a difficult environment, our challenge in the quarter was clearly our adjusted gross margin performance, as the percentage decline by about 4 points compared to last year, including a 1 point negative mix impact from our recent acquisitions.  Gross margin performance was driven by higher-than-expected cost inflation, primarily higher transportation and logistic costs, higher supply chain costs in Campbell Fresh and increased promotional spending in U.S. Soup and Pepperidge Farms.

352.    As a direct and proximate result of these partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, including their promise to

---

[3] During the quarter, Campbell acquired Snyder's-Lance.  For purposes of an "apples-to-apples" comparison, the above chart utilizes the Company's guidance that includes the impact of the acquisition of Pacific Foods and the Tax Cuts and Jobs Act, but excludes the impact of the Snyder's-Lance acquisition.

deliver "profitable growth" for C-Fresh, shares of the Company's stock fell over 12%, from a close of $39.22 per share on May 17, 2018, to close at $34.37 per share on May 18, 2018.

353.    Analysts attributed the stock drop to the Company's continued poor performance, particularly at C-Fresh, and openly questioned whether C-Fresh would ever be profitable.  UBS for example, wrote: "Stock -12% in reaction to negative EPS revisions," and "[t]he immediate retirement of CEO Denise Morrison brings the Company's strategy into question."  It went on, "One probable call to action is to divest its C-Fresh business, but C-Fresh has suffered from recalls, stagnant revenue trends and is not cash flow positive."  PiperJaffray similarly wrote, "After repeatedly reiterating its commitment to the C-Fresh business, we expect a strategic portfolio review to lead to a sale of Campbell's C-Fresh business."

354.    Deutsche Bank summed up the results as follows:

Campbell Soup recorded an impairment charge of $619mm in the quarter related to the C-Fresh segment, which represents a ~40% impairment on Bolthouse Farms (acquired in 2012 for $1.55bn) and Garden Fresh Gourmet (acquired in 2015 for $231mm).  Overall, the company dropped gross margin guidance for the fiscal year to down 300 bps y/y (from prior down 100 bp at Q2'18, comparable at Q1'18, and modestly up at Q4'17), with one point of the impact attributable to recent acquisition mix and two points from base business declines, driven by weakness in Campbell Fresh and worsening transportation and logistics cost inflation.

355.    As a result of Defendants' misstatements and omissions, which were corrected by the disclosures discussed above, the price of Campbell common stock ended the Class Period at $34.37 per share, more than 31% below its Class Period high of $49.83 on December 5, 2017.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

356.    In addition to the facts alleged above in Section IV, the following facts, viewed holistically, provide a strong inference that Defendants Morrison, DiSilvestro, and Campbell knew or recklessly disregarded that the statements they made during the Class Period alleged above in Section V were materially false or misleading when each such statement was made.

A.    **Defendants' August 31, 2017 Misstatements**

357.   As set forth above in ¶¶ 300-07, in providing the FY18 Guidance to investors on August 31, 2017, Defendants made materially false or misleading statements representing that that C-Fresh would return to profitability, including: (i) "we expect [C-Fresh] to return to profitable growth going forward"; (ii) "we expect this business [C-Fresh] to return to profitable growth in fiscal 2018"; (iii) "we plan for the business [C-Fresh] to grow profitably in fiscal 2018"; (iv) "we do expect to see top line growth in Campbell Fresh in 2018"; and (v) "we plan for the business to grow profitably in fiscal 2018 as we return to more normal capacity."  Defendants further claimed that investors should expect C-Fresh FY 2018 sales growth between -2% and 0%, EBIT growth between -1% and 1%, and adjusted EPS growth between 0% and 2% (equating to EPS of $3.04 to $3.11).

1.    **The FY 2018 Guidance Was Contradicted By Known Inadequate Carrot Yields as of August 31, 2017**

358.   When Defendants made the foregoing statements, they knew or recklessly disregarded that internal reports, posted at the C-Fresh sales portal and accessible to C-Fresh marketing and sales teams no later than August 2017, indicated that excessive rainfall had already impacted C-Fresh carrot yields for the remainder of calendar year 2017 and, therefore, sales of carrots and the many C-Fresh beverages containing carrots would be negatively impacted.  Indeed, as alleged above in ¶ 227, Morrison belatedly admitted this fact one quarter later on November 21, 2017, when explaining why Campbell's performance for the first quarter of 2018 did not meet the expectations she had previously communicated to the market: "Sales of carrots declined in the quarter.  Our carrot crops were negatively impacted by adverse weather.  Due to these low yields, we placed customers on allocation in the quarter."

