**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

No. 1:18-cv-14385-NLH-MJS

IN RE CAMPBELL SOUP COMPANY
SECURITIES LITIGATION                    **OPINION**

---

**APPEARANCES**:

SHARAN NIRMUL
JOHNSTON DE F. WHITMAN, JR.
JONATHAN F. NEUMANN
STEPHANIE M. GREY
KESSLER TOPAZ MELTZER & CHECK, LLP
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087

LINDA P. NUSSBAUM
NUSSBAUM LAW GROUP, P.C.
1211 AVENUE OF THE AMERICAS, 40TH FLOOR
NEW YORK, NY 10036

        *Lead Counsel for Plaintiffs.*

JAMES E. CECCHI
DONALD A. ECKLUND
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO P.C.
5 BECKER FARM ROAD
ROSELAND, NJ 07068

        *Liaison Counsel for Plaintiffs.*

ROBERT A. MINTZ
BRIAN W. CARROLL
GREGORY J. HINDY
MCCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
NEWARK, NEW JERSEY 07102

JUSTIN D. D'ALOIA
STACY NETTLETON
AMANDA K. POOLER
JOHN A. NEUWIRTH
WEIL, GOTSHAL & MANGES LLP
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153

    *Counsel for Defendants.*


**HILLMAN**, **District Judge**

In this consolidated putative securities class action, plaintiffs allege that defendants Campbell Soup Company and two of its senior executives made various materially false or misleading statements regarding their ability to deliver profitable growth to investors.  Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint.  For the reasons expressed herein, Defendants' motion will be granted and the action will be dismissed with prejudice.

<strong><u>BACKGROUND</u></strong>

We take our brief recitation of the facts from Plaintiffs' Second Amended Consolidated Class Action Complaint ("SAC").  The SAC was filed on January 15, 2021 after this Court dismissed the First Amended Complaint ("FAC") with leave to file an amended complaint. (ECF 57, 58).

This is a putative securities class action asserted against Defendants Campbell Soup Company ("Campbell") and several of its

2

top executives, including former President and CEO Denise M.
Morrison ("Morrison") and Senior Vice President and CFO Anthony
P. DiSilvestro ("DiSilvestro") (the "Individual Defendants")
(collectively, "Defendants").  The putative class, led by court-
appointed lead plaintiff the Oklahoma Firefighters Pension and
Retirement System ("Plaintiffs"), consists of those who
purchased Campbell common stock from July 19, 2017 through and
including May 17, 2018.  (ECF 61).

Plaintiffs' claims center around Campbell's public
statements regarding one of its many divisions, a relatively new
fresh foods division called Campbell Fresh ("C-Fresh").  (Id.)
As alleged in the SAC, upon appointment as Campbell's CEO,
Morrison promised to overhaul the company's image and began by
creating C-Fresh.  (Id. at 2-3).  Morrison embarked on a crusade
of acquisitions to bolster the C-Fresh concept, ultimately
acquiring Bolthouse Farms ("Bolthouse"), a fresh food producer,
for $1.55 billion.  (Id.)  In June of 2016, Bolthouse recalled a
protein drink it produced due to possible spoilage.  (Id. at 4).
Thereafter the SAC alleges that C-Fresh's profit and sales
declined.  (Id.)

Plaintiffs allege that the negative impact of the recall
was not solely limited to "increased costs, production delays,
and reduced beverage production capacity" but also extended to
loss of critical shelf space from its largest supermarket chain

3

customers such as Target, Walmart, Publix, Kroger, and
Albertsons. (Id. at 5). Changes in shelf space allocations by
retailers are referred to as "Modular Resets", and according to
Plaintiffs can occur as infrequently as once a year for some
retailers. (Id.) According to Plaintiffs, retailers made
decisions about their Modular Resets around two months before
they were implemented, thereby putting Campbells on notice of
changes well before the date of any Modular Reset. (Id.)
Plaintiffs contend that the Bolthouse recall caused Campbell to
miss the Modular Resets at its major retailers for stocking its
Bolthouse products, "making sales growth at these customers
impossible in FY 2018." (Id.) These major retailers "often
replaced Bolthouse beverages with competitor products" which
made it "highly unlikely that Bolthouse could win back that
shelf space in FY 2018." (Id.)

Modular Resets were of "critical importance" to Campbell's
business so information regarding them was saved in a shared
document, the "Modular Reset Tracker" which was accessible to
"all C-Fresh sales personnel" and "spelled out the impact of
missed Modular Resets on C-Fresh's prospective profitability
months in advance of the Modular Reset date." (Id. at 6).
Plaintiffs state that because of the need to "sell-in" to
upcoming Modular Resets, Campbell executives, including Morrison
were "flying all over the country" at least through July 2017 to

4

meet with Bolthouse's top customers to try to preserve and regain shelf space.  (Id.)  Plaintiffs allege that Defendants concealed these facts from investors.  (Id.)

Compounding the issues stemming from the Bolthouse recall, in the time leading into the class period, Campbell had internal data that Bolthouse's carrot yields would be down for the remainder of 2017 due to excessive rainfall.  (Id.)  Carrots were a key ingredient in Bolthouse's products.  (Id.)