### 2. The FY 2018 Guidance Was Contradicted By Known Adverse Modular Resets At Major Customers Prior to August 31, 2017

359.    Additionally, as of August 31, 2017, other facts known or readily accessible to Defendants directly contradicted Defendants' statements.  Critically, Bolthouse beverages had been excluded from the Modular Resets at C-Fresh's largest customers, including Target, Kroger, Walmart, and Albertsons, and any return to profitability for the Bolthouse beverage business would necessitate winning back this shelf space later in FY 2018, without which sales growth in FY 2018 was impossible.

360.    As FE 25 explained, Campbell's largest customers conducted a major Modular Reset the spring (between March and May) and a minor Modular Reset for smaller and non-performing items in the fall (around November).  Campbell would be informed of the decision-making for the Modular Resets two months in advance of the Modular Reset being implemented and the sell-in period for the fall Resets began in July, and the sell-in period for the spring Resets began in August or September.

361.    As alleged above in ¶¶ 16-17, 152-55, Morrison was personally involved in the Modular Reset process.  From at least July 2016 through July 2017, Morrison was "flying all over the country" to play "defense and offense" in order to meet with important customers to prevent such customers from abandoning "sell-in" meetings, and to "re-instill faith" in C-Fresh and its products after the Bolthouse Recall and resulting loss of shelf space for Bolthouse products.  FE 25 prepared presentations for Campbell's C-Level executives, including for Morrison's discussions with large customers, concerning the Modular Resets and getting Bolthouse beverages back onto shelves.

362.    Additionally, C-Fresh maintained a spreadsheet that tracked customer Modular Resets (defined herein as the "Modular Reset Tracker") on a shared drive accessible to all C-Fresh

sales personnel.  The Modular Reset Tracker provided data on, among other things: (i) all of the new items that C-Fresh was trying to "sell-in" to customers; (ii) the items that had already been presented to customers; (iii) the items the customers were taking and not taking; (iv) the dates of customer sell-in meetings; and (v) lost sales opportunities/missed sell-in meetings (which usually occurred when a customer did not want to meet with C-Fresh).  The Modular Reset Tracker was "incredibly important" for both distribution and forecasting, because it was used to plan production runs, including inventory planning and production line management, and was used to determine performance compared to fiscal year goals.  The results of missing Modular Resets, as recorded in the Modular Reset Tracker, were incorporated into financial projections, which were available to Campbell's senior management, including Morrison.  Additionally, as FE 19 characterized it, the "Modular Reset was being watched by everyone" and everyone was "wired in" with respect to the Modular Reset process at Campbell's top ten customers.

363.    Moreover, Morrison received updates from SVPs who attended "Top-to-Top business review" meetings with Campbell's customers, where the Modular Resets were discussed. During these meetings, Campbell's management would discuss with their customers' leadership, among other things, consumption data and sales numbers, including the performance and sales growth of specific products.  Morrison relied upon the SVPs that attended these meetings, who would then report up to her.  As alleged above in ¶ 155, Morrison had access to presentations from FE 25 detailing the lack of demand for Bolthouse beverages.

364.    Thus, when they issued the FY18 Guidance on August 31, 2017, Defendants would have known, or would have been reckless in not knowing, that Bolthouse beverages had been excluded from at least the Target and Walmart Modular Resets, in March 2017 and August 2017, respectively, and reduction in shelf space at two of Bolthouse's most important customers would

make profitable growth for C-Fresh impossible unless that shelf space was somehow won back at the next Modular Reset. Indeed, Target dropped all types of Bolthouse beverages including juices, smoothies and protein drinks, according to FE 4. The Bolthouse beverages removed from Target's Modular Reset also spanned all drink sizes offered, FE 4 explained. Moreover, in the March Modular Reset at Target, Bolthouse had lost all of Target's carrot business because of ongoing quality problems with Bolthouse's carrots, and that decision by Target was so cataclysmic that it resonated throughout the Company. As FE 18 explained, it was "pretty shocking" to hear that the company had lost Target's business because "Target was a huge customer."

365.    Defendants would have known as of August 31, 2017 that the opportunity to win back shelf space from its major customers was highly unlikely and a critical risk to any profitable growth in FY 2018. This is because as a result of losing shelf space based upon the Bolthouse Recall and Bolthouse beverages being excluded from C-Fresh's largest customers' Modular Resets, Bolthouse had ceded valuable shelf space to competitors, including Naked Juice (PepsiCo.) and Odwalla (Coca-Cola), as alleged at ¶¶ 15, 23, 116-17, 121, 126, 129.