Plaintiffs aver that due to irreversible problems at C-Fresh, Morrison sought a "solution to suppress the disastrous problems that the C-Fresh division was suffering as Campbell's fiscal year 2017 came to a close."  (Id.)  That deal would be the acquisition of Snyder's-Lance, Inc. ("Snyder's").  (Id. at 6-7).  The SAC alleges that it was critical for Campbell to have a high credit rating in order to facilitate the acquisition of Snyder's, which was being financed in part by debt.  (Id. at 7).  According to Plaintiffs, Defendants were motivated by the acquisition and maintaining the company's credit score to make misleading statements about the health of C-Fresh.  (Id.)

Plaintiffs cite as examples statements made by Morrison and DiSilvestro at Campbell's July 19, 2017 Investor Day Conference where Morrison stated that C-Fresh ""will significantly improve," and for FY18, "Campbell Fresh would be over the [1% to 3%] range."  At the same event, DiSilvestro

stated, "We do anticipate I would call fairly significant margin expansion in C-Fresh in F'18." (Id.)  Plaintiffs say that this caused the company's stock to shoot up almost 5% overnight. (Id.)

Defendants continued to claim that C-Fresh would return to profitability, claiming, for example, that (i) "we expect [C-Fresh] to return to profitable growth in fiscal 2018," (ii) "we do expect to see top line growth in Campbell Fresh in 2018," (iii) "the Campbell Fresh turnaround is progressing," and (iv) "we would expect to see profitability pretty quick in Campbell Fresh." (Id. at 78-81).  In November 2017, Morrison announced that C-Fresh had returned to normal beverage production and packaging, and again touted this in February 2018, also claiming that C-Fresh had returned to its normal promotional activities. (Id. at 62).  According to Plaintiffs, these statements were materially false or misleading. (Id. at 8).  Plaintiffs suggest that these allegations are supported by information obtained from "multiple" former Campbell employees serving as confidential witnesses ("CWs"). (Id.)

The SAC presents statements from twenty-seven non-party CWs.  Those individuals and their statements are discussed as relevant through this Opinion.  The CW statements generally focus on Defendants' knowledge regarding the status of C-Fresh's business-state and its knowledge relating to growth goals and

6

outward-facing statements regarding C-Fresh's financial state. For example, CW statements include allegations that C-Fresh was "losing shelf space like crazy[,]" that its stated growth goals were "unrealistic[,]" and that Campbell's leadership team was "overly optimistic" with "all sales targets . . . and [p]rofit [m]argins [being] extremely aggressive[.]"  (Id. at 36, 58, 65).

These CW statements were primarily present in the FAC, but the SAC adds allegations that the timing and scale of Modular Resets of Bolthouse products by Campbell's major customers made it "impossible for the Bolthouse beverage business to regain shelf space and reach profitable growth in FY 2018."  (Id. at 41).  They allege that from at least July 2016 through July 2017 Morrison was "flying all over the country" to play "defense and offense" in order to meet with important customers to prevent such customers from abandoning "sell-in" meetings, and to "re-instill faith" in C-Fresh and its products after the Bolthouse Recall and resulting loss of shelf space for Bolthouse products. (Id. at 100).

The SAC further adds allegations that C-Fresh employees had access to a spreadsheet called the Modular Reset Tracker which was "incredibly important" because it tracked data related to Modular Resets and C-Fresh products and thus was integral to planning.  (Id. at 100-01).  The SAC states that information from the Modular Reset Tracker was incorporated into financial

projections which were available to Morrison.  (Id.)  According to one CW, the "Modular Reset was being watched by everyone" and everyone was "wired in" with respect to the Modular Reset process at Campbell's top ten customers.  (Id. at 101).  Plaintiffs also contend that Morrison received updates from Senior Vice Presidents at the Company who attended meetings where Modular Resets were discussed and that she had access to presentations from one CW regarding the lack of demand for Bolthouse beverages.  (Id.)

The SAC alleges that key Modular Resets had passed by August 2017, so Morrison and DiSilvestro should have known they would not be able to make up the shelf space until the next Modular Reset and that that would have made their projections of growth in FY 2018 virtually impossible.  (Id. at 102).  They allege that this coupled with the outsourcing of marketing responsibilities for C-Fresh products to a "mercenary marketing group" that had divided attention and was not knowledgeable about customer relationships made it impossible to gain back Bolthouse shelf space.  (Id.)  Plaintiffs also add that a poor carrot crop made clear to Bolthouse's marketing and sales team by August 2017 that there would be erosion in Bolthouse products for the rest of the calendar year 2017.  (Id. at 6).  According to Plaintiffs, Morrison had expressed in a September 1, 2016 earnings call regarding financial results for FY 2015, that

carrots were the "the chassis for our higher margin value added [consumer packaged goods] business." (Id. at 25).

CWs also claim that on August 31, 2017, when Morrison told investors there was a "robust innovation pipeline" for Bolthouse beverage products, she knew that one of the company's new beverages, the Pea Protein Milk, was not properly positioned for launch because Campbell was using inferior quality peas to better position it to meet its profit margins.  (Id. at 104). They also allege that Morrison knew by June 2017 that C-Fresh had missed the Modular Resets for two major customers, Safeway and Albertsons, with respect to the Pea Protein Milk, "thus foreclosing the opportunity to get the new Pea Protein Milk product on the shelves of at least Safeway and Albertsons for the entirety of FY 2018."  (Id.)