366.    Further hampering Campbell's ability to win back the shelf space lost from the Modular Resets were management changes and cost cuts at C-Fresh. During the summer of 2017, Morrison either knew or personally directed that experienced C-Fresh sales representatives be laid off and replaced with independent contractors provided by Acosta.

367.    Thus, instead of a dedicated team of experienced Campbell employees with interpersonal relationships built on trust and mutual respect navigating the treacherous waters of negotiating the claw back of Bolthouse shelf space lost to competitors, those duties were outsourced to a mercenary marketing group, whose representatives had divided attention when making store visits, and were not knowledgeable about the fresh foods sector. Multiple FEs,

including FE 8 and FE 10, confirmed that replacing Campbell-employed sales representatives with independent contractors from Acosta placed further strain on Campbell's post-Recall tenuous relationships with key customers and efforts to regain lost shelf space.  Not only were Campbell's customers shocked that Campbell fired several C-Fresh employees and switched to a mercenary marketing team, they were also upset that the marketing team was not sufficiently knowledgeable in fresh produce-related products.  According to FE 18, Acosta's lack of experience with fresh products left customers "up in arms."

      **3.**      **The FY 2018 Guidance Was Contradicted By Diminished Margins for Bolthouse Beverages Caused by Post-Recall Production Modifications**

368.   In addition to the loss of shelf space for Bolthouse products resulting from the Recall and missed Modular Resets, Morrison knew that Campbell's post-Recall enhanced quality control standards slowed production and increased costs, which severely impacted Bolthouse's ability to produce its Protein/Low Acid beverage line, and hamstrung Bolthouse's ability to service customers' orders.  The increased costs and reduced production speed eroded margins, further rendering profitable growth in FY 2018 impossible, unless Campbell somehow managed to scale up its sales, which of course, was highly unlikely because of the loss of shelf space at its major customers.  Morrison knew of these impediments from, among other things, the Modular Reset Tracker, the reporting structure at C-Fresh, and MBR meetings, which covered consumption data, Plan to Actual performance, Actual vs Year to Go, as alleged above in ¶¶ 41, 154-55, 232-48.

369.   For instance, as FE 20 explained, Campbell's corporate "Profit Center" generated reports showing C-Fresh's and Bolthouse's total sales and EBIT, through a BI platform which interfaced with SAP software.  C-Fresh executives discussed these numbers with Morrison and DiSilvestro.

4. **The FY 2018 Guidance Was Contradicted by Known Problems With the Claimed "Innovations" That Morrison Declared Would Contribute to Profitable Growth**

370. During the 1Q18 Conference Call held on August 31, 2017, Morrison claimed that forthcoming Bolthouse products would materially contribute to C-Fresh's return to profitability in FY 2018. In this regard, Morrison specifically called out the Pea Protein Milk when assuring investors that "[w]e also have a robust innovation pipeline to help fuel additional growth, and we'll begin to introduce new beverage products to the market such as plant protein milk."

371. However, at that time, Morrison knew that the Pea Protein Milk was not properly positioned for launch. Among other things, the Pea Protein Milk utilized an inferior pea ingredient, that was untested with customers, because, as alleged at ¶¶ 206-08, Campbell's corporate office directed Bolthouse to use inferior pea ingredients to better position Campbell to meet its profit margins. Moreover, as alleged in ¶¶ 213-14, the R&D Team tasked with readying the Pea Protein Milk for commercial launch believed during the summer of 2017 that the product still needed another 6-9 months of development time to remedy production issues as well as issues related to taste and consistency. Nevertheless, Campbell demanded that the product go to market "within a week or a month," resulting in a product that was not properly positioned for its launch in September 2017.

372. Additionally, Morrison knew by June 2017 that manufacturing and distribution problems had caused C-Fresh to miss at least Safeway's and Albertsons' modular resets, two of the major customers that had agreed to take on the Pea Protein Milk when it had been pitched as being available in the spring of 2017. However, because of production delays, Campbell missed the Modular Reset for these major customers, which occurred in June 2017, thus foreclosing the opportunity to get the new Pea Protein Milk product on the shelves of at least Safeway and Albertsons for the entirety of FY 2018.