Plaintiffs complain that statements made in press releases, SEC filings, and investor conferences by Defendants directly contradict the evidence of C-Fresh's failing state.  As with the SAC, Plaintiffs have generally separated these statements into date-driven categories, arguing that false or misleading statements occurred on the following dates: July 19, 2017; August 31, 2017; November 21, 2017; and February 16, 2018.

This Court dismissed the FAC on November 30, 2020 on the basis that Plaintiffs had failed to raise an adequate inference of scienter.  (ECF 57, 58).  Plaintiffs filed the SAC on January

15, 2021 in an attempt to remedy the FAC's deficiencies.  (ECF 61).  Defendants filed the present Motion to Dismiss on March 10, 2021.  (ECF 72).  The Motion to Dismiss has been fully briefed.  Therefore, the motion is ripe for adjudication.

<u>**DISCUSSION**</u>

**A.   Subject Matter Jurisdiction**

This Court has subject matter jurisdiction over this case because it presents a federal question under the Exchange Act. <u>See</u> 28 U.S.C. § 1331; 15 U.S.C. § 78aa.

**B.   Motion to Dismiss Standard**

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. <u>Evancho v. Fisher</u>, 423 F.3d 347, 351 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do . . . ."  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (alteration in original)
(citations omitted) (first citing Conley v. Gibson, 355 U.S. 41,
47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,
40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v.
Allain, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court
> must take three steps.  First, the court must "tak[e]
> note of the elements a plaintiff must plead to state a
> claim."  Second, the court should identify allegations
> that, "because they are no more than conclusions, are
> not entitled to the assumption of truth."  Third, "whe[n]
> there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether
> they plausibly give rise to an entitlement for relief."

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (alterations
in original) (citations omitted) (quoting Ashcroft v. Iqbal, 556
U.S. 662, 664, 675, 679 (2009)).  A court may "generally
consider only the allegations contained in the complaint,
exhibits attached to the complaint and matters of public
record."  Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)
(citing Pension Benefit Guar. Corp. v. White Consol. Indus.,
Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court, in weighing a motion to dismiss, asks
"not whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claim."
Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416
U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our

decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570).

Since this action involves claims covered by the Private Securities Litigation Reform Act ("PSLRA"), heightened pleading standards apply. "The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." Id. at 252-53 (quoting Winer Family Trust v. Queen, 503 F.3d 319, 325 (3d Cir. 2007)).

Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the

12

defendant acted with the required state of mind." Id. at 253
(quoting 15 U.S.C. § 78u-4(b)(2)).  Both provisions require
facts to be pled "with particularity."  The Third Circuit has
explained that this language echoes precisely Fed. R. Civ. P.
9(b).  Id. (citing In re Advanta Corp. Sec. Litig., 180 F.3d
525, 534 (3d Cir. 1999)).  Indeed, although the PSLRA
replaced Rule 9(b) as the pleading standard governing private
securities class actions, Tellabs, Inc., 551 U.S. at 324, Rule
9(b)'s particularity requirement "is comparable to and
effectively subsumed by the requirements of [§ 78u-4(b)(1) of]
the PSLRA."  Id. (quoting Miss. Pub. Employees' Ret. Sys. v.
Boston Scientific Corp., 523 F.3d 75, 85 n.5 (1st Cir. 2008)).
This standard "requires plaintiffs to plead the who, what, when,
where and how[.]" Id. (quoting Advanta, 180 F.3d at 534).

Federal Rule of Civil Procedure 9(b) requires that "[i]n
alleging fraud or mistake, a party must state with particularity
the circumstances constituting fraud or mistake."  Moreover, to
allege a material misrepresentation, a plaintiff must "specify[]
each allegedly misleading statement, why the statement was
misleading, and, if an allegation is made on information or
belief, all facts supporting that belief with particularity."
Avaya, Inc., 564 F.3d at 252-53.  Finally, to allege scienter, a
plaintiff must "state with particularity facts giving rise to a
strong inference that the defendant acted with the required

state of mind." <u>Id</u>.

    **C.   Motion to Dismiss**

To allege a Section 10(b) claim, a plaintiff must plead "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." <u>City of Edinburgh Council v. Pfizer, Inc.</u>, 754 F.3d 159, 167 (3d Cir. 2014). "Every person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act will be held jointly and severally liable under Section 20(a). As is apparent from the statutory text, Section 20(a) liability may only be found if there is an underlying violation of the Exchange Act – here Section 10(b).

Defendants advance several main arguments concerning dismissal of Plaintiffs' claims, many of which are similar to their arguments when they moved to dismiss the FAC. Defendants first advance arguments explaining why Plaintiffs cannot satisfy the first element of a Rule 10(b)(5) claim: a material misrepresentation or omission. First, Defendants argue that the statements complained of were neither material nor false or misleading, and therefore, are not actionable. Defendants argue that all of the statements at issue were either (1) forward-looking statements accompanied by meaningful, cautionary

14

language, rendering them within the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c); (2) statements of opinion; or (3) non-actionable statements of corporate puffery.  (See ECF 72-1 at 16).  Defendants also argue that the CW statements do not support any alleged fraud, and that the facts actually establish that no fraud occurred.  (See id. at 18 (pointing out the allegation in the SAC that implicitly admitted that Defendants were able to gain back shelf space for at least one of its Bolthouse products in October 2017)).