**B.     Defendants' November 21, 2017 Misstatements**

373.    As alleged above in ¶ 332, Campbell reported its financial results for the first quarter of 2018 on November 21, 2017, which included C-Fresh losses of $6 million.  Defendants, nevertheless, assured investors that C-Fresh would achieve profitability in Campbell's fiscal year 2018, representing, among other things: (i) "[f]or fiscal 2018, our outlook for sales remains unchanged"; (ii) "the Campbell Fresh turnaround is progressing"; (iii) "we would expect to see profitability pretty quick in Campbell Fresh.  And as we've said before, on a full year basis, we would expect to deliver both top and bottom line growth"; and (iv) "we do expect to see improved gross margin performance in the back half."

374.    Yet, in addition to the facts alleged above in ¶¶ 308-16 that were known to Defendants in connection with the materially false or misleading statements that they made on August 31, 2017, new events that took hold in Campbell's first quarter of 2018 (i.e., in the fall of 2017), were omitted from Defendants' disclosures that would have made any reasonable investor question the veracity of Defendants' guidance.

375.    In October 2017 and soon thereafter, at least Kroger, Walmart, Albertsons, Target, and Ahold, excluded from their Modular Reset or stopped purchasing Bolthouse's popular 32 oz. beverages, which accounted for up to 30% of Bolthouse beverage revenues.  Thus, the only way that Bolthouse could achieve profitable growth at all in 2018 was if somehow, miraculously, Defendants convinced these major customers to:  (i) return lost shelf space to C-Fresh at the next Modular Reset, which would not occur until the spring of 2018, well into Campbell's third quarter of 2018 and stretching into Campbell's fourth quarter of 2018; and (ii) increase the shelf space allocated to C-Fresh.  Accomplishing this would have required C-Fresh's largest customers, in many instances, to replace competitor products including Naked Juice (PepsiCo.), Odwalla Juice

(Coca-Cola), Suja Juice and GT Kombucha, with C-Fresh's untested new "innovations" that Morrison claimed would spur the profitable growth.

376.    Indeed, with respect to Morrison's claim that C-Fresh's "strong innovation plans" that would drive profitable growth, the most important innovation that C-Fresh was trying to roll out was the Pea Protein Drink, and this product was already proving to be an abject failure by November 2017.  As alleged above, Pea Protein Milk had missed the modular resets at Albertsons and Safeway in June 2017 due to production delays and distribution issues.  Furthermore, the handful of customers that had accepted early orders for Pea Protein Milk were not reordering the product, which Morrison would have known based on the chain of command reporting up to her, as alleged in ¶¶ 41, 153-55, 182-84, 214, 232-48, as well as the "Top-to-Top" meetings and MBR meetings.

377.    Indeed, the Protein Pea Milk, despite being so heavily touted by Morrison as something that would drive growth, was destined to fail.  As noted above, after C-Fresh provided its customers with samples of the Pea Protein Milk using a premium pea ingredient, Campbell switched to a less expensive pea ingredient to improve the Pea Protein Milk profit margins, but in exchange, reduced the overall quality of the product.  The R&D Team, in fact, believed that the product still needed another 6-9 months of development time when it was finally launched in September 2017, after already extensive delays.  As of fall 2017, C-Fresh's new Pea Protein Milk "simply wasn't selling," and was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either.  ¶¶ 25, 218.

**C.    Defendants' February 16, 2018 Misstatements**

378.    The falsity of Defendants' FY 2018 profitability assurances and the deleterious impact of the October 2017 Modular Resets would be partially revealed by Defendants on

February 16, 2018, when Campbell published its earnings for its second quarter of 2018, which had ended on January 28, 2018, and convened an earnings call to discuss the results.

379.    During the 2Q18 Conference Call, Morrison disclosed that the principal reason why C-Fresh missed expectations for the second quarter of 2018, wherein C-Fresh had suffered an $11 million loss, was that C-Fresh had lost "some shelf space" at Modular Resets during the quarter. This explanation was false because, as alleged above, the Modular Resets in question had actually occurred before the second quarter of 2018 had even commenced, i.e., in October 2017.  Moreover, because decisions about Modular Resets are made in the preceding months, Morrison would have known of the impact that Modular Resets would have on C-Fresh's sales during the second quarter of 2018.

380.    Despite all of the setbacks that Defendants knew as of February 16, 2018, which could not possibly be overcome during the remainder of Campbell's FY 2018, Defendants reiterated the claim that C-Fresh would return to growth in the second half of 2018.  Once again, this could only have been accomplished if there were a miraculous return of the lost shelf space from the vast majority of C-Fresh's largest customers, including Walmart, Kroger, Target, Albertsons and others, an omitted fact that any reasonable investor would have wanted to know to evaluate Defendants' claim of forthcoming profitable growth in the remaining months of Campbell's FY 2018.