Defendants additionally advance arguments that Plaintiffs cannot satisfy the second element of a Section 10(b) claim: scienter.  Defendants argue that, even with the additions in the SAC, Plaintiffs still have not pled the strong showing of scienter required to survive dismissal.  Defendants argue that (1) Plaintiffs have not presented competent evidence of any motive to commit fraud; and (2) that there was no conscious misbehavior or recklessness on behalf of any Defendant.  (Id. at 27-33).  As part and parcel of their argument regarding conscious misbehavior or recklessness, Defendants argue that Morrison's departure, the core operations doctrine, and simply a holistic review of the allegations do not give rise to an inference of scienter.  (Id. at 33-34).

Defendants make an additional argument that as a result of dismissal under either of the above two grounds, the Section

20(a) claim must also be dismissed.  (Id. at 34).  Separately
and finally, Defendants contend that Plaintiffs do not have
standing to sue on the basis of statements made on February 16,
2018 because the lead Plaintiff purportedly last purchased
Campbell stock during the putative class period on February 8,
2018.  (Id. at 34-35).

Though Plaintiffs have added allegations aimed at scienter,
the Court again finds that they are not enough to raise that
inference.  Thus, even if the Court were to find the first
element sufficiently pled as to at least some of the statements
complained of, the second element is not sufficiently pled and
as a result Plaintiffs' Section 10(b) claim cannot proceed on
that basis.  Accordingly, the Court will not address the
material misrepresentation element and instead will only focus
on the scienter element, which is dispositive of both of
Plaintiffs' claims.

1. Scienter

Defendants challenge whether Plaintiffs have pled the
strong inference of scienter needed to propel Plaintiffs' SAC
past the pleading stage.  Under this PSLRA's pleading
requirement, a plaintiff must "state with particularity facts
giving rise to a strong inference that the defendant acted with
the required state of mind."  Avaya, Inc., 564 F.3d at 267
(quoting 15 U.S.C. § 78u-4(b)(2)).  The scienter standard

requires a plaintiff to allege facts giving rise to a strong inference "of either reckless or conscious behavior."  Advanta, 180 F.3d at 534-35.  "In order to state a Rule 10b-5 claim, '[a] reckless statement is one involving not merely simple, or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  Rahman v. Kid Brands, Inc., 736 F.3d 237, 242 (3d. Cir. 2013) (quoting Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 493 (3d Cir. 2013)) (emphasis added).

In determining whether a strong inference of scienter has been shown, courts must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Tellabs, Inc., 551 U.S. at 323 (emphasis in original).  In making this determination, courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." Id. at 324.  A "strong inference" of scienter "need not be irrefutable," but it must be one that is "cogent and compelling."  Id.  "A complaint will survive only if a reasonable person would deem the inference of scienter cogent *at least as compelling* as any opposing inference of nonfraudulent

17

intent." Id. at 314 (emphasis added).

Here, the SAC alleges that Defendants knew or recklessly disregarded that the projections and statements made by the Individual Defendants were false and misleading. They argue in the alternative that Defendants had sufficient motive and opportunity to raise a strong inference of scienter. Plaintiffs claim that the following allegations form a strong inference of scienter to survive dismissal: (1) Individual Defendants had access to information and were aware that their public statements were not accurate; (2) Morrison's termination; (3) Defendants were motivated to increase the company's credit score to complete the Snyder's acquisition; and (4) C-Fresh was a core operation of Campbell. These are much the same categories of arguments as those raised in opposition to Defendants' Motion to Dismiss the FAC. However, the pleading of additional facts colors how the Court analyzes each of these factors.

This Court will first discuss each basis for scienter. Then this Court will consider the complaint as a whole in determining whether Plaintiffs have shown a strong inference of scienter that is at least as compelling as Defendants' plausible nonculpable explanation for its conduct.

i.   Whether Internal Data May Support Scienter

Plaintiffs first argue that Defendants were aware of information suggesting that their public statements regarding C-

Fresh's profitability and top line growth for 2018 were inaccurate.  (ECF 73 at 28-33).  Defendants respond that Plaintiffs failed to plead allegations that were known to the Individual Defendants that were contrary to the public statements.

The first set of facts that Plaintiffs have added to their SAC to suggest conscious misbehavior or recklessness is the allegation that Morrison and DiSilvestro knew or should have known that they could not make the FY 2018 projections because the Modular Resets conducted by Campbell's major retailers removed shelf space for Bolthouse products, one of the brands under the C-Fresh division of the company.  (Id. at 29-31).  The Court disagrees.