381.    Once again, on the February 16, 2018 earnings call, Morrison hung C-Fresh's fate for the remainder of the year on beverage innovations she claimed would spur the return of profits. In doing so, she misleadingly claimed that Campbell was "building on the initial success" of the Pea Protein Milk.  This statement was materially misleading because she knew or was reckless in not knowing that reception for the Pea Protein Milk across C-Fresh's customers was astoundingly

negative, and that customers did not re-order the product after the initial shipment. As of fall 2017, C-Fresh's new Pea Protein Milk was so poorly received by customers that unsold cases were given away to warehouse employees, who did not want them either.

382. Additionally, Morrison knew based on the Modular Reset Tracker that the low sugar Bolthouse B Line, which she touted on the 2Q18 Conference Call as being an innovation that would also propel C-Fresh growth in the second half of 2018, was incapable of delivering high growth in FY 2018 because Bolthouse consistently missed Modular Resets in at least March 2017 and August 2017, a fact that Morrison knew two months prior, when Bolthouse's beverages would have been pitched to customers during the "sell-in" period, as alleged in ¶¶ 153-54, 360-62. Internally, Morrison also discussed the low sugar beverages scheduled for release in Spring 2018, describing them as "key to jumpstarting things," as alleged in ¶ 202.

### D. Defendants' Misrepresented and Concealed the Truth to Close the Snyder's-Lance Acquisition

383. At the same time that Defendants were misrepresenting and concealing facts bearing upon C-Fresh's ability to return to profitable growth in fiscal year 2018, they were negotiating, financing, and then closing the largest cash acquisition in the Company's history – the acquisition of Snyder's-Lance for $6.1 billion.

384. As alleged above in ¶¶ 20, 262, 268, maintaining Campbell's credit rating was critical to Defendants' ability to secure financing for the deal, which necessitated Campbell raising its Debt/EBITDA rating from 2.2x before the acquisition to 5.0x after the acquisition. At the time that the merger was announced, Campbell was rated A3 and Moody's placed Campbell on a review for downgrade, but affirmed Campbell's Prime-2 short term rating. Key to this action was Moody's expectation, based on the Company's disclosures, that Campbell had sufficient cash to service the debt load and pay it down relatively quickly. Weddington, wrote on December 17,

2017, around the time that the deal was announced, that "the affirmation of the company's Prime-2 short-term rating reflects the rating agency's expectation that any resulting downgrade is unlikely to exceed two notches.  Campbell should be able to reduce financial leverage steadily through core operating cash flow and cost savings, which will provide important support of the company's credit profile."

385.   In March 2018, Campbell's issued $5.1 billion in unsecured notes to fund the Snyder's-Lance acquisition (after securing from Credit Suisse a bridge loan).  At that time, Moody's had completed its downgrade review of Campbell and consistent with its earlier note at the time of the announcement of the acquisition, reduced Campbell's rating from A3 to Baa2, exactly two notches down, keeping Campbell's debt issuance in the prime territory and thereby substantially reducing the cost of financing the acquisition.

386.   As Moody's credit officer Weddington explained in a March 9, 2018 note, "Despite Campbell's recent disappointing operating performance due to weak soup and premium beverage sales and increased carrot and transportation costs, core cash flow should remain relatively strong. This will be supported by significant ongoing US tax overhaul savings and working capital reductions in the second half of fiscal 2018."  This echoed Defendants statements to the market on February 16, 2018, in which Morrison claimed that C-Fresh was still poised to return to profitable growth in 2018.

387.   Had Morrison actually spoken the truth about C-Fresh's prospects and withdrawn the false claim of returning to profitability, this would undoubtedly have required Campbell to write down the $619 million in goodwill on Campbell's balance sheet, reflecting the lack of prospect of earnings for C-Fresh.

388.    As set forth above, however, just two months after Campbell successfully raised $5.1 billion in new debt based on an inflated credit rating tied to in inflated cash outlook, Campbell was forced to come clean.

389.    On May 18, 2018, in releasing its earnings for the third quarter 2018, as more fully set forth above, Campbell announced extremely disappointing financial results, including losses of $475 million for Campbell and $19 million for C-Fresh.  It wrote down the entire remaining value of the C-Fresh businesses, taking a $619 million charge, or $1.65 per share.  At the same time, Campbell announced that Morrison would be stepping down, effectively immediately, as alleged below in ¶¶ 287, 291.