Plaintiffs contend in a conclusory manner that Modular Resets were "watched by everyone", Morrison and DiSilvestro would have had access to financial projections based on the Modular Reset Tracker, and they were privy to information regarding Modular Resets because employees who attended meetings where the Modular Resets were discussed reported to Morrison and DiSilvestro.  (Id. at 30).  Plaintiffs also contend that the poor carrot yield in 2017 and the slow rollout of the Pea Protein Milk would have made it apparent to Defendants that they would not be able to meet the deadlines for the Modular Resets of major retailers in order to earn back shelf space in time to

19

meet the FY 2018 projections.  (Id. at 30-31).

First, the Court need not credit Plaintiffs' conclusory statement that the Modular Resets were "watched by everyone" in the absence of more concrete allegations that the Individual Defendants watched them.  Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) ("[W]e are not compelled to accept unsupported conclusions and unwarranted inferences" on a motion to dismiss); Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) ("'[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.'" (quoting Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)).

This conclusory statement was made by two CWs, a former mid-level Manager for Bolthouse and Garden Fresh and a regional VP at Campbell in the Snack Division.  (ECF 61 at 15, 17, 46, 101).  The SAC alleges that the mid-level manager attended monthly meetings with C-Fresh executives but does not explain exactly what was discussed in those meetings and how she knew that "everyone" watched the Modular Resets.  Similarly, it stretches the imagination to understand how a VP in a different division than C-Fresh would be able to speak authoritatively about what the Individual Defendants would have known about a completely different division.  Plaintiffs offer no reason to view that differently.  Indeed, as this Court noted in its last Opinion, where "detail provided by the confidential sources, the

20

sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia[,] Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004), call into question the allegations, the Court must discount them steeply. This is consistent with Tellabs's teaching that "omissions and ambiguities count against inferring scienter" under the PSLRA's particularity requirements.  Tellabs, 551 U.S. at 326.[1]

Further, the allegations are vague about when and how frequently the Modular Resets occurred and the extent to which the loss of shelf space for Bolthouse products meant that C-Fresh as a whole could not meet FY 2018 projections.  For instance, though the CW statements on shelf space all revolve around Bolthouse products, nowhere in the SAC do Plaintiffs make

---

[1]  As a general matter here, the CWs are described by their position titles, general responsibilities, and time period of employment.  (See generally ECF 61).  None appear to have occupied positions in C-Fresh or at Campbell as a whole that would have given them a view into the information and data being circulated at the highest echelons of the company.  Cf. Ortiz v. Canopy Growth Corp., 537 F. Supp. 3d 621, 652 (D.N.J. 2021) (information from CWs "can be used in only two situations: (1) if the complaint sets forth other factual allegations, such as documentary evidence that are nearly sufficient to support a fraud allegation, or (2) when the confidential sources are described in the complaint with such degree of particularity as to support the inference that the confidential source is a person in a position to possess the specific information alleged") (citation omitted).

a specific allegation regarding what percentage Bolthouse made up of C-Fresh. Thus, even assuming that Plaintiffs are correct that Defendants could not regain shelf space for Bolthouse products, they do not explain how that translates into conscious or reckless misrepresentation regarding projections for C-Fresh as a whole. See In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 418 (D.N.J. 2010) (discounting allegations that were "heavily laden with a multitude of factual incoherences, logical gaps, contradictions with the underlying technical background").

Similarly, the allegation that Morrison and DiSilvestro had access to financial projections based on the Modular Reset Tracker is too vague to withstand scrutiny under the PSLRA. See Tellabs, Inc., 551 U.S. at 324 (requiring specific allegations on who, what, when, where, why, and how to meet the particularity pleading standard). The fact that Morrison and DiSilvestro might have had data derivative of the Modular Reset Tracker through financial projections and briefings by subordinate employees does not get over the hurdle of pleading with particularity here. Rahman, 736 F.3d at 247 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegations of specific information conveyed to management and related to fraud.") (citation omitted).

Plaintiffs also seem to overstate the import of the slow

launch of the Pea Protein Milk and the low carrot yield.  As the SAC itself acknowledges, the Pea Protein Milk was only one of several products that Defendants were launching around the time that Morrison touted innovations in C-Fresh.  (ECF 61 at 62 ("Looking ahead, we have strong innovation plans in place with the continued rollout of Bolthouse Farms Plant Protein Milk, new Garden Fresh Gourmet fresh soup and salsa products in the first half and a range of Bolthouse Farms [indiscernible] and beverages in the back half.")).  The innocent plausible inference here is that Defendants believed that they could reach their FY 2018 goals based on the full complement of products it was introducing, not just the Pea Protein Milk.  Sheet Metal Workers Loc. 28 Pension Fund v. Off. Depot, Inc., No. 07-14348, 2009 WL 10667541, at *5 (S.D. Fla. Mar. 31, 2009) ("If the court finds the inference that the defendants acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter, it must dismiss the complaint.").

Further, to accept Plaintiffs' theory that the poor carrot yield precluded Defendants from reaching their FY 2018 projections would require the Court to make a few assumptions. Centrally, the Court would have to assume that the low carrot yield significantly harmed C-Fresh operations as a whole without room for recovery.  The Court is not prepared to do that where

23

Plaintiffs only made statements regarding the use of carrots for Bolthouse, not C-Fresh, and they have not pled particular facts linking the business health of Bolthouse to the health of C-Fresh.  In re Synchronoss Sec. Litig., 705 F. Supp. 2d at 418.