390.    For Moody's, like the rest of the market, this was a shocking development and it resulted in a dramatic downgrade of Campbell's debt, including the bonds issued just two months earlier.  Writing on May 21, 2018, Moody's expressed its surprise at the developments, and placed Campbell's newly issued debt as well as the entire $10 billion in outstanding Campbell debt on a ratings review:

> Moody's Investors Service, Inc. ("Moody's") today placed all the ratings of Campbell Soup Company ("Campbell") under review for downgrade. This includes the company's Baa2 senior unsecured debt rating and Prime-2 short-term rating. ***The action follows an unexpectedly sharp decline in Campbell's profitability in the fiscal third quarter and the sudden resignation of the company's chief executive officer***. The review for downgrade primarily reflects Moody's expectation that the company's high financial leverage is likely to be sustained for longer than anticipated and could rise further due to recent deterioration in core operating performance. Moody's estimates that debt/EBITDA at the March closing of the Snyder's-Lance acquisition was approximately 5.0x. Moody's had expected that Campbell would be able to reduce the metric to below 4.0x within 24 months through core operating cash flow and cost synergies. "The sharp and unexpected decline in profitability in the third quarter casts serious doubt that Campbell will be able to meet its deleveraging plans following the Snyder's-Lance acquisition," commented Brian Weddington, a Moody's Senior Credit Officer. "Additionally, the departure of the CEO adds further uncertainty about whether the company will

respond successfully to its operating challenges in the near term," added Weddington.

391.    The threat of a Moody's downgrade of Campbell's assets to junk status led to immediate action by Campbell over the ensuing months to sell off assets to pay down its debt, which ultimately avoided a downgrade.   Writing in September 2018, Moody's affirmed Campbell's Baa2 rating explaining, "The rating confirmations reflect Moody's expectation that the recently announced asset sales — net proceeds from which will be used to repay debt — should be sufficient to reduce financial leverage over the next 12 to 15 months to a level that is acceptable at the current ratings, based on the company's post-divestiture business profile."

392.    Indeed, Campbell had announced on August 30, 2018, that it would divest its Campbell International and Campbell Fresh businesses, including Bolthouse, Garden Fresh Gourmet and the Company's refrigerated soup business.

393.    The timing of Campbell's massive debt issuance that began on March 14, 2018, in the midst of Campbell's 3Q18 in order to fund the Snyder's-Lance acquisition, and the subsequent impairment charge taken as of the end of the quarter, which ended on April 28, 2018, was all too convenient.  Campbell was able to raise $5.1 billion in debt on a credit rating predicated on cash flows from C-Fresh that Defendants knew would not materialize.  With the inflated credit rating, Defendants deceived the unsuspecting investors in those bonds who clearly paid too much for them.

394.    As Campbell would later reveal in its quarterly report for the third quarter of 2018, filed with the SEC on June 5, 2018, it had actually begun its review for an impairment charge during the third quarter based on the Company's revision of the long term cash flows for C-Fresh:

*In the third quarter of 2018, we performed interim impairment assessments within Campbell Fresh on the deli reporting unit, which includes Garden Fresh Gourmet and the U.S. refrigerated soup business, and the Bolthouse Farms*

111

*refrigerated beverages and salad dressings reporting unit. Within the deli unit, we revised our long-term outlook due to the anticipated loss of refrigerated soup business with certain customers, as well as the recent performance of the business. In addition, the operating performance of the Bolthouse Farms refrigerated beverages and salad dressings reporting unit was below expectations. We revised our long-term outlook for future earnings and cash flows for each of these reporting units*. We recorded a non-cash impairment charge of $11 million on the tangible assets and $94 million on the intangible assets ($80 million after tax, or $.27 per share) of the deli reporting unit, and a non-cash impairment charge of $514 million ($417 million after tax, or $1.39 per share) related to the intangible assets of the Bolthouse Farms refrigerated beverages and salad dressings reporting unit. The aggregate impact of the impairment charges was $619 million, of which $11 million was recorded in Cost of products sold and $608 million in Other expenses / (income), ($497 million after tax, or $1.65 per share).

395.     As set forth above, however, all of the material impacts that changed the cash flow outlook for C-Fresh's business had already occurred before the third quarter commenced, and the delay in Campbell taking its impairment can only be chalked up to intentionally avoiding negative news that would make its debt issuance not just more costly, but likely prohibitively costly as to scuttle the Snyder's-Lance acquisition.  Unsurprisingly, these shenanigans led to the abrupt firing of Morrison, who had orchestrated the acquisition and Campbell's assumption of debt based on false projections concerning C-Fresh.