In addition, the Court finds Plaintiffs' contention that the fact that Morrison was "flying all over the country" to meet with major retailers of Bolthouse to weigh against Plaintiffs' proffered inference that this meant that Morrison knew that they could not recoup Modular Resets due to recalls, poor carrot yields and other business issues.  The more plausible inference is that those efforts represent the strategy adopted by Defendants to meet their FY 2018 goals in spite of setbacks.  Sheet Metal Workers Loc. 28 Pension Fund, 2009 WL 10667541 at *5.  The fact that these efforts failed does not necessarily mean that Defendants acted with scienter, but perhaps that they had a bad strategy.  In re Hertz Glob. Holdings Inc, 905 F.3d 106, 121 (3d Cir. 2018) ("More plausible is the suggestion that the Individual Defendants were just bad leaders.").  Thus, the Court holds that the additional facts that Plaintiffs have pled regarding internal data available to Defendants are not enough to create an inference of scienter.[2]

---

[2]  The Court refers the parties to the analysis that it conducted in its original Opinion on the differences between the instant matter and Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Swanson, 2011 WL 2444675, at *1 (D. Del. June 14,

ii.  Whether Morrison's Termination May Support Scienter

Plaintiffs largely make the same argument regarding inferences to be drawn from Morrison's termination on May 18, 2018 as they did the first time around.  They note that she resigned on the day that "Campbell recorded losses of $19 million for C-Fresh, and made the shocking announcement that it was taking a $619 million impairment charge on C-Fresh[.]" (ECF 61 at 9).  The SAC terms the resignation "astonishing" because "Campbell has no CEO succession plan" but attributes the continued tenure of DiSilvestro to the need to help with "the massive restructuring and asset sale that Campbell undertook to retain its credit rating" in the absence of other "C-Suite leadership." (Id. at 112).

Generally, "[t]he departure of corporate executive defendants is a factor that can strengthen the inference of scienter."  In re Hertz Global Holdings, Inc., 905 F.3d at 118 (citing City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 622 (9th Cir. 2017)).  But, even the termination of an executive after the announcement of

_____

2011) as well as Curran v. Freshpet, Inc., No. 16-2263, 2018 WL 394878, at *1 (D.N.J. Jan. 12, 2018) regarding the specificity and detail of allegations necessary to impute knowledge or recklessness to an executive for scienter purposes.  (ECF 57 at 21-24 ("Here, unlike Swanson and Curran, the FAC fails to plead enough allegations that demonstrate the Defendants were aware of facts that were actually contrary to the Individual Defendants' expectations of top line growth and profitability for 2018.")).

so-called bad news requires "more than pleading a link between bad news and an executive's resignation." Id. at 119.  This is because "[c]hanges in leadership is only expected when leadership fails." Id.  There must still be allegations which "cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." Id.  The SAC does not support an inference of scienter from these allegations and instead merely pleads a link between Morrison's resignation and the bad news that Campbell had to downgrade its financial guidance again and chose to take an impairment charge.

First, as a judge of this Court noted in In re Interpool, Inc., a court "may not infer scienter unless it is satisfied that the Defendants acted with reckless or conscious behavior" even when a corporation chooses to "terminate[] employees for making errors due to negligence, oversights, etc., or simply for incompetence." In re Interpool, Inc. Sec. Litig., No. 04-321, 2005 WL 2000237, at *17 (D.N.J. Aug. 16, 2005).  Certainly, a termination can be "a piece of the scienter puzzle," In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 347 (D.N.J. 2007), but will constitute such a piece only if it is accompanied by an "extraordinary corporate punishment measure" such "denial of severance payment." Id.  There is no evidence of such a denial here.  Morrison's resignation may very well

have been related to incompetence and negligence in her failed attempts to resolve issues with C-Fresh following the Bolthouse Recall; however, that does not equate to fraudulent behavior. In re Hertz Glob. Holdings Inc, 905 F.3d at 121.

Second, the fact that DiSilvestro retained a role at Campbell further undercuts Plaintiffs' scienter theory even with Plaintiffs' further pleading. In re Toronto-Dominion Bank Securities Litigation, 2018 WL 638188, at *18. A resignation may support a finding of scienter because it may be implied that the individual knew of the fraud being perpetrated. Once those outside the fraud find out, supposedly, they terminate (or force to resign) all those who may have been responsible. If DiSilvestro knew or were reckless in not knowing of the falsity of Campbell's public statements, why would Campbell retain him? Plaintiffs' new allegation that he was needed in the absence of other C-Suite leadership to help with a "massive restructuring and asset sale" is thin if he truly was responsible along with Morrison for Campbell's failure as Plaintiffs allege.