### E.     Morrison's Abrupt "Resignation"

396.     As noted above, on May 19, 2018, along with the disclosure of the total write-off of C-Fresh's goodwill, Campbell announced that Defendant Morrison had resigned effective immediately.  What was astonishing about this abrupt action was that Campbell had no CEO succession plan.  Indeed, replacing Morrison on an interim basis was Keith R. McLoughlin, a member of Campbell's board of directors since 2016.  Given that there was no C-Suite leadership, it is not surprising that Campbell's retained Defendant DiSilvestro to help with the massive restructuring and asset sale that Campbell undertook to retain its credit rating.

112

397.    Once Campbell announced in August 2019 that it had completed its turnaround under new CEO Mark Clouse, appointed in January 2019, it simultaneously announced that DiSilvestro had left in October 2019.

**F.      The Fraud Concerns the Core of Campbell's Operations**

398.    C-Fresh was one of the Company's core operations during the Class Period.  C-Fresh is one of the Company's three primary divisions, which accounted for 12% of its net sales in 2017.  At the time of its creation, the Company itself stated: "The fresh opportunity is so compelling that we formed an entire division around it: Campbell Fresh, which we call C-Fresh." In addition, Bolthouse is one of the main components of C-Fresh.  At the time of the acquisition, Campbell's purchase of Bolthouse was the largest acquisition in the Company's history.  Based on the importance of C-Fresh and Bolthouse to the Company's business, it would be absurd to suggest that Defendants were not aware of all material facts affecting C-Fresh's revenue generation potential.

399.    What's more, C-Fresh's (and, by extension, the Company's) sales and margins are two of Campbell's most closely watched and highly touted metrics, and critical components of the Company's growth strategy—i.e., increasing sales and operating margins.  Indeed, throughout the Class Period, Defendants regularly focused investors' attention on C-Fresh's sales and operating margins as evidence of Campbell's purported transition and growth potential in the fresh foods segment.  Thus, the importance of C-Fresh's sales and operating margins to Campbell's business and bottom line raises a strong inference that the Individual Defendants knew their statements about C-Fresh's sales growth and margin improvement (and, by extension, the Company's) were false and/or misleading or omitted material facts.

400.    Indeed, securities analysts following Campbell looked to C-Fresh as a source of Company growth.  For example, in a July 19, 2017 Deutsche Bank Equity Research report, the

analyst noted: "As we indicated in our recent note, Fresh in Focus, the company's primary source of incremental profit dollars over the next three years could be from its C-Fresh segment, if growth and profitability forecasts prove correct.  The company reiterated its ~10% operating profit margin target for the segment over the next three years, with less than half, but a "big chunk" coming in FY'18.  Given ramped marketing and innovation dollars, coupled with integration into its sales force, C-Fresh is expected to grow revenues $50mm on average per year over the next five years, or an implied MSD organic sales growth rate.  Of note is management's commentary around retaking share with its own 'challenger' brands as well as with the opportunity Pacific Foods presents given the potential for supply chain leverage and margin upside."

### G. Defendants' High Level Positions

401.   As the Company's top executives, Morrison and DiSilvestro—the President and CEO, and CFO, respectively—controlled the Company's daily operations and were informed of and responsible for monitoring C-Fresh's sales and operating margins.

402.   As the Company's CEO and President, Morrison was responsible for all aspects of the Company's daily operations.  Morrison was also a member of the Company's Board of Directors.  Additionally, Morrison certified the Company's financial reporting filed with the SEC, which included Campbell and C-Fresh sales and operating margins.

403.   As the Company's CFO and Senior Vice President, DiSilvestro was responsible for reviewing and approving all of Campbell's financial reporting, and for signing and approving each of the monthly press releases.  DiSilvestro also certified the Company's financial reporting filed with the SEC, which included Campbell and C-Fresh's sales and operating margins.

**H.    The Individual Defendants Controlled the Contents of the Company's Public Statements During the Class Period**

404.    Due to their high-level positions, each Individual Defendant was also provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to and were being concealed from, the public, and that the positive representations that were being made to investors concerning C-Fresh's ability to deliver "profitable growth," were materially false, misleading, and incomplete.

405.    As a result, the Individual Defendants were responsible for the accuracy of Campbell's corporate statements.   Therefore, each is responsible and liable for the representations contained therein or omitted therefrom.   Campbell knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that Individual Defendants knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.   Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

406.    Statements made by Campbell and the Individual Defendants during the Class Period strongly and plausibly suggest each had access to the disputed information.   Indeed, the vast majority of Defendants' material misrepresentations and omissions explicitly or implicitly pertain to the ability of C-Fresh to deliver "profitable" and "positive" growth, and could not have been made with any reasonable basis in fact, as the Company in large part admitted in May 2018

when it disclosed such representations were not attainable, as well as a $619 million impairment

charge for C-Fresh.