In addition, Plaintiffs' themselves acknowledge that Morrison was replaced with "Keith R. McLoughlin, a member of Campbell's board of directors since 2016." (ECF 61 at 112). Thus, by Plaintiffs' own pleading Campbell had an interim CEO with prior experience with the company at the helm. As the Court found in with the FAC, it is not enough to look at

27

Morrison's termination from a current perspective and "plead fraud by hindsight."  In re Hertz Global Holdings, Inc. Sec. Litig., No. 13-7050, 2017 WL 1536223, at *17 (D.N.J. Apr. 27, 2017).  Even with the additional allegations about why DiSilvestro kept his job, the pleadings in the SAC appear to be the pleading version of Monday morning quarterbacking.  The SAC as drafted fails to include additional evidence to infer that the resignation of Morrison had anything to do with her supposed knowledge or reckless involvement with any fraud.

   iii. Whether Motive May Support Scienter

     Plaintiffs argue the Individual Defendants were allegedly motivated to mislead the market to maintain Campbell's credit rating, since they planned to fund the Snyder's acquisition with debt.  (ECF 61 at 7).  They argue, "With a $6.1 billion price tag for the acquisition, which Campbell intended to fund with roughly $5 billion in debt, it was critical that Campbell maintain a prime credit rating, then hovering at Moody's Aaa3." (Id.)  Defendants argue the even with these additions to the SAC, the allegations are conclusory and do not explain why they "would be motivated to issue misstatements solely about a division that contributed less than 5% of Campbell's earnings." (ECF 72-1 at 28 (citing Campbell's annual 10-K reports from 2016

and 2017)).[3]

Courts within this district have recognized that "a company's desire to maintain a high bond or credit rating does not qualify as sufficient motive for fraud . . . because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." In re Interpool, Inc. Sec. Litig., 2005 WL 2000237 at *11 (quoting Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J. 2002)). Similarly, the Third Circuit has held that "[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent." GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2014).

Maintaining a high credit rating is a normal goal of many

---

[3] As the Court noted in its first Opinion, it may properly consider documents incorporated into the Complaint by reference. Tellabs, Inc., 551 U.S. at 322 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) ("[W]e will take judicial notice of the SEC filings."). The SAC references Campbell's 10-Ks and SEC filings during the relevant period, (see, e.g., ECF 61 at 91), and so the Court properly considers those documents.

businesses and does not raise an inference of fraud absent some other compelling evidence.  In re Synchronoss Sec. Litig., 705 F. Supp. 2d at 400 ("[A] plaintiff may not rely on facts indicating that the defendant had certain goals or aspirations common to the aspirations held by law-abiding business community: such goals or practices cannot amount to a valid motive for the purposes of showing scienter.").

This Court acknowledged in its last Opinion that an alleged motive to make misleading statements directly before a company offering "to artificially inflate stock prices or better credit terms" may still be probative of scienter.  In re Toronto-Dominion Bank Securities Litigation, No. 17-1665, 2018 WL 6381882, at *19 (D.N.J. Dec. 6, 2018).  This Court still agrees that Campbell's alleged motive may support an inference of scienter, but also agrees with the court in In re Toronto-Dominion that such a motive is "not particularly helpful."  Id. In other words, in the absence of further circumstantial evidence, an inference of scienter based on the desire to maintain a credit rating is not "at least as compelling as Defendants' inference."  Id.

iv.  Whether the Core Operations Doctrine May Support Scienter

Plaintiffs again contend the core operations doctrine applies and strengthens the inference of Defendants' scienter given C-Fresh's (i) importance to Campbell leadership; (ii) its

role as Campbell's primary growth engine; (iii) Morrison's
personal efforts to secure Bolthouse shelf space; (iv)
Defendants' repeated public statements; and (v) the focus of
analysts and ratings agencies. (ECF 73 at 33-34).  Defendants
respond that the allegations concerning the core operations
doctrine are insufficient because (1) C-Fresh only represented
12% of Campbell revenues, which is less than 5% of Campbell's
earnings; and (2) there are no additional allegations of
specific information conveyed to the Individual Defendants that
related to the alleged fraud.  (ECF 72-1 at 33).  They contend
that the addition of allegations regarding the fact that
securities analysts followed C-Fresh's growth does not cure the
deficiencies in the FAC because it does not go to specific
information conveyed to management related to a fraud.  (Id.)

The "core operations doctrine" provides that a plaintiff
may be able to allege a strong inference of scienter by alleging
"that a defendant made misstatements concerning the 'core
matters' of central importance to a company." Martin v. GNC
Holdings, Inc., 757 Fed. App'x 151, 155 (3d Cir. 2018).
However, the doctrine "does not support a finding of scienter .
. . absent some additional allegation of specific information
conveyed to management and related to the fraud." Id. (internal
quotation marks omitted); see Nat'l Junior Baseball League v.
PharmaNet Dev. Grp., Inc., 720 F. Supp. 2d 517, 526 (D.N.J.