## VIII.   THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

407.    At all relevant times, the market for Campbell's common stock was efficient for

the following reasons, among others:

   a) Campbell's common stock met the requirements for listing, and was listed and
      actively traded on the NYSE, a highly efficient and automated market;

   b) As a regulated issuer, Campbell filed periodic public reports with the SEC and the
      NYSE;

   c) Campbell regularly and publicly communicated with investors via established
      market communication mechanisms, including through regular disseminations of
      press releases on the national circuits of major newswire services and through other
      wide-ranging public disclosures, such as communications with the financial press
      and other similar reporting services; and

   d) Campbell was followed by multiple securities analysts employed by major
      brokerage firms who wrote reports, which were distributed to the sales force and
      certain customers of their respective brokerage firms.  Each of these reports was
      publicly available and entered the public marketplace.  Indeed, more than 190
      analyst reports on Campbell were published during the Class Period.

408.    As a result of the foregoing, the market for Campbell's common stock promptly

digested current information regarding Campbell from all publicly available sources and reflected

such information in the price of Campbell's stock.  Under these circumstances, all purchasers of

Campbell's common stock during the Class Period suffered similar injury through their purchase

of Campbell's stock at artificially inflated prices, and a presumption of reliance applies.

409.    Further, at all relevant times, Lead Plaintiff and other members of the Class

reasonably relied upon Defendants to disclose material information as required by law and in the

Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have

purchased or otherwise acquired Campbell's common stock at artificially inflated prices if

Defendants had disclosed all material information as required.  Thus, to the extent that Defendants

concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

410.   The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

411.   None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

412.   To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

413.   To the extent that any materially false and/or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

414.   To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false

117

and/or misleading statement because at the time such statement was made, the speaker actually knew the statement was false and/or misleading, or the statement was authorized and approved by an executive officer of Campbell who knew that such statement was false and/or misleading.

## X.      CLASS ACTION ALLEGATIONS

415.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Campbell from August 31, 2017 through and including May 17, 2018, and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

416.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Campbell had more than 197 million shares of common stock outstanding and actively trading on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

417.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

418.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

419.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

- whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;

- whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;

- whether and to what extent the market price of Campbell's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

- whether Campbell and the Individual Defendants acted with the requisite level of scienter;

- whether the Individual Defendants were controlling persons of the Company;

- whether reliance may be presumed; and

- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

420.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members

of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### <u>COUNT I</u>
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Campbell and the Individual Defendants**

421.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

422.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiff and all other members of the Class, against Campbell and the Individual Defendants.

423.    As alleged herein, throughout the Class Period, Campbell and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Campbell and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Campbell's common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

424.    The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or

disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

425.   As set forth above, Campbell and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

426.   In ignorance of the materially false and misleading nature of Campbell's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Campbell's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Campbell's common stock declined precipitously, and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

427.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

428.   This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of the Lead Plaintiff and all other members of the Class, against Defendants Morrison and DiSilvestro.

429.     As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of Campbell's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and Campbell is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

430.     As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.   As such, the Individual Defendants had regular access to non-public information about Campbell's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

431.     By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

432.     The Individual Defendants were culpable participants in Campbell's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

433.     By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

a)   Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

b)   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

c)   Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

d)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

e)   Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Lead Plaintiff demands a trial by jury.

Dated:  January 15, 2021

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN,
 BRODY & AGNELLO P.C.**

/s/ *James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for Lead Plaintiff
and the Class*

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**

/s/ *Sharan Nirmul*
Sharan Nirmul
Matthew L. Mustokoff (*pro hac vice*)
Johnston de F. Whitman, Jr. (*pro hac vice*)
Kevin E.T. Cunningham, Jr. (*pro hac vice*
forthcoming)
Henry W. Longley (*pro hac vice* forthcoming)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
mmustokoff@ktmc.com
jwhitman@ktmc.com
kcunningham@ktmc.com
hlongley@ktmc.com

*Lead Counsel for Lead Plaintiff
and the Class*

**NUSSBAUM LAW GROUP, P.C.**
Linda P. Nussbaum (*pro hac vice*)
Hugh Sandler (*pro hac vice*)
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com
hsandler@nussbaumpc.com

*Additional Counsel for Lead Plaintiff*