2010) (rejecting core operations doctrine in absence of "other individualized allegations"); In re Amarin Corp. PLC, No. 13-6663, 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) (refusing to infer scienter from core operations doctrine "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements"); see also Rahman, 736 F.3d at 246 (declining to apply core operations doctrine in the absence of allegations demonstrating that Defendants knew the information they disseminated was false). Just as with the FAC, for the reasons expressed above, Plaintiffs have failed to allege sufficient facts to make out a plausible claim, under standard applicable to this case, that Defendants knew their statements were false or were reckless as to the falsity of their statements.

v.   Failure to Plead a Strong Inference of Scienter

Plaintiffs urge this Court to conclude that a holistic review of the SAC's allegations leads to a plausible string of inferences — that the Individual Defendants knowingly or at least recklessly made statements while being aware of internal data that was inconsistent with such statements to order to deceive reasonable investors into purchasing stock so as to increase Campbell's overall credit rating to complete C-Fresh's acquisition of Snyder's.  The difficulty with this argument is that even with the additional allegations made by Plaintiffs,

such as those regarding the Modular Resets and analyst interest in C-Fresh, the total mix of information has not changed.  It is just more of the same.  In fact, the principal difference between the FAC and the SAC is that the SAC added the statements of more CWs without elevating the quality and specificity of their statements.  More of less is not more.  These additions do not make the inference of scienter more probable than an inference that Defendants simply had a bad business strategy. In re Hertz Glob. Holdings Inc, 905 F.3d at 121 ("More plausible is the suggestion that the Individual Defendants were just bad leaders.").

Similar to the last time the Court opined on this matter, a nonculpable explanation for Defendants' conduct is supported by Morrison's focus on the launch of new Bolthouse products and her trips around the country in 2016 and 2017 to meet with major retailers, which Plaintiffs believe is evidence of Morrison's fraudulent conduct.  These allegations actually support Defendants' position that the Individual Defendants' projections were accounting for their changes in strategy following the Bolthouse recall and had plans to improve C-Fresh's performance for FY18.  In addition, as Defendants point out, Plaintiffs' new allegations that Defendants knew by August 2017 that carrot yields were bad does not quantify the magnitude of the poor crop and misses the fact that Defendants disclosed that they had a

bad carrot crop during the class period.  (ECF 61 at 56-57); See Tellabs, Inc., 551 U.S. at 324 (requiring specific allegations on who, what, when, where, why, and how to meet the particularity pleading standard).  Just as with the addition of new CWs in the SAC, the additional imprecise allegation regarding the carrot crop does not make the inference of scienter more plausible than the innocent one.

Even though, as this Court recognized in dismissing the FAC, an inference of fraud need not be the "of the 'smoking gun' genre", Rahman, 736 F.3d at 247, the SAC still asks a factfinder, and hence the Court, to make illogical leaps in order to arrive at the conclusion that sufficient facts are alleged to satisfy the element of scienter.  As it relates to scienter, the allegations of the SAC are still a bridge too far. In re Synchronoss Sec. Litig., 705 F. Supp. 2d at 418.  Count One will, accordingly, be dismissed.[45]

---

[4] The Court will dismiss with prejudice this time because this Court already granted leave to amend once and in doing so gave Plaintiffs instructions on how to properly plead scienter. Chubb Corp., 394 F.3d 126, 164 (3d Cir. 2004) ("The District Court's decision to dismiss the Amended Complaint thus provided Plaintiffs with a detailed blueprint of how to remedy the defects in their claims.").

[5] The Court notes separately here, that its discussion has focused on the scienter of the Individual Defendants and not the company.  The Third Circuit has yet to opine on whether it adopts the doctrine of corporate scienter, which would allow a plaintiff to plead scienter against a company without pleading scienter against an individual defendant.  Rahman, 736 F.3d at

2. <u>Control Person Claim Against Individual Defendants Under §
20(a) of the Securities Exchange Act</u>

Section 20(a) of the Securities Exchange Act of 1934

creates a cause of action against individuals who exercise

control over a "controlled person," including a corporation,

that has committed a violation of Section 10(b).  15 U.S.C. §

78t(a); <u>In re Suprema Specialties, Inc. Sec. Litig.</u>, 438 F.3d

256, 284 (3d Cir. 2006).  Accordingly, liability under Section

20(a) is derivative of an underlying violation of Section 10(b)

by the controlled person. <u>Avaya, Inc.</u>, 564 F.3d at 252; <u>In re

Alpharma Inc. Sec. Litig.</u>, 372 F.3d 137, 153 (3d Cir. 2004)

("[P]laintiffs must prove not only that one person controlled

another person, but also that the 'controlled person' is liable

under the Act.") (internal quotation marks omitted).  Because

Plaintiffs have failed to state a claim for violation of § 10(b)

against Defendants, Plaintiffs' § 20(a) claims against the

Individual Defendants necessarily fail.  Count Two will be

---

246 ("We, however, neither have accepted nor rejected the
doctrine of corporate scienter in securities fraud actions, and
we do not do so now because the allegations in the SAC cannot
support the existence of corporate or collective scienter.");
<u>In re Hertz Glob. Holdings Inc</u>, 905 F.3d at 121 n.6 ("We have
neither accepted nor rejected that doctrine and decline to do so
here because the FAC's allegations would not give rise
to corporate scienter under any recognized theory of that
doctrine.").  Given the conclusory nature of scienter allegations
in the SAC as a whole, the Court does not find it appropriate to
adopt the doctrine today.

dismissed with prejudice as well.

## CONCLUSION

For the reasons stated above, the Court will grant

Defendants' Motion to Dismiss and the SAC will be dismissed with

prejudice.[6]  An appropriate Order will be entered.


Date: October 11, 2022            s/   Noel L. Hillman
At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.

---

[6]  Because the Court will dismiss the SAC for failure to plead
scienter, the Court need not reach Defendants' arguments on
standing.